# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ROBERT B. LOVE, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | FILED UNDER SEAL |
| ) | |
| MEDICAL COLLEGE OF WISCONSIN, INC., ) | Case No. |
| FROEDTERT MEMORIAL LUTHERAN ) | |
| HOSPITAL, INC., ) | JURY TRIAL DEMANDED |
| ALFRED C. NICOLOSI, M.D., ) | |
| JOSEPH E. KERSCHNER, M.D., ) | |
| MARY A. PAPP, D.O., ) | |
| DAVID C. WARLTIER, M.D., and ) | |
| LARRY LINDENBAUM, M.D., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, ROBERT B. LOVE, M.D. ("Dr. Love"), by and through his undersigned attorneys, for his Complaint against Defendants, MEDICAL COLLEGE OF WISCONSIN, INC. ("MCW"), FROEDTERT MEMORIAL LUTHERAN HOSPITAL, INC. ("FMLH"), ALFRED C. NICOLOSI, M.D. ("Dr. Nicolosi"), JOSEPH E. KERSCHNER, M.D. ("Dr. Kerschner"), MARY A. PAPP, D.O. ("Dr. Papp"), DAVID C. WARLTIER, M.D. ("Dr. Warltier"), and LARRY LINDENBAUM, M.D. ("Dr. Lindenbaum"), states as follows:

## PARTIES

1.      Plaintiff Dr. Love is a resident of Illinois. He is a cardiothoracic ("CT") and transplant surgeon, and he holds Board Certifications in Surgery, Surgical Critical Care, and Cardiothoracic Surgery.

2.      Defendant MCW is a Wisconsin non-stock corporation with its principal place of business at 8701 Watertown Plank Road, Milwaukee, Wisconsin 53226. MCW is affiliated with

**EXHIBIT A**

several hospitals, including FMLH and Clement J. Zablocki Veterans' Affairs Medical Center ("Zablocki VA"). Zablocki VA, operated by the Department of Veterans' Affairs, is an affiliate of MCW and one of MCW's major sites for medical and surgical training. MCW provides services and operates graduate medical programs at the Zablocki VA.

3.     Defendant FMLH is a Wisconsin non-stock corporation with its principal place of business at 9200 West Wisconsin Avenue, Milwaukee, Wisconsin 53226. FMLH is an adult acute care hospital that serves as a primary teaching site for MCW. FMLH is a 486-bed academic medical center staffed by MCW physician faculty.

4.     Defendant Dr. Nicolosi is a resident of Maine. He currently serves as a CT surgeon at the Maine Medical Center in Portland, Maine. At all times relevant hereto, Dr. Nicolosi practiced as a CT surgeon in the Division of Cardiothoracic Surgery at MCW.

5.     Defendant Dr. Kershner is a resident of Wisconsin. He is and was, at all times relevant hereto, Dean and Executive Vice President of MCW.

6.     Defendant Dr. Papp is a resident of Wisconsin. At all times relevant hereto, Dr. Papp practiced as a cardiologist at MCW and FMLH.

7.     Defendant Dr. Warltier is a resident of Wisconsin. He is and was, at all times relevant hereto, Professor and Chairman of Anesthesiology at MCW.

8.     Defendant Dr. Larry Lindenbaum is a resident of Wisconsin. He is and was, at all times relevant hereto, Assistant Professor of Anesthesiology at MCW.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter in controversy is between citizens of different states.

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3730(h)(2) because Dr. Love's False Claims Act Retaliation claim herein arises out of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

11.     This Court has supplemental jurisdiction over Dr. Love's remaining state law claims under 28 U.S.C. § 1367(a) because the state law claims are so related to the False Claims Act Retaliation claim that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Dr. Love's claims occurred in this judicial district.

## FACTS

### Dr. Love's Employment at MCW and FMLH

13.     On April 26, 2012, Dr. Love accepted a position at MCW and FMLH as Professor and Section Chief of Adult Cardiac Surgery and Director of the Thoracic Transplantation program.

14.     At the time he accepted a position at MCW and FMLH, Dr. Love had a reputation as a world-renowned transplant and CT surgeon.

15.     Before joining MCW and FMLH, Dr. Love practiced at Loyola University Medical Center in Maywood, Illinois ("Loyola"), where he served as Professor and Chairman of the Department of Cardiothoracic Surgery and Professor of Surgery, Microbiology, and Immunology.

16.     During Dr. Love's tenure at MCW and FMLH, he played an integral role in MCW and FMLH's effort to build the Department of Surgery programs in Adult Cardiac Surgery, Heart Transplantation, Lung Transplantation, Heart Failure, and Mechanical Circulatory Support ("MCS") into clinically relevant programs with market-leading outcomes.

17.     Dr. Love was also instrumental in building MCW and FMLH's heart and lung transplant programs. Under Dr. Love's leadership, FMLH acquired and implemented the clinical use of a full spectrum of modern MCS devices and became the first hospital in North America to successfully implant the HeartWare HVAD outside of a clinical trial.

18.     After Dr. Love introduced the HeartWare device into clinical practice in December 2012, the six-month survival for MCW patients with long-term Ventricular Assist Device ("VAD") implants improved to greater than 90 percent. MCW and FMLH also achieved market-leading outcomes for short-term VAD implant patients: rescue of the sickest MCW patients was zero percent in 2012, 39 percent in 2013, and 57 percent in the first quarter of 2014, which compares favorably to the Interagency Registry for Mechanically Assisted Circulatory Support benchmark of 25 percent.

19.     Dr. Love was instrumental in increasing the patient volume at MCW and FMLH's Transplant Center, which allowed the program to obtain approval from the Centers for Medicare & Medicaid Services ("CMS") in 2013. Through Dr. Love's efforts, MCW and FMLH added Donor After Cardiac Death Lung Transplantations, which Dr. Love pioneered in the early 1990s as a way to increase lung utilization.

20.     At MCW and FMLH, Dr. Love also established a research program and an Organ Recovery Lab, acquired funding to purchase an Ex-Vivo Lung Perfusion device to implement preclinical lung recovery on discarded lungs, and established a collaborative group of researchers who study novel methods to assess lung recovery using optical coherence tomography analysis.

21.     Dr. Love helped MCW and FMLH make crucial financial and strategic commitments toward the goal of becoming a larger volume transplant center with expanded complex cardiovascular and thoracic care.

22.     Dr. Love led the efforts build a new 20-bed Cardiovascular Intensive Care Unit ("ICU") adjacent to the operating rooms.

23.     Dr. Love also played a critical role in the design of two new CT operating rooms and the purchase and redesign of new cardiopulmonary bypass pumps and perfusion services.

24.     Dr. Love's duties at MCW and FMLH included treating patients with CT surgical complications at FMLH, teaching surgical fellows, residents, and medical students, and training physician's assistants who came to MCW with little or no prior experience.

25.     At all times during Dr. Love's employment at MCW and FMLH, Dr. Love served as a dedicated and professional physician and strived to improve the quality of MCW and FMLH's patient care.

**Dr. Love's Concerns Regarding MCW and FMLH's Grossly Substandard Patient Care**

26.     Dr. Love first became concerned on August 15, 2012, his first day as an MCW and FMLH employee, that MCW and FMLH were providing grossly substandard care.

27.     ███████████████, Claudius Mahr, D.O. ("Dr. Mahr"), the Medical Director of Cardiac Transplantation at MCW and FMLH, brought Dr. Love to the ICU to ask his opinion on the proper treatment of ███████████████, ██ ███████████████████████ Zahir A. Rashid, M.D. ("Dr. Rashid"), Assistant Professor of Cardiothoracic Surgery at MCW, and Dr. Nicolosi ███████████████████ ██ ████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

28.     Dr. Love immediately recognized that Dr. Rashid and Dr. Nicolosi ███████████

████████████████████████████ ██ ██████

29.     On the afternoon of August 15, 2012, at a meeting with several members of MCW and FMLH's senior management, which neither Dr. Rashid nor Dr. Nicolosi attended, Dr. Mahr and Dr. Love advised several MCW doctors ███████████████████████████████ ████████████████████ ██ ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████ .

30.     Dr. Rashid and Dr. Nicolosi refused to heed Dr. Mahr's and Dr. Love's advice ███ ████████████████████████████ ██ █████████████████ .

31.     ███████████████ , Dr. Rashid ██████████████████████████████████ ███ ████████████████████████████████████████████████████████████ ███████████████ ███ ███ Dr. Rashid and Dr. Nicolosi denied that Dr. Rashid ███ ████████████████████████████████████████████████████████ . Dr. Love, ████████████████████████████████████████████ ████ ██████████████ █████████████████████████████████████████████ .

32.     At NMH, Edward McGee, M.D. ("Dr. McGee") operated emergently on ███ , ████████████████████████████████████████ . Dr. McGee emailed Dr. Love ██████████████████████████████ Dr. Rashid ██████████████████ ███ ██████████████████ .

33.     In the wake of that incident, Dr. Love showed the photographs and expressed concerns to several members of MCW and FMLH's senior management regarding the grossly substandard patient care Dr. Rashid and Dr. Nicolosi had rendered.

34.     In July 2013, Dr. Love expressed concerns to Lee A. Biblo, M.D. ("Dr. Biblo"), MCW's Chief Medical Officer and Professor in the Division of Cardiology, regarding the grossly

substandard care Dr. Rashid had rendered to ▒▒ ▒▒ ▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

35. On December 24, 2013, Dr. Love sent Cathy Buck, M.S.N., R.N. ("Ms. Buck"), President of FMLH, an email in which he expressed those same concerns.

36. ▒▒▒▒▒▒▒▒▒▒▒▒, Izabela Jugovac, M.D. ("Dr. Jugovac"), an MCW and FMLH anesthesiologist, ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒. Dr. Jugovac ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒ ▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒, Dr. Jugovac ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒. On information and belief, Dr. Jugovac was unable to interpret the fluoroscopy image.

37. Dr. Jugovac summoned Wade Fischer, M.D. ("Dr. Fischer"), a cardiac transplant surgeon, to the operating room.

38. ▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ and Dr. Fischer called Dr. Love ▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒.

39. Dr. Fischer and Dr. Love ▒▒▒▒▒▒ ▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒.

40. Dr. Fischer and Dr. Love ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒ ▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒.

41. While Dr. Fischer and Dr. Love ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒, doctors in MCW and FMLH's anesthesiology department filed a confidential complaint alleging improper patient care against Dr. Fischer and Dr. Love because they ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒ ▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒.

42.     After Dr. Fischer and Dr. Love had completed the surgery, Lynn Fischer, FMLH's Vice President for Transplant, Heart, and Vascular Service Lines, informed Dr. Love of the anesthesiologists' complaint. Dr. Love inspected ███ medical record and found that the fluoroscopy image had not been saved there, in violation of MCW and FMLH protocol. Dr. Love located the fluoroscopy machine and uploaded the image to ███ medical record from the machine. ████████████ Dr. Jugovac ████████████████████████

43.     The next morning, Dr. Love and Dr. Fischer were called to a meeting with nearly every doctor in MCW and FMLH's anesthesiology department and members of MCW and FMLH's senior management, including, Ms. Fischer and Gary R. Seabrook, M.D. ("Dr. Seabrook"), Professor and Section Chief of the Division of Vascular Surgery at MCW and Senior Medical Director of Surgical Services at FMLH.

44.     At that meeting, the anesthesiologists insisted that Dr. Love and Dr. Fischer had engaged in improper patient care ████████ ████ ██████████████. Dr. Love responded by ██████████████████████████ Dr. Jugovac ██████████████████████. Based on that evidence, the anesthesiologists withdrew the complaint.

45.     After the meeting, Dr. Warltier confronted Dr. Love and accused him of disparaging Dr. Jugovac.

46.     Dr. Love later expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard patient care Dr. Jugovac had rendered. Dr. Love also expressed concern that the MCW and FMLH anesthesiologists' routine practice of filing unfounded internal complaints of improper patient care against other doctors to protect its own doctors undermined the quality of MCW and FMLH's patient care.

47.    On information and belief, MCW and FMLH's senior management did not take any meaningful action to discourage that practice.

48.    ███████████ Dr. Love performed ████████████████████ ███████████████████████████████████ ██ ███ ████████████, and Dr. Love ███████

49.    ███████████████████████, FMLH medical staff notified Dr. Love ██ ██ ██ ████████████████ ██ ████████████████████████. The proper protocol in that situation would have been to ███████ ██ ██████████████████████ ███████████████████████████ ██ █████████████████████ ███████████████████████████████████████████ ██ This was medically improper.

50.    ████ Dr. Love ██████████████████████ ████ ████████████████████. Dr. Love ██████████████ ███ When Dr. Love ██████ ███ ██████████████████ ██████████████████████████████████████████ ███████

51.    Dr. Love expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard care that MCW and FMLH had rendered in that case. Specifically, Dr. Love expressed concern that FMLH did not have a cardiac code team on duty at all times. The code team that had been on duty when ████████████████████ was been a neurology code team whose members did not know how to administer proper care to cardiac patients.

52.    In ███████ Dr. Fischer performed a ████████████████ on a ████████ ███████ ██ ██████████████████ Dr. Jugovac and Sweeta D. Gandhi, M.D.

("Dr. Gandhi"), another MCW and FMLH anesthesiologist, ██████████ ████ ██████████ ████████████████████. The catheter, which was necessary to administer medication to aid ██████████████████████████████████████ Dr. Jugovac and Dr. Gandhi ████████████████████████.

53.     As a result of catheter's becoming dislodged, ███ ████████████████████ ████████████████████████████████████████.

54.     Dr. Jugovac, in an attempt to protect herself, filed a complaint against Dr. Fischer, alleging that Dr. Fischer had provided improper patient care during the transplant operation.

55.     After that incident, Dr. Love expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard patient care Dr. Jugovac and Dr. Gandhi had rendered. Dr. Love reiterated his concern that the MCW and FMLH anesthesiologists' routine practice of filing unfounded internal complaints of improper patient care by other doctors to protect its own doctors undermined the quality of MCW and FMLH's patient care.

56.     On information and belief, MCW and FMLH's senior management again took no meaningful action to discourage that practice.

57.     On or about ██████████████████████████ ████ ██████████████████ ████████████████████ ████ ████████████████████████████████ ████████████████████████████████████████████████.

58.     While MCW and FMLH anesthesiologists and critical care physicians withdrew ██████████████████████ ████ ████████████████████████, Dr. Love waited in ██████████████████████ ████ ████, David C. Cronin, M.D. ("Dr. Cronin"), an MCW and FMLH abdominal transplant surgeon, ████████████ ████ ████████, and Philip Wai, M.D. ("Dr.

Wai"), a liver transplant surgeon from Loyola, ████████████ ████ ████████████████
████

     59.    The MCW and FMLH's anesthesiologists ordered medical staff not to remove ████
████████████████████████████████████████████████████, in violation of
written MCW and FMLH policies. ████████ ████ ████████████████████ before Dr.
Wai ████████████████████████

     60.    While Dr. Love ████████████████ ████ ████, George Hassler, M.D. ("Dr.
Hassler"), Professor and Section Chief of Adult General Thoracic Surgery at MCW and FMLH,
████████████████████████████████████. Despite Dr. Love's
████████ Dr. Hassler ████████████████████████████████████, Dr.
Hassler ████████████████████████████████████████. Dr.
Hassler ████████████████████████████████████████████
████████████████████████ ██ Dr. Hassler's actions violated the
standard protocol of waiting until organs have been procured and approved for transplantation
before commencing surgery on the recipient.

     61.    With Dr. Love's assistance, Dr. Hassler ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████

     62.    After that incident, Dr. Love expressed concerns to several members of MCW and
FMLH's senior management about the grossly substandard patient care the anesthesiologists had
rendered ████████████████████████ and the grossly substandard patient care Dr.
Hassler had rendered by subjecting his patient to needless trauma.

63. As with all of the concerns Dr. Love had expressed previously, on information and belief, MCW and FMLH's senior management took no meaningful action to address the concerns Dr. Love expressed about that incident.

64. In addition, throughout his tenure at MCW, Dr. Love repeatedly expressed concerns to members of MCW and FMLH's senior management about the MCW and FMLH's unacceptable Quality Assessment ("QA") program. Dr. Love informed them, MCW and FMLH's unacceptable QA program contributed to MCW and FMLH's grossly substandard patient care and was in violation of CMS rules and regulations, including 42 C.F.R. § 482.2, which requires health care facilities, as a condition of participation in Medicare, to track adverse patient events, analyze their causes, and implement actions and mechanisms to prevent recurrences.

65. For instance, Dr. Love requested that MCW and FMLH conduct QA reviews of the October 2012 case in which Dr. Rashid had implanted a ███████████████ ████ ███████████ █████████████████████████ ███ ███ ███ ██████ after Dr. Rashid had performed minimally ████████████████████████████████████████████████ case in which Dr. Jugovac ████████████ ███ █████████████████████████████████████████████ ██████

66. On information and belief, MCW and FMLH ignored Dr. Love's requests and never conducted QA reviews of any of those cases.

67. MCW and FMLH did, however, conduct extensive QA reviews of Dr. Love's cases.

68. On February 27, 2014, Dr. Biblo reported to Dr. Love, Douglas B. Evans, M.D. ("Dr. Evans"), Professor and Chairman of the Department of Surgery at MCW, James S. Tweddell, M.D. ("Dr. Tweddell"), Chair of the Division of Cardiothoracic Surgery at MCW, and Sue Huerta ("Ms. Huerta"), Vice President for Quality and Patient Safety at FMLH, the findings of a months-

long QA review of 20 cases of Dr. Love's in which a patient was alleged to have suffered surgical complications. As a result of that QA review, MCW and FMLH determined that Dr. Love had performed in accordance with the standard of care in every case.

**Dr. Love's Concerns Regarding MCW and FMLH's Transplant Program**

69.     During his tenure at MCW and FMLH, Dr. Love investigated MCW and FMLH had a longstanding practice of regularly declining organs offered to potential recipients who were awaiting transplants FMLH. Dr. Love examined organ procurement records, to which he had access as a medical director of the Wisconsin Donor Network, and he discussed the issue with other transplant surgeons at MCW and FMLH. Based on his investigation, Dr. Love discovered that the reason for that practice was that MCW and FMLH transplant surgeons were not available to perform transplant surgeries at all times.

70.     That practice violates the requirement of the Organ Procurement and Transplantation Network ("OPTN") that all transplant centers, including FMLH, must have surgeons available at all times to perform transplant operations. Accordingly, that practice is in violation of CMS regulation 42 C.F.R. § 482.72, which obligates all transplant centers to follow OPTN requirements as a condition of participation in Medicare.

71.     In addition, on information and belief, that practice has led to the avoidable deaths of dozens of patients awaiting organ transplants at FMLH over the past two decades.

72.     When he was employed by MCW, Dr. Love attempted to curtail that practice, but he suspected that certain transplant surgeons were continuing to improperly decline organs for patients awaiting transplants at FMLH.

73.     Dr. Love repeatedly expressed concerns to members of MCW and FMLH's senior management that MCW and FMLH's regular practice of declining organs violated OPTN

requirements and CMS regulations, led to avoidable patient deaths, and posed a substantial risk to the viability of MCW and FMLH's transplant program.

**Dr. Love's Concerns Regarding Dr. Stone**

74.     Since September 2012, Christopher D. Stone, M.D. ("Dr. Stone") has been a faculty member and employee of MCW and a practicing CT surgeon at the Kenosha Medical Center Campus ("KMC").

75.     At all times relevant hereto, MCW had a contract with KMC for MCW physicians, including Dr. Stone, to provide CT surgery there. MCW had the unilateral right to terminate Dr. Stone, Dr. Stone received his paycheck from MCW, and Dr. Stone was subject to MCW's policies and procedures governing faculty conduct.

76.     Throughout Dr. Love's tenure at MCW, he repeatedly expressed concerns that Dr. Stone, as a faculty member and employee of MCW, had provided grossly substandard patient care, performed unnecessary and non-standard operations on patients, and had engaged in fraudulent Medicare billing practices.

77.     Members of MCW and FMLH's senior management were aware of Dr. Stone's providing grossly substandard patient care, performing unnecessary and non-standard operations, and engaging in fraudulent billing practices.

78.     In fact, as early as August 30, 2012, Mark W. Lodes, M.D. ("Dr. Lodes") complained to Dr. Kerschner, Dr. Evans, Dr. Tweddell, and Dr. Love about Dr. Stone's conduct, and Dr. Lodes encouraged MCW to remove Dr. Stone from its faculty and his practice at KMC.

79.     In response, Dr. Kerschner sent Dr. Lodes, Dr. Love, and Dr. Tweddell an email, on August 31, 2012, in which he counseled against terminating Dr. Stone, stating, "[t]here is a financial risk to the enterprise given the large number of cases that Dr. Stone does – we discussed

Case 2:15-cv-00650-LA Filed 06/28/16 Page 14 of 44 Document 55

the importance of 'doing the right thing' – but we need to understand the financial implications of this." Even though Dr. Kerschner was aware of Dr. Stone's apparent fraudulent billing practices, Dr. Kerschner did not want to remove Dr. Stone because he generated significant revenue for MCW.

80. Starting in September 2012, Dr. Love repeatedly expressed concerns to members of MCW and FMLH's senior management that retaining Dr. Stone as a faculty member of MCW was unethical and tantamount to condoning his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.

81. In December 2012, Dr. Love met with Sarah Cohn ("Ms. Cohn"), MCW's general counsel, and told her that Dr. Stone's presence on the MCW faculty was a "clear and present danger" to MCW and its patients. At that meeting, Dr. Love expressed the following concerns:

- Dr. Lodes had a "black book" documenting Dr. Stone's grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices;

- Rick Schmidt, the Chief Executive Officer of United Hospital Group in Kenosha, had implored MCW to remove Dr. Stone and hire another surgeon;

- Dr. Love had reason to believe that Dr. Stone was committing Medicare billing fraud because documents related to Dr. Stone's billing reflected markedly inflated Relative Value Units ("RVUs") that were not commensurate with the treatment he was providing; and

- Dr. Stone was performing unnecessary and non-standard operations on patients (presumably for the purpose of defrauding Medicare).

82. To remedy the situation, Dr. Love attempted to recruit Nick V. Augelli, M.D. ("Dr. Augelli"), an experienced and well-respected CT surgeon, to replace Dr. Stone at KMC.

15

83. But the members of MCW and FMLH's senior management resisted Dr. Love's efforts to recruit Dr. Augelli as Dr. Stone's replacement.

84. In or around February 2013, Dr. Augelli traveled to KMC, at Dr. Evans' invitation, to interview for a CT surgeon position, only to discover that the position did not exist. Indeed, MCW had already decided that Dr. Stone would remain in his practice at KMC and on the faculty of MCW.

85. In a March 3, 2013 letter to Dr. Evans, Dr. Love, and Dr. Tweddell, Dr. Augelli expressed his disappointment that there was no position for him at KMC, his concerns about Dr. Stone's lack of professionalism, and his suspicion that Dr. Stone was defrauding Medicare by inflating his RVUs.

86. After he read Dr. Augelli's letter and learned that MCW had decided to retain Dr. Stone rather than consider hiring Dr. Augelli, Dr. Love criticized that decision to MCW and FMLH's senior management. Dr. Love continued to entreat them to terminate Dr. Stone in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices, as Dr. Augelli highlighted in his letter.

87. In March 2014, Dr. Seabrook corresponded with Dr. Evans, Dr. Tweddell, Dr. Love, Daniel J. DeBehnke, M.D. ("Dr. DeBehnke"), Chief Clinical Integration Officer at MCW and FMLH, and Jonathon D. Truwit, M.D. ("Dr. Truwit"), the Enterprise Chief Medical Officer and Senior Administrative Dean of MCW and FMLH, about multiple patients who had received grossly substandard care from Dr. Stone and about the scheme Dr. Stone had used to fraudulently bill for operations he never performed.

Case 2:15-cv-00650-LA Filed 06/24/16 Page 16 of 44 Document 255

88.     For example, on March 13, 2014, Dr. Seabrook wrote an email to those physicians about an incident in which Dr. Stone had performed an unnecessary and non-standard operation on a patient but described a different procedure in his post-operative report.

89.     In response to that email, Dr. Tweddell stated, "I think this is more than a quality issue. The procedure described in detail in the operative report is not the procedure that was performed."

90.     Dr. Seabrook then sent an email to Dr. Tweddell in which he stated that MCW was "accustomed to this practice of Dr. Stone performing unnamed operations."

91.     In that email, Dr. Seabrook described in detail Dr. Stone's fraudulent billing practices: "Many of [Dr. Stone's] procedures are performed in increments. Staging the revascularization avoids the multiple procedure reduction modifier so if procedures are performed on different days, you can charge more for the same work. Of course, the patient must endure several operations."

92.     In March 2014, Dr. Seabrook also corresponded with Dr. Evans, Dr. Tweddell, Dr. Love, Dr. DeBehnke, and Dr. Truwit about another patient who had received grossly substandard care from Dr. Stone. Dr. Seabrook noted that Dr. Stone had performed an ████████████ ████████████ on the patient, which was a "completely unconventional and unindicted surgical operation" ███████████████████████████.

93.     In March through May of 2014, Dr. Love continued to urge the members of MCW and FMLH's senior management to terminate Dr. Stone in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.

94.     Yet MCW and FMLH's senior management did not terminate Dr. Stone.

95.     On information and belief, Dr. Stone is still a member of MCW's faculty.

**Dr. Love's Concerns Regarding Dr. Almassi**

96.     Dr. Love also expressed concerns to members of MCW and FMLH's senior management about Hossein G. Almassi, M.D. ("Dr. Almassi"), the Section Chief of Cardiac Surgery at the Zablocki VA and a faculty member and employee of MCW.

97.     Before Dr. Love even arrived at MCW and FMLH, Dr. Evans and Dr. Tweddell told him that Dr. Almassi would be relieved of his clinical duties because he had provided grossly substandard patient care.

98.     Dr. Evans had authority to relieve Dr. Almassi of his clinical duties.

99.     Throughout his tenure at MCW, Dr. Love witnessed first-hand the grossly substandard care that Dr. Almassi provided to veterans at the Zablocki VA.

100.    For example, in the summer of 2013, Dr. Almassi performed a ████████████ ████████████████████████████████████████. During the operation, Dr. Almassi ████████████████████████████████████████████████████████████ ████████████████████████████.

101.    ████████████████████████████████████, Dr. Almassi called Dr. Love to request that MCW physicians ████████████████████████████████████████ ██████████.

102.    Dr. Love declined Dr. Almassi's request ████████████████████ ████████████████████████, where such a procedure had never been performed.

103.    Instead, the patient was ████████████████████████████ ██████, and Dr. Love and Dr. Rashid ████████████████████████



████████████████████████████████████████████ Dr.

Almassi had performed.

104.    On March 13, 2014, Dr. Love sent an email to Dr. Evans and Dr. Tweddell in which he expressed his concerns about MCW's failure to take any meaningful steps toward removing Dr. Almassi from the MCW faculty and the Zablocki VA medical staff.

105.    Between March 2014 and April 2014, Dr. Love and other MCW physicians, including Dr. Evans, Dr. Tweddell, Dr. Biblo, and Dr. Rashid, met on multiple occasions to discuss all of Dr. Love's concerns and to develop a plan to transition Dr. Almassi out of the Zablocki VA.

106.    At a meeting that Dr. Evans convened and conducted on March 13, 2014, Dr. Love and Dr. Evans both stated that MCW needed to take action to relieve Dr. Almassi of his clinical duties as soon as possible because he was providing grossly substandard patient care to veterans.

107.    In April 2014, Dr. Evans informed Dr. Love that he had assigned Dr. Rashid take over control of the Zablocki VA cardiac program from Dr. Almassi.

108.    On information and belief, Dr. Evans knew at the time that Dr. Rashid had a close personal relationship with Dr. Almassi, that Dr. Rashid did not have full authority to remove Dr. Almassi, and that Dr. Rashid had no intention of removing Dr. Almassi from his position at the Zablocki VA.

109.    Indeed, Dr. Rashid took no action to prevent Dr. Almassi from continuing to provide grossly substandard patient care to veterans at the Zablocki VA.

110.    When he learned that Dr. Rashid had taken no action against Dr. Almassi, Dr. Love complained to Dr. Evans and urged him to pursue an effective means of removing Dr. Almassi.

111.    Nevertheless, neither Dr. Evans nor any other member of MCW and FMLH's senior management took any meaningful action to remove Dr. Almassi.

112.    On information and belief, Dr. Almassi is still practicing at the Zablocki VA.

**MCW and FMLH's Retaliation Against Dr. Love**

113.    On the afternoon of May 8, 2014, Dr. Evans met with Dr. Love and informed him that he had decided to terminate Dr. Fischer. Dr. Love informed Dr. Evans that he believed terminating Dr. Fischer would undermine MCW and FMLH's ability to provide adequate care to heart transplant patients and would expose the approximately 20 patients awaiting transplants at FMLH to unreasonable risk. Dr. Love also explained to Dr. Evans that if he were to terminate Dr. Fischer, MCW and FMLH could no longer represent itself as a transplant center in accordance with OPTN requirements and CMS regulations.

114.    Dr. Love told Dr. Evans he did not want to retain his title as Section Chief of Adult Cardiac Surgery if Dr. Evans were to terminate Dr. Fischer. But Dr. Love did not suggest that he would surrender any of his privileges or responsibilities.

115.    At the conclusion of meeting, Dr. Evans announced that he and Dr. Tweddell would schedule a meeting with Dr. Love the following week. Dr. Evans also instructed Dr. Love to take a leave of absence until after that meeting. Dr. Evans did not suggest that MCW or FMLH would revoke any of Dr. Love's privileges or responsibilities.

116.    On the evening of May 8, 2014, Ms. Buck sent an email to numerous MCW and FMLH employees (the "Buck Email"), stating, "Drs. Wade Fischer and Robert Love are currently on a leave of absence and will no longer perform cardiac surgery here."

117.    On information and belief, Ms. Buck sent the Buck Email at the behest of Dr. Evans.

118.     The Buck Email humiliated Dr. Love because many of his colleagues who received or learned of it interpreted the Buck Email to mean that MCW and FMLH had revoked his privileges.

119.     On May 16, 2014, Dr. Love received an email from Dr. Tweddell in which Dr. Tweddell indicated that he and Dr. Evans would meet with Dr. Love in the following week and that Dr. Love could resume performing surgeries after that meeting.

120.     On May 18, 2014, Dr. Love received an email from Dr. Evans, who was attending a conference in New Orleans. In that email, Dr. Evans gave no indication that MCW or FMLH planned any disciplinary action against Dr. Love.

121.     In response to Dr. Evans' email, Dr. Love wrote, "I agree that it is important that there be a meeting soon. However, as I indicated in my email to you last week, I would like the meeting to be attended by a decision-maker, the ombudsman if he wishes to attend, and my lawyer. I look forward to hearing from you with dates and times that would work for you, and with names of who will be attending from the medical school and/or the hospital."

122.     Based the myriad unethical practices he had witnessed during his employment at MCW and FMLH and the lack of detail Dr. Evans and Dr. Tweddell had provided about the upcoming meeting, Dr. Love believed that it would be in his best interest for his attorney, James Gardner, to be present.

123.     In a May 19, 2014 email, Ms. Cohn insisted it was "not appropriate" for Mr. Gardner to attend Dr. Love's meeting with Dr. Evans and Dr. Tweddell.

124.     On May 20, 2014, Dr. Love and Mr. Gardner met with Dr. Evans, Dr. Tweddell, and Ms. Cohn. During that meeting, Dr. Evans informed Dr. Love that there was no longer a

Case 2:15-cv-00650-LA Filed 06/24/15 Page 21 of 44 Document 1

clinical role for him at MCW and FMLH. Dr. Evans also told Dr. Love that it would be in his best interest not to threaten to bring any legal action against MCW and FMLH.

125.    Mr. Gardner and Ms. Cohn met separately on May 20, 2014. On information and belief, during that meeting, Ms. Cohn told Mr. Gardner that Dr. Love's had only two options: to resign from MCW or to undergo a formal tenure revocation hearing after being on unpaid leave for several months. On information and belief, Ms. Cohn told Mr. Gardner that she would ensure that tenure revocation hearing would result in Dr. Love's termination for cause.

126.    On May 26, 2014, Dr. Tweddell informed Dr. Love that he would not be allowed to attend any future CT surgery faculty meetings.

127.    As of May 27, 2014, MCW eliminated Dr. Love's name was eliminated from its call schedule.

128.    On June 19, 2014, Dr. Evans wrote a letter to Dr. Love informing him that his salary would be reduced by approximately 25 percent, effective July 1, 2014.

**Dr. Love's Separation Agreement**

129.    On August 26, 2014, Dr. Love entered into a Separation Agreement with MCW (the "Separation Agreement"). The Separation Agreement is attached hereto as Exhibit A.

130.    The Separation Agreement provided that MCW would pay Dr. Love a reduced salary through April 1, 2015, which MCW did.

131.    Section 7 of the Separation Agreement provides that Dr. Love released all of his claims against MCW and its employees and agents "relating to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement…."

132.    Dr. Love did not, in Section 7 of the Separation Agreement or elsewhere, release any of his claims that arose after August 26, 2014, the effective date of the Separation Agreement.

133.    Section 7 of the Separation Agreement also provides that "Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards … any obligations that MCW owed to Dr. Love under … this Agreement…."

134.    Furthermore, Dr. Love did not, in Section 7 of the Separation Agreement or elsewhere, release MCW or its employees and agents from any of his claims based upon their intentional or reckless conduct.

135.    Section 12(a) of the Separation Agreement provides, in relevant part, as follows:

Dr. Love, on the one hand, and MCW's officers, on the other hand, agree not to make disparaging remarks about each other. If, after the date of this Agreement, MCW's officers are contacted by third parties regarding Dr. Love, they will provide an explanation (and limit any discussion) as to the circumstances surrounding Dr. Love's employment and termination consistent with that contained in the reference letter, attached as Exhibit B. MCW will make its officers aware of this provision of this Agreement for purposes of assuring their compliance therewith.

136.    Dr. Love has not released any claims based on obligations MCW owed him under the Separation Agreement, including its obligations under Section 12(a).

**The Zablocki VA's September 5, 2014 Revocation of Dr. Love's Privileges**

137.    On September 5, 2014, Michael D. Erdmann, M.D. ("Dr. Erdmann"), Associate Dean and Professor at MCW and Chief of Staff at the Zablocki VA, notified Dr. Love that his privileges at the Zablocki VA had been revoked.

138.    On information and belief, the Zablocki VA did not conducted a hearing or any formal proceedings before terminating Dr. Love's privileges.

139.    On information and belief, Dr. Erdmann revoked Dr. Love's privileges at the behest of Dr. Rashid and with the knowledge and approval of Dr. Evans.

140.    Dr. Love was not provided any advance notice of the Zablocki VA's revocation of his privileges, and he was not provided any opportunity to defend himself against that action.

141. The Zablocki VA's revocation of Dr. Love's privileges has caused him humiliation and damaged his professional reputation, as it is a matter of public record that Dr. Love had to address at each of his subsequent interviews for surgical positions.

**Dr. Nicolosi's September 26, 2013 Letter**

142. On September 26, 2013, Dr. Nicolosi sent Dr. Kerschner a letter containing numerous statements that reflect negatively on Dr. Love's professional competence (the "Nicolosi Letter").

143. In the Nicolosi Letter, Dr. Nicolosi levelled the following accusations against Dr. Love:

- Dr. Love attempted to ███████████████████████████████████ ███████████████████████

- Dr. Love had such poor patient outcomes at MCW and FMLH that he had to turn to Dr. Nicolosi for assistance.

- After Dr. Love requested Dr. Nicolosi's assistance, Dr. Nicolosi helped Dr. Love with his next VAD implantation. Dr. Nicolosi performed "flawlessly" during this procedure, and without his assistance, Dr. Love's mismanagement of the patient would have resulted in the patient's death.

- Dr. Love was so lacking in surgical judgment that he willfully perpetrated billing fraud by providing "unnecessary, inappropriate treatments" to patients whom Dr. Mahr had referred to him.

- Dr. Love had ████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████

- Dr. Love ████████████████████████████ ██████████ and did not do so only because Dr. Tweddell intervened.

- Dr. Love fabricated reports of surgical outcomes to his superiors to cover up his own incompetence.

144. All of these accusations in the Nicolosi Letter are false. At the February 27, 2014 QA review meeting, Dr. Biblo reported that he and other members of MCW's senior management had thoroughly analyzed the Nicolosi Letter and determined, unanimously, that all of its allegations against Dr. Love were false.

145. On information and belief, in the fall of 2013, after Dr. Kerschner received the Nicolosi Letter, he disseminated it widely among MCW and FMLH physicians, including, but not limited to, Dr. Tweddell, Dr. Evans, and Dr. Papp. When Dr. Kerschner disseminated the Nicolosi Letter, he knew or recklessly disregarded that the allegations therein were false.

146. In October 2013, Dr. Tweddell informed Dr. Love of the Nicolosi Letter. Dr. Tweddell told Dr. Love that the Nicolosi Letter contained serious but unfounded allegations against him and that the allegations were so serious that Ms. Cohn had decided to conduct a thorough investigation.

147. Dr. Tweddell did not give Dr. Love a copy of the Nicolosi Letter, saying Dr. Love would find it deeply upsetting.

148. On information and belief, on or around February 6, 2014, Dr. Papp, knowing or recklessly disregarding that the allegations in the Nicolosi Letter were false, rushed into FMLH's cardiac imaging unit, waving the letter around frantically. Dr. Papp showed the Nicolosi Letter to all of the MCW and FMLH employees who were present, and she threatened to report the false allegations against Dr. Love to CMS.

149. Dana Bode, a nurse who witnessed that episode, informed several members of MCW and FMLH's senior management. But none of them took any action to prevent Dr. Papp from continuing to disseminate the Nicolosi Letter.

150. In late 2013 and early 2014, Dr. Love repeatedly complained to Dr. Kerschner, Dr. Evans, and Dr. Biblo about the damage that the Nicolosi Letter was causing to his reputation, including, but not limited to, the damage caused by Dr. Papp's actions on February 6, 2104. Yet Dr. Kerschner, Dr. Evans, and Dr. Biblo failed to take any action to prevent the dissemination of the Nicolosi Letter or to refute any of its false allegations against Dr. Love.

151. Moreover, on information and belief, MCW and FMLH employees have published the allegations in the Nicolosi Letter, or the Nicolosi Letter itself, to third parties outside of MCW and FMLH, including, but not limited to, after August 26, 2014

152. Indeed, several of Dr. Love's colleagues in the CT surgery field who practice outside of MCW and FMLH have informed Dr. Love that they learned of the allegations in the Nicolosi Letter after August 26, 2014.

**Dr. Warltier's Email to St. Mary's Hospital**

153. After Dr. Love's separation from MCW and FMLH, he attempted to move forward with his career and find a new position as a CT transplant surgeon.

154. Starting in July 2014, Dr. Love engaged in extensive communications with St. Mary's Hospital ("St. Mary's") in Madison, Wisconsin regarding the possibility of his joining its Department of Surgery.

155. Dr. Love was enthusiastic about the possibility of joining St. Mary's Department of Surgery because doing so would allow him to be near his ailing wife and his daughter with

Case 2:15-cv-00650-LA Filed 06/24/16 Page 26 of 44 Document 255

special needs, who live in the family home near Madison. In addition, Dr. Love has longstanding personal and professional relationships with several St. Mary's physicians.

156.    On October 20, 2014, Dr. Love interviewed at St. Mary's and met with a search committee that included two cardiac surgeons with whom Dr. Love had longstanding professional relationships, Vijay K. Kantameni, M.D. ("Dr. Kantameni"), a cardiothoracic surgeon, and Douglas L. Cowgill, M.D. ("Dr. Cowgill"), a cardiothoracic and vascular surgeon.

157.    In or around late October 2014, shortly after Dr. Love interviewed at St. Mary's, Dr. Warltier, acting in his capacity as the Chairman of Anesthesiology at MCW, sent an email to Andrew R. Schroeder, M.D. ("Dr. Schroeder"), a St. Mary's anesthesiologist (the "Warltier Email"). The Warltier Email includes false statements reflecting negatively on Dr. Love's professional competence and character

158.    Dr. Warltier sent the Warltier Email to Dr. Schroeder knowing or recklessly disregarding that the statements therein are false and knowing that Dr. Love had a prospective employment contract with St. Mary's.

159.    The Warltier Email includes the following false statements:

- Dr. Love's surgical incompetence caused numerous patient deaths at MCW and FMLH and ultimately destroyed MCW and FMLH's cardiothoracic transplant program;

- Dr. Love lacks professional integrity;

- Dr. Love refused to cooperate with other MCW and FMLH physicians;

- Dr. Love was personally responsible for the wrongful termination of certain MCW and FMLH physicians;

- Dr. Evans was "appalled" by Dr. Love's surgical incompetence;

27

- When he practiced at Loyola, Dr. Love was such an incompetent surgeon and had such a contentious relationship with other physicians and administrators, that Loyola threw a party to celebrate his departure;

- Dr. Love had been terminated for cause from MCW and FMLH; and

- MCW and FMLH had revoked all of Dr. Love's privileges.

160.   Dr. Schroeder forwarded the Warltier Email to a member of St. Mary's search committee, who stood up and read it aloud at a meeting of the committee.

161.   As a direct result of the false statements in the Warltier Email, St. Mary's decided not to hire Dr. Love. Indeed, Dr. Kantameni informed Dr. Love that the Warltier Email was "very damaging, shocking and knocked [Dr. Love] out of the job."

162.   The Warltier Email, which, on information and belief, has been disseminated to physicians outside of St. Mary's, has so damaged Dr. Love's reputation that it has lowered him in the estimation of the medical community and caused him tremendous humiliation.

**Dr. Lindenbaum's Statements to the University of Kentucky College of Medicine**

163.   In late 2014, the University of Kentucky College of Medicine ("UKCM") recruited Dr. Love for the position of Director of the University of Kentucky Transplant Center and Chief of Thoracic Transplantation, a position for which Dr. Love was highly qualified.

164.   Although accepting the position at UKCM would require Dr. Love to live apart from his family, he was excited by the position's prestige.

165.   In December 2014, Dr. Love visited UKCM twice to interview for that position

166.   During his first visit, on December 1, 2014, Dr. Love met with Theodore S. Wright, M.D. ("Dr. Wright"), Professor of Cardiac Surgery, Joseph B. Zwischenberger, M.D. ("Dr.

28

Zwischenberger"), Chair of the Department of Surgery, and Sibu P. Saha, M.D. ("Dr. Saha"), Professor of Cardiothoracic Surgery.

167.    After Dr. Love's first visit, Dr. Saha called Dr. Love and informed him that UKCM's CT surgery faculty had agreed unanimously to extend him an offer.

168.    On or about December 18, 2014, Dr. Love returned to UKCM and had dinner with Dr. Zwischenberger and Dr. Saha, who confirmed the offer and discussed its terms with Dr. Love. By the end of the dinner, Dr. Love had agreed in principle with Dr. Zwischenberger and Dr. Saha that he would accept the position at UKCM under a five-year contract.

169.    On or about December 19, 2014, Dr. Love met with Michael Karpf, M.D. ("Dr. Karpf"), UKCM's Executive Vice President for Health Affairs. Dr. Karpf and Dr. Love agreed in principle to the terms of Dr. Love's employment, and Dr. Karpf asked Dr. Love to recruit Maher A. Baz, M.D. ("Dr. Baz"), a Critical Care Specialist at Indiana University Health, to join UKCM as a pulmonologist. Accordingly, Dr. Love recruited Dr. Baz, and Dr. Baz, enthusiastic about having the opportunity to practice with Dr. Love, joined UKCM.

170.    In early January 2015, Dr. Lindenbaum interviewed for a critical care position at UKCM and made false statements that reflected negatively on Dr. Love's professional competence (the "Lindenbaum Statements") to UKCM physicians, including Dr. Edwin A. Bowe, M.D. ("Dr. Bowe"), Chairman of the Department of Anesthesiology, and Dr. Kevin W. Hatton, M.D. ("Dr. Hatton"), a critical care specialist.

171.    The Lindenbaum Statements included the following: (1) Dr. Love is an incompetent surgeon who had terrible patient outcomes at MCW and FMLH; (2) MCW and FMLH had terminated Dr. Love with cause for that reason; and (3) Dr. Love had destroyed MCW and FMLH's transplant program through his incompetence.

172. Dr. Lindenbaum made the Lindenbaum Statements knowing or recklessly disregarding their falsity and knowing that Dr. Love had a prospective employment contract with UKCM.

173. On information and belief, Dr. Bowe and Dr. Hatton spoke to other physicians in MCW and FMLH's anesthesiology department, who also made false statements about Dr. Love that reflected negatively on his professional competence.

174. Dr. Bowe and Dr. Hatton communicated the Lindenbaum Statements to members of UKCM's management, including, but not limited to, Dr. Zwischenberger, Dr. Karpf, and Dr. Wright.

175. Approximately one week later, Dr. Saha informed Dr. Love by text message that UKCM had decided to withdraw its offer.

176. UKCM withdrew its employment offer to Dr. Love as a direct result of the Lindenbaum Statements.

**Dr. Love's Position with the Cadence Physician Group**

177. After Dr. Love learned of Dr. Warltier's interference with his prospective position at St. Mary's and Dr. Lindenbaum's interference with his prospective position at UKCM, he realized he would have to broaden his job search and accept the first CT surgery position available, even if doing so would diminish his professional status and force him to live apart from his family.

178. Accordingly, in January 2015, Dr. Love contacted Margo Shoup, M.D. ("Dr. Shoup"), a surgical oncologist at Cadence Physician Group ("Cadence"), a community hospital-based physician group located in the western suburbs of Chicago, to inquire whether there was an open CT surgical position at Cadence.

Case 2:15-cv-00650-LA Filed 06/24/16 Page 30 of 44 Document 25

179.    Approximately two weeks later, Dr. Shoup, who had worked with closely with Dr. Love at Loyola, invited him to interview at Cadence.

180.    After Dr. Love's initial interview, Dr. Shoup informed him that MCW and FMLH representatives had made statements to Cadence that reflected negatively on Dr. Love's professional competence and character.

181.    Dr. Shoup told Dr. Love that, because she holds him in high esteem, she had advocated for him by assuring members of Cadence's senior management that the MCW and FMLH representatives' statements must be false. Dr. Shoup told Dr. Love that, as a result of her advocacy, Cadence's senior management had agreed to give Dr. Love a chance to refute those statements in a second interview.

182.    Accordingly, when Dr. Love interviewed at Cadence for the second time, he met with several members of Cadence's senior management and explained that the MCW and FMLH representatives' statements were false.

183.    In light of those discussions, Cadence's senior management concluded that the MCW and FMLH representatives' statements were false, and they offered Dr. Love a position as a thoracic surgeon.

184.    Dr. Love gratefully accepted Cadence's offer, believing that MCW and FMLH's smear campaign had left him no other choice.

185.    Dr. Love began practicing at Cadence on April 1, 2015, and he continues to practice there.

186.    Dr. Love's accepting the position at Cadence has diminished his professional status, as compared to his former status at MCW and FMLH and the status he would have enjoyed in

other positions for which he is qualified, including the position for which he received an offer from UKCM.

187.    Dr. Love's accepting the position at Cadence has diminished his professional status for the following reasons:

- The Cadence position is as a member of a community hospital-based physician group rather than as a member of the faculty of an academic hospital;

- The Cadence position is as a staff physician rather than as a department chief;

- In the Cadence position, Dr. Love will perform only thoracic surgery, so he has had to permanently relinquish his practices in cardiac surgery and CT transplant surgery, the field in which he built an international reputation; and

- Dr. Love's salary at Cadence is significantly lower than the salary he earned at MCW, the salary he would have earned at UKCM, or the salary he would have earned as a CT transplant surgeon at another academic hospital.

188.    In addition to diminishing his professional status, Dr. Love's accepting the Cadence position has forced him to live apart from his ailing wife and his daughter with special needs, who live near Madison and are unable to relocate to the western suburbs of Chicago.

## COUNT I
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
## AGAINST MCW AND FMLH

189.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 188 of this Complaint.

190.    Section 3730(h)(1) of the False Claims Act ("FCA") provides as follows:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful

32

acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

191. Dr. Love engaged in lawful acts in furtherance of an action under the FCA or other efforts to stop violations of the FCA when he investigated and expressed concerns to MCW and FMLH regarding the following actual or potential FCA violations:

- MCW and FMLH's providing patient care that may have been so grossly substandard as to constitute worthless services;

- MCW and FMLH's actual or potential violations of CMS regulation 42 C.F.R. § 482.72, which obligates all transplant centers to follow OPTN requirements as a condition of Medicare payment and participation;

- MCW and FMLH's actual or potential violations of CMS regulation 42 C.F.R. § 482.21, which requires health care facilities, as a condition of Medicare payment and participation, to track adverse patient events, analyze their causes, and implement actions and mechanisms to prevent recurrences;

- MCW and FMLH's actual or potential violations of 42 U.S.C. §1320c-5(a), which requires health care facilities, as a condition of Medicare payment and participation, to provide services only when medically necessary and of a quality that meets professionally recognized standards of health care;

- Dr. Stone's patient care that may have been so grossly substandard as to constitute worthless or substantially diminished services;

- Dr. Stone's performing operations that may have been unnecessary and non-standard;

33

- Dr. Stone's billing practices that may have been fraudulent; and

- Dr. Almassi's providing patient care that may have been so grossly substandard as to constitute worthless services.

192. MCW and FMLH knew Dr. Love was engaging in lawful acts in furtherance of an action under the FCA or other efforts to stop violations of the FCA when he investigated and expressed concerns to MCW and FMLH regarding those actual or potential FCA violations.

193. Because Dr. Love was engaging in lawful acts in furtherance of an action under the FCA or other efforts to stop violations of the FCA, MCW and FMLH discriminated against Dr. Love in the terms and conditions of his employment, in violation of Section 3730(h)(1) of the FCA.

194. Specifically, MCW and FMLH discriminated against Dr. Love in the terms and conditions of his employment in the following manner: (1) placing Dr. Love on a leave of absence on May 8, 2014; (2) sending the Buck Email to numerous MCW and FMLH's employees on May 8, 2014; (3) informing Dr. Love, on May 20, 2014, that there was no longer a clinical role for him at MCW and FMLH; (4) threatening to terminate Dr. Love for cause on May 20, 2014; (5) excluding Dr. Love from faculty meetings as of May 26, 2014; (6) eliminating Dr. Love's name from MCW's call schedule as of May 27, 2014; (7) reducing Dr. Love's salary by approximately 25 percent as of July 1, 2014; and (8) revoking Dr. Love's privileges at the Zablocki VA on September 5, 2014.

195. As a direct and proximate result of MCW and FMLH's violations of Section 3730(h)(1) of the FCA, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and

employment benefits, humiliation, emotional distress, and mental pain and anguish, in an amount to be proven at trial.

**COUNT II**
**DEFAMATION**
**AGAINST MCW, FMLH, DR. NICOLOSI, DR. KERSCHNER, AND DR. PAPP**

196.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 195 of this Complaint.

197.     The Nicolosi Letter contains numerous written statements that are false and that were false when Dr. Nicolosi wrote them.

198.     Dr. Nicolosi communicated the false statements in the Nicolosi Letter to Dr. Kerschner.

199.     Dr. Kerschner communicated the false statements in the Nicolosi Letter to several MCW and FMLH employees, including, but not limited to, Dr. Papp.

200.     Dr. Papp communicated the false statements in the Nicolosi Letter to several MCW and FMLH employees, including, but not limited to, MCW and FMLH employees who were present in FMLH's cardiac imaging unit on February 6, 2014.

201.     On information and belief, Dr. Nicolosi, Dr. Kerschner, or Dr. Papp has communicated the false statements in the Nicolosi Letter to third parties outside of MCW and FMLH.

202.     Dr. Nicolosi, Dr. Kerschner, and Dr. Papp communicated the false statements in the Nicolosi Letter knowing they were false or recklessly disregarding their falsity.

203.     The false statements in the Nicolosi Letter have damaged Dr. Love's reputation so as to lower him in the estimation of the medical community and have deterred potential employers from hiring him.

Case 2:15-cv-00650-LA   Filed 06/24/15   Page 35 of 44   Document 55

204.    As a direct and proximate result of Dr. Nicolosi's, Dr. Kerschner's, and Dr. Papp's communicating the false statements in the Nicolosi Letter, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish, in an amount to be proven at trial.

205.    In addition, because Dr. Nicolosi, Dr. Kerschner, and Dr. Papp communicated the false statements in the Nicolosi Letter either maliciously or with a wanton, willful, or reckless disregard of Dr. Love's rights, Dr. Love is entitled to punitive damages.

206.    When Dr. Nicolosi, Dr. Kerschner, and Dr. Papp communicated the false statements in the Nicolosi Letter, they were acting within the scope of their employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for their actions.

## COUNT III
## DEFAMATION AGAINST MCW, FMLH, AND DR. WARLTIER

207.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 206 of this Complaint.

208.    The Warltier Email contains numerous written statements that are false and that were false when Dr. Warltier wrote them.

209.    Dr. Warltier communicated the Warltier Email to Dr. Schroeder, who forwarded it to a member of St. Mary's search committee, who stood up and read it aloud at a meeting of the committee.

210.    Dr. Warltier communicated the false statements in the Warltier Email knowing they were false or recklessly disregarding their falsity.

Case 2:15-cv-00650-LA   Filed 06/24/16   Page 36 of 44   Document 255

211.    The false statements in the Warltier Email have damaged Dr. Love's reputation so as to lower him in the estimation of the medical community and have deterred potential employers, including St. Mary's, from hiring him.

212.    As a direct and proximate result of Dr. Warltier's communicating the false statements in the Warltier Email, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish, in an amount to be proven at trial.

213.    In addition, because Dr. Warltier communicated the false statements in the Warltier Email either maliciously or with a wanton, willful, or reckless disregard of Dr. Love's rights, Dr. Love is entitled to punitive damages.

214.    When Dr. Warltier communicated the false statements in the Warltier Email, he were was acting within the scope of their employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Warltier's actions.

## COUNT IV
## DEFAMATION
## AGAINST MCW, FMLH, AND DR. LINDENBAUM

215.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 214 of this Complaint.

216.    The Lindenbaum Statements are false and were false when Dr. Lindenbaum wrote them.

217.    Dr. Lindenbaum communicated the Lindenbaum Statements to Dr. Bowe and Dr. Hatton, who communicated them to members of UKCM's management, including, but not limited to, Dr. Zwischenberger, Dr. Karpf, and Dr. Wright.

218. Dr. Lindenbaum communicated the Lindenbaum Statements knowing they were false or recklessly disregarding their falsity.

219. Lindenbaum Statements have damaged Dr. Love's reputation so as to lower him in the estimation of the medical community and have deterred potential employers, including UKCM, from hiring him.

220. As a direct and proximate result of Dr. Lindenbaum's communicating the Lindenbaum Statements, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish, in an amount to be proven at trial.

221. In addition, because Dr. Lindenbaum communicated the Lindenbaum Statements either maliciously or with a wanton, willful, or reckless disregard of Dr. Love's rights, Dr. Love is entitled to punitive damages.

222. When Dr. Lindenbaum communicated the Lindenbaum Statements, he were was acting within the scope of their employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Lindenbaum's actions.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST MCW, FMLH, AND DR. WARLTIER

223. Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 222 of this Complaint.

224. In or around October 2014, Dr. Love had a prospective contractual employment relationship with St. Mary's.

225.     By sending the Warltier Email to Dr. Schroeder in or around October 2014, Dr. Warltier interfered with Dr. Love's prospective contractual employment relationship with St. Mary's.

226.     Dr. Warltier's primary purpose in sending the Warltier Email to Dr. Shroeder was to interfere with Dr. Love's prospective contractual employment relationship with St. Mary's or, alternatively, Dr. Warltier knew or should have known that such interference was substantially certain to occur as a result of his sending the Warltier Email to Dr. Shroeder.

227.     As a result of Dr. Warltier's sending the Warltier Email to Dr. Shroeder, St. Mary's terminated its prospective contractual employment relationship with Dr. Love.

228.     As a result of St. Mary's terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish, in an amount to be proven at trial.

229.     Dr. Warltier was were neither justified nor privileged in sending the Warltier Email to Dr. Schroeder.

230.     In addition, because Dr. Warltier sent the Warltier Email to Dr. Schroeder either maliciously or with a wanton, willful, or reckless disregard of Dr. Love's rights, Dr. Love is entitled to punitive damages.

231.     When Dr. Warltier sent the Warltier Email to Dr. Schroeder, he was acting within the scope of his employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Warltier's actions.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS
## AGAINST MCW, FMLH, AND DR. LINDENBAUM

232.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 232 of this Complaint.

233.     In late December 2014, Dr. Love had a prospective contractual employment relationship with UKCM.

234.     By communicating the Lindenbaum Statements to Dr. Bowe and Dr. Hatton, Dr. Lindenbaum interfered with Dr. Love's prospective contractual employment relationship with UKCM.

235.     Dr. Lindenbaum's primary purpose in communicating the Lindenbaum Statements to Dr. Bowe and Dr. Hatton was to interfere with Dr. Love's prospective contractual employment relationship with UKCM or, alternatively, Dr. Lindenbaum knew or should have known that such interference was substantially certain to occur as a result of his communicating the Lindenbaum Statements to Dr. Bowe and Dr. Hatton.

236.     As a result of Dr. Lindenbaum's communicating the Lindenbaum Statements to Dr. Bowe and Dr. Hatton, UKCM terminated its prospective contractual employment relationship with Dr. Love.

237.     As a result of UKCM's terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish, in an amount to be proven at trial.

238.    Dr. Lindenbaum was were neither justified nor privileged in communicating the Lindenbaum Statements to Dr. Bowe and Dr. Hatton.

239.    In addition, because Dr. Lindenbaum communicatied the Lindenbaum Statements to Dr. Bowe and Dr. Hatton either maliciously or with a wanton, willful, or reckless disregard of Dr. Love's rights, Dr. Love is entitled to punitive damages.

240.    When Dr. Lindenbaum communicated the Lindenbaum Statements to Dr. Bowe and Dr. Hatton, he was acting within the scope of his employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Lindenbaum's actions.

## COUNT VII
## BREACH OF CONTRACT
## AGAINST MCW

241.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 241 of this Complaint.

242.    Dr. Love entered into the Separation Agreement with MCW on August 26, 2014.

243.    The Separation Agreement is a valid and enforceable contract.

244.    Section 12 of the Separation Agreement provides, in part, as follows:

Dr. Love, on the one hand, and MCW's officers, on the other hand, agree not to make disparaging remarks about each other. If, after the date of this Agreement, MCW's officers are contacted by third parties regarding Dr. Love, they will provide an explanation (and limit any discussion) as to the circumstances surrounding Dr. Love's employment and termination consistent with that contained in the reference letter, attached as Exhibit B. MCW will make its officers aware of this provision of this Agreement for purposes of assuring their compliance therewith.

245.    Dr. Warltier is an officer of MCW.

246.    In the Warltier Email, Dr. Warltier made disparaging remarks about Dr. Love.

247.    Because Dr. Warltier sent the Warltier Email to Dr. Schroeder, MCW breached Section 12 of the Separation Agreement.

248. As a result of MCW's breaching Section 12 of the Separation Agreement, St. Mary's terminated its prospective contractual employment relationship with Dr. Love.

249. As a result of St. Mary's terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, and lost future earnings and employment benefits.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST ALL DEFENDANTS

250. Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 249 of this Complaint.

251. As described above, Defendants engaged in a protracted campaign to ruin Dr. Love's career and well-earned reputation.

252. Defendants' conduct was intentioned to cause Dr. Love emotional distress.

253. Defendants' conduct was extreme and outrageous.

254. Dr. Love suffered an extreme disabling emotional response to the defendant's conduct.

255. Defendants' conduct was a cause-in-fact of Dr. Love's emotional distress.

256. As a result of Defendants' conduct, Dr. Love suffered damages and continues to suffer damages, in an amount to be determined at trial.

257. In addition, because Defendants engaged in a protracted campaign to ruin Dr. Love's career and well-earned reputation maliciously or with a wanton, willful, or reckless disregard of Dr. Love's rights, Dr. Love is entitled to punitive damages.

Case 2:15-cv-00605-DA Filed 06/24/15 Page 42 of 44 Document 255

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robert B. Love, M.D. respectfully requests that this Court enter judgment in his favor and against Defendants and grant him the following relief:

A.    On Count I, an award of compensatory damages, under 31 U.S.C. § 3730(h)(2), equal to double back pay, interest on that back pay, and the value of Dr. Love's reinstatement against MCW and FMLH;

B.    On Count II, an award of compensatory and punitive damages against MCW, FMLH, Dr. Nicolosi, Dr. Kerschner, and Dr. Papp;

C.    On Count III, an award of compensatory and punitive damages against Dr. MCW, FMLH, and Dr. Warltier;

D.    On Count IV, an award of compensatory and punitive damages against MCW, FMLH, and Dr. Lindenbaum;

E.    On Count V, an award of compensatory and punitive damages against MCW, FMLH, and Dr. Warltier;

F.    On Count VI, an award of compensatory and punitive damages against MCW, FMLH, and Dr. Lindenbaum;

G.    On Count VII, an award of compensatory damages against MCW;

H.    On Count VIII, an award of compensatory and punitive damages against all Defendants;

I.    An award of Dr. Love's attorneys' fees and costs incurred in this action;

J.    Pre-judgment and post-judgment interest; and

K.    Such other and further relief as this Court may deem just and proper.

Dated:      May 28, 2015                Respectfully submitted,

RUBERRY, STALMACK & GARVEY, LLC

/s/ Alexander W. Ross
**Attorney for Plaintiff**

Edward F. Ruberry
Alexander R. Hess
Alexander W. Ross
RUBERRY, STALMACK & GARVEY, LLC
500 West Madison, Suite 2300
Chicago, Illinois 60661
Phone: (312) 466-8050
Fax: (312) 488-8055
ed.ruberry@rsg-law.com
alex.hess@rsg-law.com
alex.ross@rsg-law.com

# EXHIBIT A

# SEPARATION AGREEMENT

This Separation Agreement is made by and between Robert Love, M.D. ("Dr. Love") and The Medical College of Wisconsin, Inc. ("MCW"), a Wisconsin non-profit corporation (collectively, the "Parties").

## BACKGROUND

Dr. Love's administrative appointment as Chief of Division of Cardiothoracic Surgery, Department of Surgery has ended. Dr. Love remains employed by MCW as a Professor of Surgery, with tenure. Dr. Love has decided to terminate his employment relationship with MCW, and the Parties have agreed to resolve all of the matters between them based upon a mutual understanding without further expenditure of time, effort or money.

NOW, THEREFORE, for good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree as follows:

1. **Resignation**. Dr. Love will resign as Professor of Surgery on April 1, 2015 (the "Resignation Date"). Dr. Love agrees that the execution of this Agreement shall effect his resignation from MCW effective April 1, 2015 if he has not resigned effective on an earlier date, in which case he will notify MCW promptly of the prior resignation date. Should Dr. Love accept employment outside MCW prior to April 1, 2015, he shall resign from MCW prior to commencing that other employment, which earlier date shall be deemed the "Resignation Date" hereunder. Between the Effective Date of this Agreement and the Resignation Date, Dr. Love will remain on a leave. Dr. Love shall not perform any duties during the leave, except with respect to his research, as set forth in Section 6. Dr. Love will have access to an administrative assistant in the Department of Surgery for up to 10 hours per week of administrative time and will be given an MCW mailing address for use until the Resignation Date.

2. **Vacate Office; Email Account; Equipment**. Dr. Love represents that he will remove his personal property from MCW and return to MCW all of its property, whether owned or leased by it, by the Resignation Date of this Agreement. Access to Dr. Love's MCW email account will cease upon the Resignation Date.

3. **Compensation.** Dr. Love will be paid his current monthly base salary of $51,250.00 commencing July 1, 2014 through April 1, 2015 (that paycheck will be issued in early April). All monthly payments will continue to be subject to the legally required withholdings and customary benefit costs. While Dr. Love remains on the MCW payroll, he shall have access to his usual employee benefits and 403(b) participation, and any benefits provided by or through the Department of Surgery, on such terms as are provided to tenured faculty of that Department. Should Dr. Love resign prior to April 1, 2015, MCW's obligations under this Section shall cease, except that an amount equivalent to the base salary continuation not yet paid to Dr. Love under this Section shall be added to the Severance Payment described in Section 4 below.

4. **Severance Payment**. MCW will pay Dr. Love a single, lump sum severance payment of $350,000, increased by any amounts owing to Dr. Love pursuant to the last sentence of Section 3, above (the "Severance Payment"). The amount of the Severance Payment is not reduced, and the timing of the payment of the Severance Payment does not change, if the Resignation Date occurs prior to April 1, 2015. The Severance Payment shall be subject to all legally required withholdings, including but not limited to deductions for federal and state taxes. In order to qualify for the Severance Payment, Dr. Love must execute, after the Resignation Date, a second release in the form attached hereto as Exhibit A, and the rescission period must expire without revocation by Dr. Love, provided that such rescission period ends prior to April 30, 2015. MCW will promptly deliver the payment to Dr. Love by directly depositing this amount in the bank account in which the payments under Section 1 hereof are being deposited within fourteen (14) days after the expiration of the rescission period, but in all events no later than June 1, 2015.

1

5. **COBRA.** Commencing on the first day of the first calendar month after the Resignation Date, MCW shall offer Dr. Love and his dependents, if applicable, a continuation of health and dental benefits coverage as required under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Continuation of health and/or dental coverage shall be subject to timely payment of premiums by or on behalf of Dr. Love and his dependents, if applicable, to the third party administrators that administer MCW's health and dental benefit plans. It is Dr. Love's responsibility to pay these premiums if benefit coverage is to continue. Dr. Love shall retain all other rights under COBRA.

6. **Research Laboratory.** MCW will continue to fund Dr. Love's research laboratory (the "Laboratory") at its current staffing and supply level through September 30, 2014. MCW will store any frozen research specimens/samples at its expense until the Resignation Date. At any time before that date, Dr. Love may arrange to have the frozen specimens/samples transferred/shipped to another institution at his expense (or paid by the receiving institution). If Dr. Love is not successful in transferring the samples as of the Resignation Date, then the samples will be destroyed or otherwise disposed of by MCW at its expense. Any and all research supplies and equipment purchased during Dr. Love's employment with MCW will remain the property of MCW and the Department of Surgery.

7. **Release of Claims.** In exchange for the benefits and payment to him described in this Agreement, Dr. Love hereby irrevocably and unconditionally releases, waives, and fully and forever discharges MCW and its past and current agents, servants, officers, trustees, insurers, attorneys and employees and their respective successors and assigns (the "Released Parties") from and against any and all claims, liabilities, obligations, covenants, rights, demands, attorney fees and/or costs and damages of any nature whatsoever, whether known or unknown, anticipated or unanticipated, relating to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement, including without limitation, any and all claims relating to or arising out of his employment by MCW, the termination thereof (which the parties acknowledge has been agreed to by both prior to execution of this agreement) and arising under the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), the Wisconsin Family Medical Leave Act or the Federal Family Medical Leave Act of 1993 (the "Claims"). Notwithstanding anything contained herein to the contrary, Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards, (i) any obligations that MCW owes to Dr. Love under (A) this Agreement, and (B) the welfare benefit plans and qualified retirement plans of MCW, and (ii) any and all indemnification rights that Dr. Love may have by contract, under the By-Laws of MCW and pursuant to any insurance that MCW carries.

8. **Compliance with Older Workers Benefit Protection Act.** Dr. Love and MCW acknowledge that it is their mutual intent that Dr. Love's release and discharge of the Released Parties from liability under the ADEA (the "Release") contained in Section 7 of this Agreement fully comply with the Older Workers Benefit Protection Act. Accordingly, this Agreement requires, and Dr. Love agrees, that:

        (a)      The Release of his rights or claims under the ADEA is his knowing and voluntary act;

        (b)      This Release shall apply only to rights and claims arising prior to the Effective Date of this Agreement, and the Release shall not apply to rights or claims that arise after the Effective Date of this Agreement;

        (c)      He is releasing rights or claims under the ADEA in exchange for consideration consisting of continued monthly salary payments at his current salary through April 1, 2015 (minus legally required deductions and benefit costs), and but for this Agreement, Dr. Love acknowledges that he would not otherwise be entitled to the payment described in Section 3;

        (d)      He has been advised in writing by MCW to consult with an attorney prior to executing this Agreement and has done so;

(e)     He has been given a period of at least 21 days within which to consider this Agreement;

(f)     He has the right to revoke this Agreement for a period of seven (7) days after his execution of this Agreement, and none of the terms and provisions of this Agreement shall become effective or enforceable until the revocation period has expired. In computing the seven-day period, the day the Agreement is executed by Dr. Love shall not be included, and the last day of the seven-day period shall be included. If the last day of the period falls on a Saturday, Sunday, or holiday, the last day of the revocation period shall be the next business day following the Saturday, Sunday, or holiday.

(g)     He has read and fully understands the terms of this Agreement.

(h)     Should Dr. Love elect to revoke this Agreement, the compensation set forth in Sections 3 and 4 shall cease, and Dr. Love shall be paid in an amount to be determined, or shall resign without condition.

9.     **Effective Date**. The effective date of this Agreement (the "Effective Date") shall be the day following the revocation period referred to in Section 8 of this Agreement, unless this Agreement is revoked by Dr. Love during that period by written notice.

10.    **Non-Admission**. Neither the negotiations concerning this Agreement, nor the actual provision of consideration set forth in this document, nor the drafting or execution of this document by either party shall be construed as an acknowledgment or admission by either party of any liability to the other party, other than under this Agreement, or to any other individual or entity of any wrongdoing under federal, state or local law.

11.    **Confidentiality**. Dr. Love and MCW agree that the terms of this Agreement and the discussions leading to its execution are confidential, and he will not disclose any information concerning its terms to anyone at any time, except to his significant other, immediate family, legal counsel, accountants or tax advisors, unless compelled to do so under subpoena or other judicial process.

12.    **Non-Disparagement.**

(a)     Dr. Love, on the one hand, and MCW's officers, on the other hand, agree not to make disparaging remarks about each other. If, after the date of this Agreement, MCW's officers are contacted by third parties regarding Dr. Love, they will provide an explanation (and limit any discussion) as to the circumstances surrounding Dr. Love's employment and termination consistent with that contained in the reference letter, attached as Exhibit B. MCW will make its officers aware of this provision of this Agreement for purposes of assuring their compliance therewith.

(b)     MCW and Dr. Love have agreed to the terms of a reference letter, attached as Exhibit B. Five (5) originals of that document shall be provided to Dr. Love on the Effective Date. MCW shall provide additional originals of the reference letter in accordance with Dr. Love's request or in response to the request of a prospective employer.

13.    **Entire Agreement.** This Agreement contains, and the terms constitute, the entire agreement of the parties concerning all matters affecting Dr. Love's employment with MCW and supersede all prior agreements, understandings and practices concerning such matters, including without limitation, any prior employment agreements Dr. Love may have had with MCW, the provisions of any MCW personnel documents, handbooks or policies and any prior customs or practices of MCW with respect to bonuses, severance pay, vacation pay, sick pay, fringe benefits or otherwise. Notwithstanding the foregoing, the terms of all welfare benefit and retirement plans of MCW shall continue to apply to Dr. Love and his family in accordance with their terms.

14.    **Notices.** Any notice required under this Agreement shall be in writing and be deemed given when received by email, by in-person delivery or overnight delivery as follows:

3

Case 2:15-cv-00650-LA Filed 06/28/16 Page 48 of 100 Document 25-1

To MCW:  Sarah Cohn, Office of the General Counsel, Medical College of Wisconsin.

To   Dr.   Love:   James   Gardner,   Lawton   &   Cates,   SC,

15.     **Governing Law; Binding Effect.**  This Agreement shall be governed by the laws of the State of Wisconsin, without regard to principles of conflicts of laws.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, assigns, heirs and personal representatives.

16.     **Severability.**  If any provision of this Agreement shall be contrary to the laws of Wisconsin or any other applicable law, at the present time or in the future, such provision shall be deemed null and void, but such shall not affect the enforceability of the remaining provisions of this Agreement.

        IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the date last below written.

Date: _Aug. 26, 2014_           By: _____
                                    Robert Love, M.D.


        The Medical College of Wisconsin, Inc.


Date: _____   By: _____
                                    John R. Raymond, Sr., MD
                                    President and CEO

4

## AGREEMENT

This Agreement is made by and between Robert Love, M.D. ("Dr. Love") and The Medical College of Wisconsin, Inc. ("MCW"), a Wisconsin non-profit corporation (collectively, the "Parties").

## BACKGROUND

Dr. Love and MCW have entered into a Separation Agreement effective _____, 2014 (the "Separation Agreement") under the terms of which, they have agreed to terminate their employment relationship and resolve all of the matters between them based upon a mutual understanding without further expenditure of time, effort or money. Because Dr. Love's employment with MCW did not end until _____, a further release is a condition precedent to Dr. Love's receipt of certain severance benefits described in the Separation Agreement.

NOW, THEREFORE, for good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree as follows:

1.     The Separation Agreement is incorporated by reference into this Agreement.

2.     **Release of Claims.**

In exchange for the benefits and payment to him described in this Agreement, Dr. Love hereby irrevocably and unconditionally releases, waives, and fully and forever discharges MCW and its past and current agents, servants, officers, trustees, insurers, attorneys and employees and their respective successors and assigns (the "Released Parties") from and against any and all claims, liabilities, obligations, covenants, rights, demands, attorney fees and/or costs and damages of any nature whatsoever, whether known or unknown, anticipated or unanticipated, relating to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement, including without limitation, any and all claims relating to or arising out of his employment by MCW or the termination thereof and arising under the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), the Wisconsin Family Medical Leave Act or the Federal Family Medical Leave Act of 1993. Notwithstanding anything contained herein to the contrary, Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards, (i) any obligations that MCW owes to Dr. Love under (A) the Separation Agreement, and (B) the welfare benefit plans and qualified retirement plans of MCW, and (ii) any and all indemnification rights that Dr. Love may have by contract, under the By-Laws of MCW and pursuant to any insurance that MCW carries.

3.     **Compliance with Older Workers Benefit Protection Act.** Dr. Love and MCW acknowledge that it is their mutual intent that Dr. Love's release and discharge of the Released Parties from liability under the ADEA (the "Release") contained in Section 2 of this Agreement

fully comply with the Older Workers Benefit Protection Act. Accordingly, this Agreement requires, and Dr. Love agrees, that:

        (a)    The Release of his rights or claims under the ADEA is his knowing and voluntary act;

        (b)    This Release shall apply only to rights and claims arising prior to the Effective Date of this Agreement, and the Release shall not apply to rights or claims that arise after the Effective Date of this Agreement;

        (c)    He is releasing rights or claims under the ADEA in exchange for consideration consisting of a severance payment as described in Section 4 of the Separation Agreement (minus legally required deductions), and but for this Agreement, Dr. Love acknowledges that he would not otherwise be entitled to the payment described therein;

        (d)    He has been advised in writing by MCW to consult with an attorney prior to executing this Agreement;

        (e)    He has been given a period of at least 21 days within which to consider this Agreement;

        (f)    He has the right to revoke this Agreement for a period of seven (7) days after his execution of this Agreement, and none of the terms and provisions of this Agreement shall become effective or enforceable until the revocation period has expired. In computing the seven-day period, the day the Agreement is executed by Dr. Love shall not be included, and the last day of the seven-day period shall be included. If the last day of the period falls on a Saturday, Sunday, or holiday, the last day of the revocation period shall be the next business day following the Saturday, Sunday, or holiday.

        (g)    He has read and fully understands the terms of this Agreement.

    4.    **Effective Date.** The effective date of this Agreement (the "Effective Date") shall be the day following the revocation period referred to in Subsection 3(f) of this Agreement, unless the Agreement is revoked in writing by Dr. Love during that period. Any revocation shall be delivered to Vice President and General Counsel, Office of the General Counsel, Medical College of Wisconsin, 8201 Watertown Plank Road, Milwaukee, WI 53226.

    5.    **Non-Admission.** Neither the negotiations concerning this Agreement, nor the actual provision of consideration set forth in this document, nor the drafting or execution of this document by either party shall be construed as an acknowledgment or admission by either party of any liability to the other party, other than under this Agreement, or to any other individual or entity of any wrongdoing under federal, state or local law.

    6.    **Entire Agreement.** This Agreement, and the Separation Agreement, contain, and their terms constitute, the entire agreement of the Parties concerning all matters affecting Dr. Love's employment with MCW and supersede all prior agreements, understandings and practices

concerning such matters, including without limitation, any prior employment agreements Dr. Love may have had with MCW, the provisions of any MCW personnel documents, handbooks or policies and any prior customs or practices of MCW with respect to bonuses, severance pay, fringe benefits or otherwise. Notwithstanding the foregoing, the terms of all welfare benefit and retirement plans of MCW shall continue to apply to Dr. Love and his family in accordance with their terms.

7. **Governing Law; Binding Effect.** This Agreement shall be governed by the laws of the State of Wisconsin, without regard to principles of conflicts of laws. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, assigns, heirs and personal representatives.

8. **Severability.** If any provision of this Agreement shall be contrary to the laws of Wisconsin or any other applicable law, at the present time or in the future, such provision shall be deemed null and void, but such shall not affect the enforceability of the remaining provisions of this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the date last below written.

Date: _Aug. 26, 2014_   _____
Robert Love, M.D.


The Medical College of Wisconsin, Inc.


Date: _____   By: _____
John R. Raymond, Sr., MD
President and CEO


065128-0010\8548956.1

Insert final date

To Whom It May Concern:

We are writing this letter in support of Dr. Robert Love in our capacity as Chief of the Division of Cardiothoracic Surgery and Chair of the Department of Surgery at the Medical College of Wisconsin (MCW). We have had the pleasure of working with Dr. Love since his recruitment to MCW in 2012 following a national search for new leadership in Adult Cardiac Surgery and Thoracic Transplantation. Historically, these programs had not enjoyed the attention and investment of resources necessary to compete with other area hospitals. In 2009 and 2010, MCW and Froedtert Hospital committed to restructuring the adult practice in cardiovascular disease including cardiology and CT surgery in an effort to enhance program development. Dr. Love joined MCW in the fall of 2012 as section head of adult cardiac surgery.

When Dr. Love joined us, his clinical practice and focus was first directed towards establishing a modern, state of the art heart failure, MCS, and transplant program. Among the first issues addressed by Dr. Love included creating a dedicated heart team in the OR; something not previously established at this hospital. After much work and leadership by Dr. Love, this came to fruition in September of 2013, only one year after his arrival. Dr. Love led the efforts to relocate and redesign the plans for a new CVICU from a ten-bed unit into a twenty-bed state of the art unit immediately adjacent to the OR. Dr. Love restructured the clinical leadership of the CVICU with Dr. Love serving as the Surgical Director because of his Board Certification in Critical Care; this new unit will open in July. Additionally, Dr. Love played a key role in the design of two new cardiothoracic operating rooms and the purchase, outfitting, and redesign of new CPB pumps and perfusion services.

Dr. Love's practice was largely focused on MCS, heart failure, and transplantation. The six-month survival for patients with long-term VAD implants has been greater than 90% since December of 2012 when Dr. Love introduced the HeartWare device into the clinical practice. The short-term device results for the rescue of the sickest patients, or salvage category, were 0% in 2012 (2 patients), 39% in 2013 (20 patients), and 57% in Q1 of 2014 (15 patients), which compares favorably to the INTERMACS benchmark of 25%.

As a direct result of Dr. Love's leadership, Froedtert Hospital has acquired and implemented the clinical use of a full spectrum of modern MCS devices. This includes the first implantation in North America of the HeartWare HVAD outside of a clinical trial. Dr. Love played a critical role in the growth of the Adult Heart Failure/Transplant/MCS program. Dr. Love's presence and experience has also been instrumental in bringing the Lung Transplant Program volume up to the point of achieving CMS approval in 2013. During his time here, Dr. Love has been the Service Line Director for Thoracic Transplantation within the comprehensive Transplant Center. Under Dr. Love, our program now has added DCD Lung Transplantations (which Dr. Love pioneered in the early 90's as a way to increase lung utilization). Dr. Love has also established a research program and an Organ Recovery Lab, acquired funding to purchase an EVLP rig to do preclinical lung recovery on discarded lungs, and established a collaborative

group of researchers studying novel methods to assess lung recovery during EVLP using optical coherence tomography (OCT) analysis.

Despite many obstacles, surgical volume and revenue have grown since Dr. Love joined us. As one might expect, not all stake holders were aligned with Dr. Love's vision and he encountered resistance to the new direction that he proposed for this hospital. In addition, competitive realities within the Milwaukee medical community created challenges we did not anticipate when Dr. Love was recruited. In the end, the senior leadership of this medical campus, after much discussion, in which Dr. Love took a leading role, has decided that the best approach given these realities is to grow a cardiology and cardiac surgery clinical program with a model of multiple points of access rather than a single flagship program. Ultimately, the organization and Dr. Love feel that the direction he has outlined as his vision for program growth is no longer aligned with its direction. Dr. Love agrees that it is best for him to seek another opportunity better matched to his leadership and personal goals for his own practice in Cardiothoracic Surgery. Much has been accomplished, but ultimately the enterprise has decided to go in a different direction.

In his time here, Dr. Love has demonstrated an excellent work ethic and a commitment to program development. His accomplishments, as outlined above, have been many and have bettered our facilities. We wish Dr. Love well in future endeavors and support him fully.

Sincerely,

Dr. James S. Tweddell
The S. Bert Litwin Chair,
Cardiothoracic Surgery,
Children's Hospital of Wisconsin,
Professor of Surgery and Pediatrics,
Chair, Division Cardiothoracic Surgery,
Medical College of Wisconsin.
jtweddell@chw.org
Office - 414.266.2638
Cell – 414.573.1146

Dr. Douglas B. Evans
Professor in Surgery and Chair
Medical College of Wisconsin
devans@mcw.edu
Office – 414.805.5706