UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ROBERT B. LOVE, M.D.,

        Plaintiff,

v.

MEDICAL COLLEGE OF WISCONSIN, INC.,
FROEDTERT MEMORIAL LUTHERAN
HOSPITAL, INC., ALFRED C. NICOLOSI,
M.D., PAUL S. PAGEL, M.D., DAVID C.
WARLTIER, M.D., and LARRY
LINDENBAUM, M.D.,

        Defendants.

Case No.: 15-CV-650

---

**DEFENDANT PAUL S. PAGEL'S ANSWER AND AFFIRMATIVE DEFENSES
TO THE FIRST AMENDED COMPLAINT**

---

NOW COMES Defendant Paul S. Pagel, M.D., ("Defendant"), by his attorneys, Michael Best & Friedrich LLP, and for his Answer and Affirmative Defenses to the First Amended Complaint of Plaintiff Robert B. Love, M.D. ("Plaintiff"), hereby admits, denies, and alleges as follows:

## ANSWER

## PARTIES

1. *Plaintiff Dr. Love is a resident of Illinois. He is a surgeon, and he holds Board Certifications in Surgery, Surgical Critical Care, and Cardiothoracic Surgery.*

1. Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's current residence and therefore denies all allegations regarding the same and demands strict proof thereof. Defendant lacks knowledge or information sufficient to form a belief as to plaintiff's current board certification and therefore denies all allegations regarding the same

16814701v1 0973773

and demands strict proof thereof. Defendant denies the remaining allegations in Paragraph 1 of the First Amended Complaint.

2. *Defendant MCW is a Wisconsin non-stock corporation with its principal place of business at 8701 Watertown Plank Road, Milwaukee, Wisconsin 53226. MCW is affiliated with several hospitals, including FMLH and Clement J. Zablocki Veterans' Affairs Medical Center ("Zablocki VA"). Zablocki VA, operated by the Department of Veterans' Affairs, is an affiliate of MCW and one of MCW's major sites for medical and surgical training. MCW provides services and operates graduate medical programs at the Zablocki VA.*

2. Defendant admits that MCW is a non-stock corporation with its principal place of business at 8701 Watertown Plank Road, Milwaukee, Wisconsin 53226. Defendant admits that MCW is affiliated with FMLH and the Clement J. Zablocki Veterans' Affairs Medical Center (the "Zablocki VA"). Defendant admits that the Zablocki VA is operated by the Department of Veterans' Affairs and is an affiliate of MCW and is one of MCW's major sites for medical and surgical training. Defendant admits that MCW provides services and operates graduate medical programs that the Zablocki VA. Defendant denies the remaining allegations contained in Paragraph 2 of First Amended Complaint.

3. *Defendant FMLH is a Wisconsin non-stock corporation with its principal place of business at 9200 West Wisconsin Avenue, Milwaukee, Wisconsin 53226. FMLH is an adult acute care hospital that serves as a primary teaching site for MCW. FMLH is a 486-bed academic medical center staffed by MCW physician faculty.*

3. Defendant admits that FMLH has an adult acute care hospital located at 9200 West Wisconsin Avenue, Milwaukee Wisconsin 53226. Defendant admits that FMLH is a primary teaching site for MCW and is staffed, in part, by physician faculty members at MCW. Defendant lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 3 of the Complaint and therefore denies the same and demands strict proof thereof.

4. *Defendant Dr. Nicolosi is a resident of Wisconsin. He currently practices as a CT surgeon at Dean Health Systems, Inc. and St. Mary's Hospital in Madison, Wisconsin (collectively,*

2

*"St. Mary's Hospital").  Dr. Nicolosi formerly practiced as a CT surgeon in the Division of Cardiothoracic Surgery at MCW.*

4.    Defendant admits the allegations in Paragraph 4 of the First Amended Complaint.

*5.    Defendant Dr. Kershner is a resident of Wisconsin.  He is and was, at all times relevant hereto, Dean and Executive Vice President of MCW.*

5.    Defendant admits the allegations in Paragraph 5 of the First Amended Complaint.

*6.    Defendant Dr. Pagel is a resident of Wisconsin.  He is and was, at all times relevant hereto, Director of Cardiac Anesthesia at MCW.*

6.    Defendant admits the allegations in Paragraph 6 of the First Amended Complaint.

*7.    Defendant Dr. Warltier is a resident of Wisconsin.  He is and was, at all times relevant hereto, Professor and Chairman of Anesthesiology at MCW.*

7.    Defendant admits the allegations in Paragraph 7 of the First Amended Complaint.

*8.    Defendant Dr. Lindenbaum is a resident of Wisconsin.  He is and was; at all times relevant hereto, Assistant Professor of Anesthesiology at MCW.*

8.    Defendant admits the allegations in Paragraph 8 of the First Amended Complaint.

## JURISDICTION AND VENUE

*9.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(l) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter in controversy is between citizens of different states.*

9.    Paragraph 9 of the First Amended Complaint states a legal conclusion to which no response

is required.    To the extent a response is required, Defendant denies the allegations in

Paragraph 9 of the First Amended Complaint as to those claims asserted against Defendant.

*10.    This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3730(h)(2) because Dr. Love's False Claims Act Retaliation claim herein arises out of the False Claims Act,  31 U.S.C. § 3729 et seq.*

3

10. Paragraph 10 of the First Amended Complaint states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 10 of the First Amended Complaint as to those claims asserted against Defendant.

11. *This Court has supplemental jurisdiction over Dr. Love's remaining state law claims under 28 U.S.C. § 1367(a) because the state law claims are so related to the False Claims Act Retaliation claim that they form part of the same case or controversy under Article III of the United States Constitution.*

11. Paragraph 11 of the First Amended Complaint states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 11 of the First Amended Complaint as to those claims asserted against Defendant.

12. *Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Dr. Love's claims occurred in this judicial district.*

12. Paragraph 12 of the First Amended Complaint states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 12 of the First Amended Complaint as to those claims asserted against Defendant.

## FACTS

### Dr. Love's Employment at MCW and FMLH

13. *On April 26, 2012, Dr. Love accepted a position at MCW and FMLH as Professor and Section Chief of Adult Cardiac Surgery and Director of the Thoracic Transplantation program.*

13. Defendant admits that Dr. Love joined the faculty at MCW in 2012 and held the noted positions. Defendant lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 13, and therefore denies the same and demands strict proof thereof.

14. *At the time he accepted a position at MCW and FMLH, Dr. Love was a world-renowned transplant and CT surgeon.*

14. Defendant denies the allegations in Paragraph 14 of the First Amended Complaint.

4

15. *Before joining MCW and FMLH, Dr. Love practiced at Loyola University Medical Center in Maywood, Illinois ("Loyola Hospital"), where he served as Professor and Chairman of the Department of Cardiothoracic Surgery and Professor of Surgery, Microbiology, and Immunology.*

15. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 15 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

16. *During Dr. Love's tenure at MCW and FMLH, he played an integral role in MCW and FMLH's effort to build the Department of Surgery programs in Adult Cardiac Surgery, Heart Transplantation, Lung Transplantation, Heart Failure, and Mechanical Circulatory Support ("MCS") into clinically relevant programs with market-leading outcomes.*

16. Defendant denies the allegations in Paragraph 16 of the First Amended Complaint.

17. *Dr. Love was also instrumental in building MCW and FMLH's heart and lung transplant programs. Under Dr. Love's leadership, FMLH acquired and implemented the clinical use of a full spectrum of modern MCS devices and became the first hospital in North America to successfully implant the HeartWare HVAD outside of a clinical trial.*

17. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 17 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

18. *After Dr. Love introduced the HeartWare device into clinical practice in December 2012, the six-month survival rate for MCW patients with long-term Ventricular Assist Device ("VAD") implants improved to greater than 90 percent. MCW and FMLH also achieved market-leading outcomes for short-term VAD implant patients: the rescue rate of the sickest MCW patients was zero percent in 2012, 39 percent in 2013, and 57 percent in the first quarter of 2014, a trend that compares favorably to the Interagency Registry for Mechanically Assisted Circulatory Support benchmark of 25 percent.*

18. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 18 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

19. *Dr. Love was instrumental in increasing the patient volume at MCW and FMLH's Transplant Center. This allowed the program to obtain approval from the Centers for Medicare & Medicaid Services ("CMS") in 2013. Through Dr. Love's efforts, MCW and FMLH added to*

5

*its offered services Donor After Cardiac Death Lung Transplantations, which Dr. Love pioneered in the early 1990s as a way to increase donor lung utilization.*

19. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 19 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

20. *At MCW and FMLH, Dr. Love also established a research program and an Organ Recovery Lab, acquired funding to purchase an Ex-Vivo Lung Perfusion device to implement preclinical lung recovery on discarded lungs, and assembled a collaborative group of researchers who study novel methods to assess lung recovery using optical coherence tomography analysis.*

20. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 20 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

21. *Dr. Love helped MCW and FMLH make crucial financial and strategic commitments toward the goal of becoming a larger volume transplant center with expanded complex cardiovascular and thoracic care.*

21. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 21 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

22. *Dr. Love led the effort to build at FMLH a new 20-bed Cardiovascular Intensive Care Unit ("ICU") adjacent to the operating rooms.*

22. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 22 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

23. *Dr. Love also played a critical role in the design of two new CT operating rooms at FMLH and in the purchase and redesign of new cardiopulmonary bypass pumps and perfusion services.*

6

23. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 23 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

24. *Dr. Love's duties at MCW and FMLH included treating patients with CT surgical complications at FMLH, teaching surgical fellows, residents, and medical students, and training physicians' assistants who came to MCW with little or no prior clinical experience.*

24. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 24 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

25. *At all times during Dr. Love's employment at MCW and FMLH, Dr. Love served as a dedicated and professional physician and strived to improve the quality of MCW and FMLH's patient care.*

25. Defendant denies the allegations in Paragraph 25 of the First Amended Complaint.

## **"Dr. Love's Concerns Regarding MCW and FMLH's Grossly Substandard Patient Care"**

Defendant denies that he needs to respond to Paragraphs 26 through 139, which set forth allegations concerning his False Claims Act retaliation claim against MCW. To the extent responses are required, they are as stated below.

26. *Dr. Love first became concerned on August 15, 2012, his first day as an MCW and FMLH employee, that MCW and FMLH were providing grossly substandard care.*

26. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 26 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

27. *On August 15, 2012, Claudius Mahr, D.O. ("Dr. Mahr"), the Medical Director of Cardiac Transplantation at MCW and FMLH, brought Dr. Love to the ICU to ask his opinion on the proper treatment of Patient #1, who was suffering complications after Zahir A. Rashid, M.D. ("Dr. Rashid"), Assistant Professor of Cardiothoracic Surgery at MCW, and Dr. Nicolosi had implanted a VAD in his heart. Patient#1's chest cavity was open, he was under general anesthesia, and an Automatic Implantable Cardioverter Defibrillator ("AICD") was delivering periodic shocks to his heart to counteract the ventricular tachycardia that the improper placement of his VAD induced.*

7

27. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 27 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

28. *Dr. Love immediately recognized that Dr. Rashid and Dr. Nicolosi had implanted the VAD improperly such that it had caused irreversible damage to Patient #1's heart.*

28. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 28 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

29. *On the afternoon of August 15, 2012, at a meeting with several members of MCW and FMLH's senior management, which neither Dr. Rashid nor Dr. Nicolosi attended, Dr. Mahr and Dr. Love advised several MCW doctors that the medically proper course of action would be to administer palliative care to Patient #1, because nothing could be done to salvage his heart and continuing to prolong his life by using the AICD to deliver shocks to his heart would be tantamount to torture.*

29. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 29 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

30. *Dr. Rashid and Dr. Nicolosi refused to heed Dr. Mahr's and Dr. Love's advice to that effect and instead ordered the continuation of AICD treatment until Patient #1 died several days later.*

30. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 30 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

31. *In October 2012, Dr. Rashid implanted a VAD improperly in Patient #2. Although it was urgent that the VAD be replaced before it caused irreversible damage to Patient #2's heart, Dr. Rashid and Dr. Nicolosi denied that Dr. Rashid had implanted the VAD improperly and refused to perform surgery to replace it. Although he was out of the state at the time, Dr. Love intervened and arranged for Patient #2 to be transferred to Northwestern Memorial Hospital ("NMH") in Chicago to receive proper treatment.*

8

31. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 31 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

32. *At NMH, Edward McGee, M.D. ("Dr. McGee") operated emergently on Patient #2, removing the improperly-placed VAD and implanting a new VAD properly. Dr. McGee emailed Dr. Love intraoperative photographs showing that Dr. Rashid had placed in the VAD in Patient#2's heart improperly.*

32. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 32 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

33. *In the wake of that incident, Dr. Love showed the photographs and expressed concerns to several members of MCW and FMLH's senior management regarding the grossly substandard patient care that Dr. Rashid and Dr. Nicolosi had provided.*

33. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 33 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

34. *In July 2013, Dr. Love expressed concerns to Lee A. Biblo, M.D. ("Dr. Biblo"), MCW's Chief Medical Officer and Professor in the Division of Cardiology, regarding the grossly substandard care Dr. Rashid had provided to Patient #3 and Patient #4, who died after Dr. Rashid had performed minimally invasive aortic and mitral valve replacement surgery.*

34. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 34 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

35. *On December 24, 2013, Dr. Love sent Cathy Buck, M.S.N., R.N. ("Ms. Buck"), President of FMLH, an email in which he expressed these same concerns.*

35. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 35 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

9

36. *In December 2013, Izabela Jugovac, M.D. ("Dr. Jugovac"), an MCW and FMLH anesthesiologist, implanted a catheter in Patient #5 prior to his scheduled cardiac surgery. Dr. Jugovac placed the catheter improperly so that it lacerated Patient #5's superior vena cava, right atrium, and right ventricle. When Patient #5's vital signs began to worsen, Dr. Jugovac ordered an intraoperative fluoroscopy, which showed that she had placed the catheter incorrectly. On information and belief, Dr. Jugovac was unable to interpret the fluoroscopy image.*

36. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 36 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

37. *Dr. Jugovac summoned Wade Fischer, M.D. ("Dr. Fischer"), a cardiac transplant surgeon, to the operating room.*

37. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 37 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

38. *Patient #5 then went into cardiac arrest, and Dr. Fischer called Dr. Love to the operating room to assist him.*

38. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 38 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

39. *Dr. Fischer and Dr. Love opened Patient #5's chest cavity and discovered that the improperly-placed catheter had lacerated his superior vena cava, right atrium, and right ventricle.*

39. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 39 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

40. *Dr. Fischer and Dr. Love performed a lengthy surgery and saved Patient #5's life, despite having to transfuse roughly 100 units of blood products during the surgery due to the lacerations of his superior vena cava, right atrium, and right ventricle.*

40. Defendant denies the allegations in Paragraph 40 of the First Amended Complaint.

10

41. *While Dr. Fischer and Dr. Love were performing the surgery on Patient #5, members of MCW and FMLH's anesthesiology department filed a confidential complaint alleging improper patient care against Dr. Fischer and Dr. Love because, allegedly, they had unnecessarily opened Patient #5 chest cavity and caused complications.*

41. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 41 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

42. *After Dr. Fischer and Dr. Love had completed the surgery on Patient #5, Lynn Fischer, FMLH's Vice President for Transplant, Heart, and Vascular Service Lines, informed Dr. Love of the anesthesiologists' complaint. Dr. Love analyzed Patient #5's medical record and saw that it did not include the fluoroscopy image Dr. Jugovac had ordered, in violation of MCW and FMLH protocol. Dr. Love located the fluoroscopy machine and uploaded the image to Patient #5's medical record. The image showed that Dr. Jugovac had placed the catheter improperly.*

42. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 42 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

43. *The next morning, Dr. Love and Dr. Fischer were called to a meeting with nearly every doctor in MCW and FMLH's anesthesiology department and members of MCW and FMLH's senior management, including, Ms. Fischer and Gary R. Seabrook, M.D. ("Dr. Seabrook"), Professor and Section Chief of the Division of Vascular Surgery at MCW and Senior Medical Director of Surgical Services at FMLH.*

43. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 43 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

44. *At that meeting, the anesthesiologists insisted that Dr. Love and Dr. Fischer had opened Patient #5's chest unnecessarily. Dr. Love responded by displaying the fluoroscopy image that proved Dr. Jugovac had placed the catheter improperly. Based on that indisputable evidence, the anesthesiologists withdrew their complaint.*

44. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 44 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*45. After the meeting, Dr. Warltier confronted Dr. Love and accused him of disparaging Dr. Jugovac.*

45. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 45 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*46. Dr. Love later expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard patient care Dr. Jugovac had provided. Dr. Love also expressed concern that the MCW and FMLH anesthesiologists' routine practice of filing unfounded internal complaints of improper patient care against other doctors to protect themselves undermined the quality of MCW and FMLH's patient care.*

46. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 46 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*47. MCW and FMLH's senior management did not take any meaningful action to discourage that routine practice.*

47. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 47 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*48. In February 2014, Dr. Love performed complex, successful heart surgery on Patient #6. After the surgery, FMLH medical staff transported Patient #6 to the recovery room, and Dr. Love went home.*

48. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 48 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*49. Approximately one hour later, FMLH medical staff notified Dr. Love that Patient #6 was in cardiac arrest in the ICU. Patient #6 had gone into ventricular fibrillation. The proper protocol in that situation would have been to disconnect Patient #6 from her temporary pacemaker, apply a defibrillator to resolve the ventricular fibrillation, and then reattach Patient #6 to the temporary pacemaker. Instead, two nurses who were part of the neurology Code Team on duty, whose members lacked training in administering proper care to cardiac patients, performed chest compressions on Patient #6. This was medically improper.*

12

49. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 49 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

50. *Dr. Love arrived a few minutes later and found Patient #6 on the verge of death. Dr. Love attempted to save Patient #6's life. When Dr. Love opened Patient #6's chest cavity, however, he found that the chest compressions had fractured her ribs and lacerated her heart in multiple places, ultimately causing her death.*

50. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 50 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

51. *Dr. Love expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard care that MCW and FMLH had provided in that case. Specifically, Dr. Love expressed concern that FMLH did not have on duty at all times a Code Team specially-trained in providing emergent cardiac care.*

51. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 51 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

52. *In April 2014, Dr. Fischer performed a heart transplant operation on Patient #7. During that operation, the catheter that Dr. Jugovac and Sweeta D. Gandhi, M.D. ("Dr. Gandhi"), another MCW and FMLH anesthesiologist, had placed in Patient #7's chest cavity before the surgery became dislodged. The catheter, which was necessary to administer medication to aid in the transplanted heart's function, became dislodged because Dr. Jugovac and Dr. Gandhi had neglected to stitch it in place.*

52. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 52 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

53. *As a result of the catheter's becoming dislodged, Patient #7 suffered postoperative complications in the form of poor transplanted heart function and infection, from which he eventually died.*

13

53. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 53 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

54. *Dr. Jugovac then filed a complaint against Dr. Fischer, alleging that Dr. Fischer had provided improper patient care during the transplant operation.*

54. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 54 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

55. *After that incident, Dr. Love expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard patient care Dr. Jugovac and Dr. Gandhi had provided to Patient #7. Dr. Love reiterated his concern that the MCW and FMLH anesthesiologists' routine practice of filing unfounded internal complaints of improper patient care by other doctors to protect themselves undermined the quality of MCW and FMLH's patient care.*

55. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 55 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

56. *MCW and FMLH's senior management again took no meaningful action to discourage that practice.*

56. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 56 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

57. *On or about April 27, 2014, Patient #8 died at FMLH due to traumatic head injuries he had sustained in a car accident. Patient #8 was an organ donor, and his kidneys, liver, and one lung were suitable for transplantation.*

57. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 57 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

14

*58. While MCW and FMLH anesthesiologists and critical care physicians withdrew life-sustaining therapies from Patient #8, who had not yet been declared brain dead, Dr. Love waited in the operating room to procure Patient #8's lung, David C. Cronin, M.D. ("Dr. Cronin"), an MCW and FMLH abdominal transplant surgeon, waited to procure Patient #8's kidneys, and Philip Wai, M.D. ("Dr. Wai"), a liver transplant surgeon from Loyola Hospital, waited to procure Patient #8's liver for a potential recipient there.*

58. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 58 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*59 The MCW and FMLH's anesthesiologists ordered the medical staff not to remove Patient #8's breathing tube at the same time they withdrew all other life-sustaining therapies, in violation of written MCW and FMLH policies. As a result, Patient #8's liver was destroyed unnecessarily before Dr. Wai had an opportunity to procure it.*

59. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 59 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*60. While Dr. Love waited to procure Patient #8's lung, George Hassler, M.D. ("Dr. Hassler"), Professor and Section Chief of Adult General Thoracic Surgery at MCW and FMLH, prepared the intended recipient, Patient #9, for surgery. Dr. Love informed Dr. Hassler that only one of the donor's lungs was suitable for transplantation. Nevertheless, Dr. Hassler made a bilateral chest incision in Patient #9 for the transplantation of two lungs. Dr. Hassler also placed Patient #9 on cardiopulmonary bypass before critical care physicians had even set a time for withdrawing life-sustaining therapies from Patient #8. Dr. Hassler's actions violated the standard protocol of waiting until organs have been procured and approved for transplantation before commencing surgery on Patient #9.*

60. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 60 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*61. With Dr. Love's assistance, DL Hassler successfully transplanted one lung in Patient #9. Yet Dr. Hassler had subjected his patient to needless trauma by making a bilateral chest incision when only a unilateral chest incision was necessary and by placing the patient on cardiopulmonary bypass for three hours longer than necessary.*

15

61. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 61 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

62. *After that incident, Dr. Love expressed concerns to several members of MCW and FMLH's senior management about the grossly substandard patient care the anesthesiologists had provided by causing the destruction of Patient #8's healthy liver and the grossly substandard patient care Dr. Hassler had provided by subjecting Patient #9 to needless trauma.*

62. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 62 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

63. *As with all of the concerns Dr. Love had expressed previously, on information and belief, MCW and FMLH's senior management took no meaningful action to address the concerns Dr. Love expressed about those incidents.*

63. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 63 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

64. *In addition, throughout his tenure at MCW, Dr. Love repeatedly expressed concerns to members of MCW and FMLH's senior management about MCW and FMLH's unacceptable Quality Assessment ("QA") program. Dr. Love informed them that MCW and FMLH's unacceptable QA program contributed to MCW and FMLH's grossly substandard patient care and was in violation of CMS rules and regulations, including 42 C.F.R. § 482.2, which requires health care facilities, as a condition of participation in Medicare, to track adverse patient events, analyze their causes, and implement actions and mechanisms to prevent recurrences.*

64. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 64 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

65. *For instance, Dr. Love requested that MCW and FMLH conduct QA reviews of the care rendered to Patient #2, Patient #3, Patient #4, and Patient #5.*

16

65. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 65 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

66. *On information and belief, MCW and FMLH ignored Dr. Love's requests and never conducted QA reviews of any of those cases.*

66. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 66 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

67. *MCW and FMLH did, however, conduct extensive QA reviews of Dr. Love's cases.*

67. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 67 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

68. *On February 27, 2014, Dr. Biblo reported to Dr. Love, Douglas B. Evans, M.D. ("Dr. Evans"), Professor and Chairman of the Department of Surgery at MCW, James S. Tweddell, M.D. ("Dr. Tweddell"), Chair of the Division of Cardiothoracic Surgery at MCW, and Sue Huerta ("Ms. Huerta"), Vice President for Quality and Patient Safety at FMLH, the findings of a months-long, QA review of 20 cases of Dr. Love's in which a patient was alleged to have suffered surgical complications. As a result of that QA review, MCW and FMLH determined that Dr. Love had performed in accordance with the standard of care in all 20 cases.*

68. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 68 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

**"Dr. Love's Concerns Regarding MCW and FMLH's Transplant Program"**

69. *During his tenure at MCW and FMLH, Dr. Love investigated MCW and FMLH's longstanding practice of regularly declining organs offered to potential recipients who were awaiting transplants at FMLH. Dr. Love examined organ procurement records, to which he had access as a medical director of the Wisconsin Donor Network. Dr. Love also discussed the issue with other transplant surgeons at MCW and FMLH. Dr. Love discovered that the reason for that practice was that MCW and FMLH transplant surgeons were not available at all times to perform transplant surgeries.*

17

69. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 69 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

70. *MCW and FMLH's practice of regularly declining organs violated the requirement of the Organ Procurement and Transplantation Network ("OPTN") that all transplant centers, including FMLH, must have surgeons available at all times to perform transplant operations. That practice violated CMS regulation 42 C.F.R. § 482.72, which obligates all transplant centers to follow OPTN requirements as a condition of participation in Medicare.*

70. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 70 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

71. *In addition, on information and belief, MCW and FMLH's practice of regularly declining organs led to the avoidable deaths of dozens of patients awaiting organ transplants at FMLH over the past two decades.*

71. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 71 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

72. *Dr. Love repeatedly expressed concerns to members of MCW and FMLH's senior management that MCW and FMLH's regular practice of declining organs violated OPTN requirements and CMS regulations, had led to avoidable patient deaths, and posed a substantial risk to the viability of MCW and FMLH's transplant program.*

72. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 72 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

**"Dr. Love's Concerns Regarding Dr. Stone"**

73. *Between 2012 and 2015, Christopher D. Stone, M.D. ("Dr. Stone") was a faculty member and employee of MCW and a practicing CT surgeon at the Kenosha Medical Center Campus ("KMC").*

18

73. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 73 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

74. *At all times relevant hereto, MCW had a contract with KMC for MCW physicians, including Dr. Stone, to provide CT surgery there. MCW had the unilateral right to terminate Dr. Stone, Dr. Stone received his paycheck from MCW, and Dr. Stone was subject to MCW's policies and procedures governing faculty conduct.*

74. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 74 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

75. *Throughout Dr. Love's tenure at MCW, he repeatedly expressed concerns that Dr. Stone, as a faculty member and employee of MCW, had provided grossly substandard patient care and had performed unnecessary and non-standard operations on patients for the purpose of defrauding Medicare.*

75. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 75 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

76. *Members of MCW and FMLH's senior management were aware of Dr. Stone's providing grossly substandard patient care and performing unnecessary and non-standard operations for the purpose of defrauding Medicare.*

76. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 76 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

77. *As early as August 30, 2012, Mark W. Lodes, M.D. ("Dr. Lodes") complained to Dr. Kerschner, Dr. Evans, Dr. Tweddell, and Dr. Love about Dr. Stone's conduct, and Dr. Lodes encouraged MCW to remove Dr. Stone from its faculty and his practice at KMC.*

77. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 77 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

19

*78. In response, on the morning of August 31, 2012, Dr. Kerschner sent Dr. Lodes, Dr. Love, and Dr. Tweddell an email in which Dr. Kerschner stated, "[w]e believe that the case brought forward suggests that Dr. Stone performed unnecessary surgery" for the purpose of defrauding Medicare. Dr. Kerschner counseled against terminating Dr. Stone, however, because "[t]here is a financial risk to the enterprise given the large number of cases that Dr. Stone does - we discussed the importance of 'doing the right thing' - but we need to understand the financial implications of this."*

78. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 78 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*79. On September 3, 2012, Dr. Tweddell sent an email in response to Dr. Kerschner's email of August 31, 2012. In that email, Dr. Tweddell informed Dr. Kerschner of the CT surgery faculty's position that "[i]f we embrace, as a colleague, someone who has performed unnecessary surgery [for the purpose of defrauding Medicare] we are also embracing that unethical and completely unacceptable behavior."*

79. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 79 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*80. Despite the CT surgery faculty's entreaty, Dr. Kerschner took no action to remove Dr. Stone because he generated significant revenue for MCW, in part by committing Medicare fraud.*

80. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 80 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*81. After September 3, 2012, Dr. Stone continued to provide grossly substandard patient care and to perform unnecessary and non-standard operations for the purpose of defrauding Medicare. Dr. Love continued to repeatedly express concerns to members of MCW and FMLH's senior management that retaining Dr. Stone as a faculty member of MCW was unethical and tantamount to condoning Dr. Stone's conduct.*

81. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 81 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

20

82. In December 2012, Dr. Love met with Sarah Cohn ("Ms. Cohn"), MCW's general counsel, and told her that Dr. Stone's presence on the MCW faculty was a "clear and present danger" to MCW and its patients. At that meeting, Dr. Love expressed the following concerns:

- Dr. Lodes had a "black book" documenting Dr. Stone's grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices;

- Rick Schmidt, the Chief Executive Officer of United Hospital Group in Kenosha, had implored MCW to remove Dr. Stone and hire a replacement surgeon;

- Dr. Love had reason to believe that Dr. Stone was committing Medicare fraud because documents related to Dr. Stone's billing reflected inflated Relative Value Units ("RVUs") that were not commensurate with the treatment he was providing; and

- Dr. Stone was performing unnecessary and non-standard operations on patients for the purpose of defrauding Medicare.

82. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 82 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

83. Dr. Love also delivered to Ms. Cohn a letter addressed to Dr. Kerschner in which he expressed these concerns.

83. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 83 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

84. To remedy the situation, Dr. Love attempted to recruit Nick V. Augelli, M.D. ("Dr. Augelli"), an experienced and well-respected CT surgeon, to replace Dr. Stone at KMC.

84. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 84 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

21

85. *The members of MCW and FMLH's senior management resisted Dr. Love's efforts to recruit Dr. Augelli to replace Dr. Stone. They decided that Dr. Stone would remain in his practice at KMC and on the faculty of MCW.*

85. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 85 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

86. *Dr. Love criticized that decision to MCW and FMLH's senior management, and he continued to entreat them to terminate Dr. Stone in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.*

86. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 86 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

87. *In March 2014, Dr. Seabrook corresponded with Dr. Evans, Dr. Tweddell, Dr. Love, Daniel J. DeBehnke, M.D. ("Dr. DeBehnke"), Chief Clinical Integration Officer at MCW and FMLH, and Jonathon D. Truwit, M.D. ("Dr. Truwit"), the Enterprise Chief Medical Officer and Senior Administrative Dean of MCW and FMLH, about multiple patients who had received grossly substandard care from Dr. Stone and about the scheme Dr. Stone had used to fraudulently bill for operations he had not performed.*

87. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 87 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

88. *For example, on March 13, 2014, Dr. Seabrook wrote an email to those physicians about an incident in which Dr. Stone had performed an unnecessary and non-standard operation on Patient #10 but described a different procedure in his post-operative report.*

88. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 88 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

22

*89. In response to that email, Dr. Tweddell stated, "I think this is more than a quality issue. The procedure described in detail in the operative report is not the procedure that was performed."*

89. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 89 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*90. Dr. Seabrook then sent an email to Dr. Tweddell in which he stated that MCW was "accustomed to this practice of Dr. Stone performing unnamed operations,"*

90. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 90 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*91. In that email, Dr. Seabrook described in detail Dr. Stone's fraudulent billing practices: "Many of [Dr. Stone's] procedures are performed in increments. Staging the revascularization avoids the multiple procedure reduction modifier so if procedures are performed on different days, you can charge more for the same work. Of course, the patient must endure several operations."*

91. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 91 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*92. In March 2014, Dr. Seabrook also corresponded with Dr. Evans, Dr. Tweddell, Dr. Love, Dr. DeBehnke, and Dr. Truwit about Patient #11, who had received grossly substandard care from Dr. Stone. Dr. Seabrook noted that Dr. Stone had performed an aorta-popliteal bypass graft implantation on Patient #11 that was a "completely unconventional and unindicted surgical operation" and left Patient #11 in a debilitated state.*

92. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 92 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*93. In March through May of 2014, Dr. Love continued to urge members of MCW and FMLH's senior management to terminate Dr. Stone in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.*

23

93. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 93 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

94. *Yet MCW and FMLH's senior management did not terminate Dr. Stone until June 1, 2015, two business days after Dr. Love filed his original Complaint in this action.*

94. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 94 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

**"Dr. Love's Concerns Regarding Dr. Almassi"**

95. *Dr. Love also expressed concerns to members of MCW and FMLH's senior management about Hossein G. Almassi, M.D. ("Dr. Almassi"), the Section Chief of Cardiac Surgery at the Zablocki VA and a faculty member and employee of MCW.*

95. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 95 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

96. *Before Dr. Love even arrived at MCW and FMLH, Dr. Evans and Dr. Tweddell told him that Dr. Almassi would be relieved of his clinical duties because he had provided grossly substandard patient care to veterans at the Zablocki VA.*

96. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 96 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

97. *Dr. Evans had authority to relieve Dr. Almassi of his clinical duties.*

97. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 97 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

98. *Throughout his tenure at MCW, Dr. Love witnessed first-hand the grossly substandard care that Dr. Almassi provided to veterans.*

24

98. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 98 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

99. *For example, in the summer of 2013, Dr. Almassi performed a routine aortic valve replacement surgery on Patient #12. During the operation, Dr. Almassi inadvertently disconnected Patient #12's aorta from his left ventricle. As a result, Patient #12 was unable to come off cardiopulmonary bypass.*

99. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 99 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

100. *After operating on Patient #12 for roughly ten hours, Dr. Almassi called Dr. Love to request that MCW physicians implant a VAD in Patient#12 at the Zablocki VA and then transfer him to FMLH.*

100. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 100 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

101. *Dr. Love declined Dr. Almassi's request because he believed it would be unsafe to perform a VAD implantation at the Zablocki VA, where such a procedure had never been performed.*

101. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 101 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

102. *Instead, Patient #12 was transferred to FMLH on a cardiopulmonary bypass machine, and Dr. Love and Dr. Rashid implanted a VAD in the patient there. Patient #12 died two days later because his heart had sustained irreversible damage as a result of the operation Dr. Almassi had performed.*

102. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 102 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

25

*103.    On March 13, 2014, Dr. Love sent an email to Dr. Evans and Dr. Tweddell in which he expressed his concerns about MCW's failure to take any meaningful steps toward removing Dr. Almassi from the MCW faculty and the Zablocki VA medical staff.*

103.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 103 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*104.    Between March 2014 and April 2014, Dr. Love and other MCW physicians, including Dr. Evans, Dr. Tweddell, Dr. Biblo, and Dr. Rashid, met on multiple occasions to discuss all of Dr. Love's concerns and to develop a plan to transition Dr. Almassi out of the Zablocki VA.*

104.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 104 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*105.    During a March 13, 2014 meeting, Dr. Love and Dr. Evans both stated that MCW needed to take action to relieve Dr. Almassi of his clinical duties as soon as possible because he was providing grossly substandard patient care to veterans.*

105.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 105 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*106.    In April 2014, Dr. Evans informed Dr. Love that he had assigned Dr. Rashid take over control of the Zablocki VA cardiac program from Dr. Almassi.*

106.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 106 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*107.    Dr. Rashid, who had a close personal relationship with Dr. Almassi, took no action to relieve Dr. Almassi of his clinical duties.*

107.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 107 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

108.     *When he learned that Dr. Rashid had taken no action against Dr. Almassi, Dr. Love complained to Dr. Evans and urged him to pursue an effective means of removing Dr. Almassi.*

108.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 108 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

109.     *Nevertheless, MCW and FMLH did not remove Dr. Almassi.*

109.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 109 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

110.     *Dr. Almassi is still practicing at the Zablocki VA.*

110.     Defendant admits the allegations in Paragraph 110 of the First Amended Complaint.

**MCW and FMLH's Retaliation against Dr. Love**

111.     *In 2014, Dr. Warltier harbored malice toward Dr. Love as a result of Dr. Love's investigating and expressing concerns about MCW and FMLH's providing grossly substandard patient care, particularly with respect to the grossly substandard care MCW and FMLH anesthesiologists had provided to Patient #5, Patient #7, and Patient #8.*

111.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 111 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

112.     *In late April 2014 or early May 2014, Dr. Warltier compiled a list of cases in which patients of Dr. Love and Dr. Fischer had, between January 2014 and April 2014, died after surgery. Dr. Warltier furnished that list to Dr. Tweddell for the purpose of providing pretext for MCW and FMLH to terminate Dr. Love and Dr. Fischer.*

27

112.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 112 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*113.    Neither Dr. Love nor Dr. Fischer had demonstrated any lack of technical competence or surgical judgment or violated the standard of care in any of those cases. Nevertheless, Dr. Tweddell decided to terminate Dr. Love and Dr. Fischer rather than to resist the pressure to terminate them from Dr. Warltier, Dr. Kerschner, and other members of MCW and FMLH's senior management.*

113.    Defendant denies that Dr. Love consistently demonstrated technical competence, exercised sound surgical judgment, or met the standard of care.  Defendant lacks knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 113 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*114.    Dr. Tweddell directed Dr. Evans, who was Dr. Love's direct supervisor at MCW and FMLH, to terminate Dr. Love and Dr. Fischer on May 8, 2014.*

114.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 114 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*115.    On the afternoon of May 8, 2014, Dr. Evans met with Dr. Love and informed him that he had decided to terminate Dr. Fischer.  Dr. Love informed Dr. Evans that he believed terminating Dr. Fischer would undermine MCW and FMLH's ability to provide adequate care to heart transplant patients and would expose the approximately 20 patients awaiting transplants at FMLH to unreasonable risk.  Dr. Love also explained to Dr. Evans that if he were to terminate Dr. Fischer, MCW and FMLH could no longer represent itself as a transplant center in accordance with OPTN requirements and CMS regulations.*

115.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 115 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

28

*116.  Dr. Love told Dr. Evans he did not want to retain his title as Section Chief of Adult Cardiac Surgery if Dr. Evans were to terminate Dr. Fischer.  Dr. Love did not offer to surrender any of his privileges or responsibilities.*

116.  Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 116 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*117.  At the conclusion of the May 8, 2014 meeting, Dr. Evans announced that he and Dr. Tweddell would meet with Dr. Love the following week.  Dr. Evans also instructed Dr. Love to take a leave of absence until after that meeting.  Dr. Evans did not suggest that MCW or FMLH would revoke any of Dr. Love's privileges or responsibilities.  Nor did Dr. Evans inform Dr. Love that Dr. Tweddell had decided to terminate him.*

117.  Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 117 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*118.  On the evening of May 8, 2014, Ms. Buck sent an email to numerous MCW and FMLH employees (the "Buck Email") stating, "Drs. Wade Fischer and Robert Love are currently on a leave of absence and will no longer perform cardiac surgery here."*

118.  Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 118 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*119.  The Buck Email humiliated Dr. Love because many of his colleagues who received or learned of the Buck Email interpreted it to mean that MCW and FMLH had revoked his privileges.*

119.  Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 119 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*120.  Based the myriad unethical practices he had witnessed during his employment at MCW and FMLH and the lack of detail Dr. Evans and Dr. Tweddell had provided about the upcoming meeting, Dr. Love believed it would be in his best interest for his attorney, James Gardner, to be present.*

29

120.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 120 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*121.    In a May 19, 2014 email, Ms. Cohn insisted it was "not appropriate" for Mr. Gardner to attend Dr. Love's meeting with Dr. Evans and Dr. Tweddell.*

121.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 121 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*122.    On May 20, 2014, Dr. Love and Mr. Gardner met with Dr. Evans, Dr. Tweddell, and Ms. Cohn. During that meeting, Dr. Evans informed Dr. Love that there was no longer a clinical role for him at MCW and FMLH. Dr. Evans also cautioned Dr. Love that it would be in his best interest not to bring any legal action against MCW and FMLH.*

122.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 122 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*123.    Mr. Gardner and Ms. Cohn met separately on May 20, 2014. On information and belief, during that meeting, Ms. Cohn informed Mr. Gardner that Dr. Love had only two options: to resign from MCW or to undergo a formal tenure revocation hearing after being on unpaid leave for several months. Ms. Cohn told Mr. Gardner she would ensure that tenure revocation hearing would result in Dr. Love's termination for cause.*

123.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 123 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*124.    On May 26, 2014, Dr. Tweddell informed Dr. Love that he would not be allowed to attend any future CT surgery faculty meetings.*

124.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 127 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

30

*125.    As of May 27, 2014, MCW eliminated Dr. Love's name from its call schedule.*

125.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 125 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*126.    In a June 19, 2014 letter, Dr. Evans informed Dr. Love that his salary would be
reduced by approximately 25 percent, effective July 1, 2014.*

126.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 126 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

**Dr. Love's Separation Agreement**

*127.    On August 26, 2014, Dr. Love entered into a Separation Agreement with MCW (the
"Separation Agreement").  A copy of the Separation Agreement is attached hereto as
Exhibit A.*

127.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 127 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*128.    The Separation Agreement provides that MCW agreed to pay Dr. Love a reduced
salary through April 1, 2015, which MCW did.*

128.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 128 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*129.    Section 7 of the Separation Agreement provides that Dr. Love released all of his
claims against MCW and its employees and agents "relating to or arising out of any
agreement, act, omission, occurrence, transaction or matter up to and including the date
of this Agreement...."*

31

129.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 129 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

130.    *Dr. Love did not, in Section 7 of the Separation Agreement or elsewhere, release any claims that arose after August 26, 2014, the effective date of the Separation Agreement.*

130.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 130 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

131.    *Section 7 of the Separation Agreement also provides that "Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards ... any obligations that MCW owed to Dr. Love under ... this Agreement...."*

131.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 131 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

132.    *Dr. Love has not released any claims based on obligations MCW owes him under the Separation Agreement, including its obligations under Section 12(a).*

132.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 132 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

## Zablocki VA's September 5, 2014 Revocation of Dr. Love's Privileges

133.    *On September 5, 2014, Michael D. Erdmann, M.D. ("Dr. Erdmann"), Associate Dean and Professor at MCW and Chief of Staff at the Zablocki VA, notified Dr. Love by letter that the Zablocki VA had revoked his privileges.  A copy of the September 5, 2014 letter is attached hereto as Exhibit B.*

133.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 133 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

32

*134. Dr. Love did not receive any notice that the Zablocki VA had revoked his privileges until September 5, 2014.*

134.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 134 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*135. The Zablocki VA did not conduct a hearing or any formal proceedings before revoking Dr. Love's privileges.*

135.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 135 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*136. The Zablocki VA revoked Dr. Love's privileges at the behest of and with the knowledge and approval of members of MCW's senior management.*

136.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 136 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*137. Dr. Love was not provided any advance notice of the Zablocki VA's revocation of his privileges, and he was provided no opportunity to defend himself against that action.*

137.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 137 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*138. The Zablocki VA's revocation of Dr. Love's privileges caused him humiliation, damaged his professional reputation, and interfered with his ability to obtain new employment, as Dr. Love had no choice but to disclose the revocation of his privileges to each hospital and medical group to which he applied for a position, including those to which he had already submitted applications.*

138.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 138 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

33

*139.  Dr. Love had no choice but to disclose the Zablocki VA's revocation of his privileges because he believed, based on his professional experience and his knowledge of the medical industry, that the revocation of his privileges would become a matter of public record.*

139.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 139 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

**"Dr. Pagel's Statements to St. Mary's Hospital"**

*140.  Immediately after Dr. Love's separation from MCW and FMLH, he attempted to move forward with his career and find a new position as a CT surgeon.*

140.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 140 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*141.  In July 2014, Dr. Love told Vijay K. Kantamneni, M.D. ("Dr. Kantamneni"), the Chair of the Department of Cardiovascular Surgery at St. Mary's Hospital, that he was searching for a position as a CT surgeon.  Dr. Kantamneni encouraged Dr. Love to apply for an open CT surgeon position at St. Mary's Hospital.*

141.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 141 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*142.  Dr. Love was enthusiastic about the possibility of joining St. Mary's Hospital Department of Surgery because doing so would allow him to practice in Madison, where his ailing wife and his daughter with special needs reside in the family home.  In addition, Dr. Love has longstanding personal and professional relationships with several St. Mary's Hospital physicians, including Dr. Kantamneni and Muhammed M. Itani, M.D. ("Dr. Itani").*

142.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 142 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

34

*143.    Dr. Kantamneni has known Dr. Love since 1989, when Dr. Kantamneni was practicing as a general surgery resident at the University of Wisconsin Hospital in Madison, Wisconsin (the "UW Hospital"), and Dr. Love was practicing there as a CT surgery fellow.*

143.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 143 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*144.    Between 1989 and 1993, Dr. Love and Dr. Kantamneni worked together on numerous surgical cases at the UW Hospital.*

144.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 144 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*145.    Dr. Love and Dr. Kantamneni kept in close touch and routinely consulted with each other on surgical matters between 1993 and 2006, when Dr. Kantamneni practiced at St. Mary's Hospital and Dr. Love practiced at the UW Hospital.*

145.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 145 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*146.    Based on Dr. Kantamneni's experience working and consulting with Dr. Love between 1993 and 2006, Dr. Kantamneni believed that Dr. Love was an excellent CT surgeon.*

146.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 146 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*147.    On or shortly before October 21, 2014, Andrew R. Schroeder, M.D. ("Dr. Schroeder"), a St. Mary's Hospital anesthesiologist who had been a resident and fellow at MCW from 2009 through 2014, learned that Dr. Love would soon be interviewing for the CT surgeon position at St. Mary's Hospital.*

35

147.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 147 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

148.     *On October 21, 2014, Dr. Schroeder contacted Dr. Pagel by text message for the purpose of eliciting details regarding Dr. Love's technical competence and surgical outcomes that Dr. Schroeder could share with other physicians at St. Mary's Hospital for their consideration in deciding whether to hire Dr. Love.  A copy of the text message exchange between Dr. Schroeder and Dr. Pagel is attached hereto as Exhibit C.*

148.     Defendant lacks knowledge or information sufficient to form a belief as to Dr. Schroeder's motivations, and therefore denies the allegations concerning the same and demands strict proof thereof. Defendant admits that the text messages attached to the First Amended Complaint as Exhibit C are between Dr. Schroeder and Defendant.

149.     *In response to Dr. Schroeder's text messages, Dr. Pagel  texted:*

   • *"U need to be loud and in their faces.  Tell them that he lost his privileges at MCW cuz of incompetence and that there r multiple malpractice cases pending.  They can call anybody here to verify the story.  Or have them call Al!!!!"*

   • *"I'll b happy to tell them that he's a threat to public health."*

   • *"17 dead in four months [January through April 2014].  That's more than John Wayne Gacy and Jeffrey Dahmer combined during any 4 month period of their serial murders."*

149.     The text messages attached to the First Amended Complaint as Exhibit C speak for themselves and are the best evidence of their contents.  Denies that Paragraph 149 contains a complete or accurate description of the text communications.

150.     *Dr. Schroeder understood that when Dr. Pagel wrote, "Al," he was referring to  Dr. Nicolosi.*

150.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 150 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*151. On information and belief, at some point between August 27, 2014 and October 21, 2014, Dr. Nicolosi and Dr. Warltier communicated to Dr. Pagel the substance of his above-quoted statements to Dr. Schroeder regarding Dr. Love ("Dr. Pagel's Statements").*

151. Defendant denies the allegations in Paragraph 151 of the First Amended Complaint.

*152. In 2014, Dr. Pagel and Dr. Warltier harbored malice toward Dr. Love as a result of Dr. Love's investigating and expressing concerns about MCW and FMLH's providing grossly substandard patient care, particularly with respect to the grossly substandard care MCW and FMLH anesthesiologists had provided to Patient #5, Patient #7, and Patient #8.*

152. Defendant denies the allegations in Paragraph 152 of the First Amended Complaint.

*153. Dr. Pagel, who has close professional relationships with Dr. Nicolosi and Dr. Almassi, also harbored malice toward Dr. Love as a result of Dr. Love's investigating and expressing concerns about Dr. Nicolosi's and Dr. Almassi's providing grossly substandard care to patients, including Patient #1, Patient #2, and Patient #12.*

153. Defendant lacks knowledge or information sufficient to form a belief as to what Plaintiff means by "close professional relationships," and therefore denies the allegations regarding the same and demands strict proof thereof. Defendant admits that he has worked with both Dr. Nicolosi and Dr. Almassi for many years and has great respect for their respective skills as surgeons. Defendant denies the remaining allegations in Paragraph 153 of the First Amended Complaint.

*154. Dr. Nicolosi harbored malice toward Dr. Love as a result of Dr. Love's investigating and expressing concerns about MCW and FMLH's providing grossly substandard patient care, particularly with respect to the grossly substandard care Dr. Nicolosi and Dr. Rashid had provided to Patient #1, Patient #2, Patient #3, and Patient #4.*

154. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 154 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*155. In late 2014, Dr. Nicolosi wanted to secure the CT surgeon position at St. Mary's Hospital for himself, which he ultimately did.*

37

155.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 155 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*156.     On October 21 or 22, 2014, during a discussion of Dr. Love's candidacy at a meeting of cardiac anesthesia and cardiac surgery at St. Mary's Hospital, at which Dr. Kantamneni was present, Dr. Schroeder read aloud Dr. Pagel's Statements.*

156.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 156 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*157.     Dr. Schroeder informed the St. Mary's Hospital physicians present at the meeting that he had received the text messages containing Dr. Pagel's Statements from a physician at MCW.*

157.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 157 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*158.     On October 23, 2014, Dr. Itani, the Chief of Cardiac Anesthesiology at St. Mary's Hospital, interviewed Dr. Love in person for the CT surgeon position at St. Mary's Hospital.*

158.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 158 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*159.     Dr. Itani first met Dr. Love in 2003, when Dr. Itani was a critical care fellow at the UW Hospital and Dr. Love was practicing there as a CT surgeon.*

159.     Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 159 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*160.     While Dr. Itani was practicing at the William S. Middleton Veterans Hospital in Madison, Wisconsin and Dr. Love was practicing at the UW Hospital, they worked together on several surgical cases.*

38

160.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 160 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

161.    *Dr. Love made a positive impression on Dr. Itani during his interview at St. Mary's Hospital on October 23, 2014.*

161.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 161 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

162.    *As of October 23, 2014, Dr. Itani's opinion of Dr. Love as a physician, based on Dr. Love's professional reputation and on Dr. Itani's own experience working with him, was that he is a good CT surgeon.*

162.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 162 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

163.    *On October 23, 2014, after Dr. Itani interviewed Dr. Love, Dr. Itani spoke to Dr. Schroeder regarding Dr. Love's candidacy for the CT surgeon position.*

163.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 163 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

164.    *During that conversation, Dr. Schroeder informed Dr. Itani of Dr. Pagel's Statements.*

164.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 164 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

165.    *Dr. Kantamneni and Dr. Itani were surprised by Dr. Pagel's Statements because they conflicted with their own experience working with Dr. Love.*

165.   Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 165 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

166.   *Dr. Pagel's Statements created enough doubt regarding Dr. Love's technical competence and surgical judgment in the minds of Dr. Kantamneni, Dr. Itani, and their colleagues that St. Mary's Hospital decided not to move forward with considering Dr. Love for the CT surgeon position.*

166.   Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 166 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

167.   *Based on Dr. Pagel's Statements, Dr. Kantamneni and Dr. Itani did not recommend to St. Mary's Hospital that it hire Dr. Love for the CT surgeon position*

167.   Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 167 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

168.   *Had Dr. Schroeder not communicated Dr. Pagel's Statements to Dr. Kantamneni and Dr. Itani, they both would have recommended that St. Mary's Hospital hire Dr. Love for the CT surgeon position.*

168.   Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 168 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

169    *Dr. Pagel's Statements ended Dr. Love's chances of receiving an offer for the CT surgeon position at St. Mary's Hospital.*

169.   Defendant denies the allegations in Paragraph 169 of the First Amended Complaint.

170.   *Dr. Kantameni informed Dr. Love that Dr. Pagel's Statements were "very damaging, shocking and knocked [Dr. Love] out of the job."*

40

170.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 170 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

171.    *Thus, as a direct result of Dr. Pagel's Statements, St. Mary's Hospital did not extend an*
*employment offer to Dr. Love.*

171.    Defendant denies the allegations in Paragraph 171 of the First Amended Complaint.

172.    *St. Mary's Hospital ultimately hired Dr. Nicolosi for the same CT surgeon position for*
*which Dr. Love interviewed.*

172.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 172 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

173.    *Dr. Pagel's statement that "[Dr. Love] lost his privileges at MCW [because] of*
*incompetence" is false. On May 23, 2014, Ms. Buck sent an email to virtually all members of*
*MCW and FMLH's senior management in which she stated that "there has been no hospital*
*action with respect to [Dr. Love's] privileges." The Zablocki VA did revoke Dr. Love's*
*privileges, but it did so purely for retaliatory purposes. Dr. Love is not incompetent.*

173.    Defendant lacks knowledge or information sufficient to form a belief as to any e-mail

sent by Ms. Buck on May 23, 2014, and therefore denies the allegations concerning the same

and demands strict proof thereof.  Defendant denies the remaining allegations in Paragraph

173 of the First Amended Complaint.

174.    *Margo Shoup, M.D. ("Dr. Shoup"), currently Dr. Love's direct supervisor at*
*Northwestern Medicine in the Western Region, formerly known as Cadence Physician Group*
*("Cadence"), spoke to Dr. Evans by telephone shortly after Dr. Love interviewed at Cadence*
*in February 2014. During that conversation, Dr. Evans stated that he believes Dr. Love is a*
*good surgeon and that the circumstances surrounding Dr. Love's separation from MCW*
*were unfortunate because Dr. Love's departure was the result of problems at MCW that were*
*"beyond his control." These statements belie Dr. Pagel's allegation that MCW took punitive*
*action against Dr. Love because of his purported incompetence.*

41

174.    Defendant lacks knowledge or information sufficient to form a belief regarding the
allegations in Paragraph 174 of the First Amended Complaint and therefore denies the same
and demands strict proof thereof.

175.    *Dr. Pagel's statement "that there [are] multiple malpractice cases pending" against Dr.
Love is false. On February 26, 2015, MCW sent a letter to Cadence, in which MCW stated as
follows:*

> *Robert Love's coverage under The Medical College of Wisconsin
> Professional Liability Insurance Program began:*
>
> *August 15, 2012 through July 01, 2015*
>
> *Insured does not have a Claim History on file.*
>
> *A copy of the February 26, 2015 letter is attached hereto as Exhibit D.
> Thus, at the time of Dr. Pagel's Statements, there were no pending-or
> past-malpractice cases against Dr. Love arising out of his practice at
> MCW.*

175.    Defendant denies that his statement "that there [are] multiple malpractice cases pending"
against Dr. Love is false.  Defendant lacks knowledge or information sufficient to form a
belief as to the authenticity of the letter attached to the First Amended Complaint as Exhibit
D and therefore denies the allegations regarding the same and demands strict proof thereof.
Defendant denies the remaining allegations in Paragraph 175 of the First Amended
Complaint.

176.    *Dr. Pagel's statement that "[Dr. Love] is a threat to public health" is false.  Dr. Evans's
statements to Dr. Shoup—as well as Dr. Love's entire professional record—belie that
allegation.*

176.    Defendant denies the allegations in Paragraph 176 of the First Amended Complaint.

177.    *Dr. Pagel's statement that 17 of Dr. Love's patients suffered perioperative deaths in the
four-month period from January through April 2014 is false.  In reality, only six of Dr.
Love's patients-out of dozens of high-risk patients on whom he performed surgery-suffered
perioperative deaths during that period.  One was Patient #6, who died solely because nurses
at FMLH improperly performed chest compressions on her after Dr. Love's successful
surgery.  Four others were patients on the verge of death whom Dr. Love was unable to save
despite performing adept surgery on them.  The sixth was a patient who died because her*

42

*right ventricle was too weak to endure the stress of surgery. None of those patients' deaths could reasonably be blamed on Dr. Love.*

177.    Defendant denies the allegations in Paragraph 177 of the First Amended Complaint.

*178.    Dr. Love did not violate the standard of care in providing treatment to any of those six patients.*

178.    Defendant denies the allegations in Paragraph 178 of the First Amended Complaint.

*179.    Dr. Pagel's implication that Dr. Love poses a greater threat to human life than John Wayne Gacy and Jeffrey Dahmer combined is false. John Wayne Gacy was a serial killer who raped and murdered 33 boys and young men between 1972 and 1978. Jeffrey Dahmer was a psychopath who raped, murdered, and dismembered 17 men and boys between 1978 and 1991. Dr. Love is a loving husband and father of three who has dedicated his last 34 years to saving the lives of thousands of people.*

179.    Defendant denies Plaintiff's statement that "Dr. Pagel's implication that Dr. Love poses a greater threat to human life than John Wayne Gacy and Jeffrey Dahmer combined is false." Defendant lacks knowledge or information sufficient to form a belief regarding the specific allegations regarding the details of the crimes committed by John Wayne Gacy and Jeffrey Dahmer as stated in the First Amended Complaint and therefore denies the same and demands strict proof thereof. Defendant lacks knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 179 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*180.    Dr. Pagel's Statements reflect negatively on Dr. Love's professional competence and character.*

180.    With respect to Paragraph 180, the text messages attached to the First Amended Complaint as Exhibit C speak for themselves and are the best evidence of their contents. Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's meaning in using the phrase "professional competence and character," and therefore denies the allegations concerning the same and demands strict proof thereof.

43

*181    Dr. Pagel made his Statements knowing they were false and knowing Dr. Love had a
prospective employment contract with St. Mary's Hospital.*

181.    Defendant denies the allegations in Paragraph 181 of the First Amended Complaint.

*182.    Dr. Pagel made his Statements with malice.*

182.    Defendant denies the allegations in Paragraph 182 of the First Amended Complaint.

*183.    Dr. Pagel's Statements have so damaged Dr. Love's reputation that they have lowered
him in the estimation of the medical community and caused him tremendous humiliation.*

183.    Defendant denies the allegations in Paragraph 183 of the First Amended Complaint.

**Dr. Lindenbaum's Statements to the University of Kentucky College of Medicine**

*184.    In late 2014, the University of Kentucky College of Medicine ("UKCM") recruited Dr.
Love for the position of Director of the University of Kentucky Transplant Center and Chief
of Thoracic Transplantation, a position for which Dr. Love was highly qualified.*

184.    Defendant lacks knowledge or information regarding the allegations in Paragraph 184 of

the First Amended Complaint and therefore denies the same and demands strict proof

thereof.

*185.    Although accepting the position at UKCM would have required Dr. Love to live apart
from his family, he was excited by the position's prestige.*

185.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 185 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*186.    In December 2014, Dr. Love visited UKCM twice to interview for that position*

186.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 186 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*187.    During his first visit, on December 1, 2014, Dr. Love met with Theodore S. Wright,
M.D. ("Dr. Wright"), Professor of Cardiac Surgery, Joseph B. Zwischenberger, M.D.
("Dr. Zwischenberger"), Chair of the Department of Surgery, and Sibu P. Saha, M.D.
("Dr. Saha"), Professor of Cardiothoracic Surgery.*

44

187.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 187 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*188.    After Dr. Love's first visit, Dr. Saha called Dr. Love and informed him that UKCM's CT surgery faculty had agreed unanimously to extend him an offer.*

188.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 188 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*189.    On or about December 18, 2014, Dr. Love returned to UKCM and had dinner with Dr. Zwischenberger and Dr. Saha, who confirmed the offer and discussed its terms with Dr. Love.  By the end of the dinner, Dr. Love had agreed in principle with Dr. Zwischenberger and Dr. Saha that he would accept the position at UKCM under a five-year contract.*

189.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 189 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*190.    On or about December 19, 2014, Dr. Love met with Michael Karpf, M.D. ("Dr. Karpf"), UKCM's Executive Vice President for Health Affairs. Dr. Karpf and Dr. Love agreed in principle to the terms of Dr. Love's employment, and Dr. Karpf asked Dr. Love to recruit Maher A. Baz, M.D. ("Dr. Baz"), a Critical Care Specialist at Indiana University Health, to join UKCM as a pulmonologist.  Accordingly, Dr. Love recruited Dr. Baz, and Dr. Baz, enthusiastic about having the opportunity to practice with Dr. Love, joined UKCM.*

190.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 190 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*191.    In early January 2015, Dr. Lindenbaum interviewed for a critical care position at UKCM and made false statements that reflected negatively on Dr. Love's professional competence ("Dr. Lindenbaum's Statements") to UKCM physicians, including Dr. Edwin A. Bowe, M.D. ("Dr. Bowe"), Chairman of the Department of Anesthesiology, and Dr. Kevin W. Hatton, M.D. ("Dr. Hatton"), a critical care specialist.*

45

191. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 191 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

192. *In 2014, Dr. Lindenbaum harbored malice toward Dr. Love as a result of Dr. Love's investigating and expressing concerns about MCW and FMLH's providing grossly substandard patient care, particularly with respect to the grossly substandard care MCW and FMLH anesthesiologists had provided to Patient #5, Patient #7, and Patient #8.*

192. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 192 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

193. *Dr. Lindenbaum's Statements included the following: (1) Dr. Love is an incompetent surgeon who had terrible patient outcomes at MCW and FMLH; (2) MCW and FMLH had terminated Dr. Love with cause for that reason; and (3) Dr. Love had effectively destroyed MCW and FMLH's transplant program through his incompetence.*

193. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 193 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

194. *Dr. Lindenbaum made his Statements knowing they were false and knowing Dr. Love had a prospective employment contract with UKCM.*

194. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 194 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

195. *On information and belief, Dr. Bowe and Dr. Hatton spoke to other physicians in MCW and FMLH's anesthesiology department, who also made false statements about Dr. Love that reflected negatively on his professional competence.*

195. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 195 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

46

*196. Dr. Bowe and Dr. Hatton communicated Dr. Lindenbaum's Statements to members of UKCM's management, including, but not limited to, Dr. Zwischenberger.*

196. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 196 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*197. Approximately one week later, Dr. Saha informed Dr. Love by text message that UKCM had decided to withdraw its offer.*

197. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 197 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*198. UKCM withdrew its employment offer to Dr. Love as a direct result of Dr. Lindenbaum's Statements.*

198. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 198 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

**Dr. Love's Position at Cadence**

*199. After Dr. Love learned of Defendants' interference with his prospective position at St. Mary's Hospital and of Defendants' interference with his prospective position at UKCM, he realized he had to broaden his job search and accept the first surgeon position offered to him, even if doing so would diminish his professional status and force him to live apart from his family.*

199. Defendant denies the allegations in Paragraph 199 of the First Amended Complaint.

*200. Accordingly, in January 2015, Dr. Love asked Dr. Shoup whether there was an open surgeon position at Cadence, which is a community hospital-based physician group located in the western suburbs of Chicago.*

200. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 200 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

47

*201.    Dr. Shoup has known Dr. Love since 2006, when he joined her former practice group at Loyola Hospital as Professor and Vice Chairman and Surgical Director of Lung Transplantation.*

201.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 201 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*202.    Dr. Shoup invited Dr. Love to interview at Cadence for an open thoracic surgeon position.*

202.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 202 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*203.    At around the time of Dr. Love's interview at Cadence in February 2015, Dr. Shoup discussed his candidacy with Karen Brasl, M.D. ("Dr. Brasl"), a trauma surgeon who practiced at MCW contemporaneously with Dr. Love.  During that discussion, Dr. Brasl stated, "everything [Dr. Love] touched turned into a disaster" at MCW.*

203.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 203 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*204.    Shortly after Dr. Shoup spoke to Dr. Brasl, she called Dr. Evans to discuss Dr. Love's candidacy.*

204.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 204 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*205.    Dr. Shoup called Dr. Evans to inquire into the accuracy of Dr. Brasl's statement because Dr. Shoup has known Dr. Evans professionally for over 10 years, she respects him as a surgeon, and she believes him to be an honest and trustworthy person.*

205.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 205 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

206.    *During Dr. Shoup's discussion with Dr. Evans, Dr. Evans stated that Dr. Brasl's statement was not true, that the circumstances surrounding Dr. Love's separation from MCW were not Dr. Love's fault, and that Dr. Love is a good surgeon.*

206.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 206 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

207.    *Because Dr. Shoup knew Dr. Love to be an excellent surgeon with a high level of technical competence and surgical judgment, because Dr. Evans refuted the disparaging statements other MCW physicians had made regarding Dr. Love, and because MCW reported there were no pending or past malpractice cases against Dr. Love arising out of his practice at MCW, Cadence offered Dr. Love the thoracic surgeon position.*

207.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 207 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

208.    *Dr. Love gratefully accepted Cadence's offer and began practicing there on April 1, 2015.*

208.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 208 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

209.    *Dr. Love continues to practice at Cadence and has exhibited a high level of technical competence and surgical judgment during his time there.*

209.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 209 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

210. *Dr. Love's accepting the position at Cadence has diminished his professional status for the following reasons:*

- *The Cadence position is as a member of a community hospital-based physician group rather than as a member of the faculty of an academic hospital;*

- *The Cadence position is as a staff physician rather than as a department chief;*

- *In the Cadence position, Dr. Love will perform only thoracic surgery, so he has had to permanently relinquish his practices in cardiac surgery and CT transplant surgery, the field in which he built an international reputation; and*

- *Dr. Love's salary at Cadence is significantly lower than the salary he earned at MCW, the salary he would have earned at UKCM, or the salary he would have earned as a CT surgeon at another academic hospital.*

210. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 210 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

211. *In addition to diminishing his professional status, Dr. Love's accepting the Cadence position has forced him to live apart from his wife and daughter, who are unable to relocate to the western suburbs of Chicago.*

211. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 211 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

## COUNT I
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
## AGAINST MCW

212. *Dr. Love realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 211 of this Complaint.*

212. Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth fully herein.

213. *Section 3730(h)(l) of the False Claims Act ("FCA") provides as follows:*

> *Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.*

> *31 U.S.C. § 3730(h)(l).*

213.    As Count I does not assert a claim against Defendant, no response is required. To the extent that any response is required, Section 3730(h)(1) of the False Claims Act ("FCA") speaks for itself and is the best evidence of its contents.

214.    *Dr. Love engaged in lawful acts in furtherance of efforts to stop violations of the FCA when he investigated and expressed concerns to MCW regarding the following actual or potential FCA violations:*

- *MCW's providing patient care that may have been so grossly substandard as to constitute worthless services;*

- *MCW's actual or potential violations of CMS regulation 42 C.F.R. § 482.72, which obligates all transplant centers to follow OPTN requirements as a condition of Medicare payment and participation;*

- *MCW's actual or potential violations of CMS regulation 42 C.F.R. § 482.21, which requires health care facilities, as a condition of Medicare payment and participation, to track adverse patient events, analyze their causes, and implement actions and mechanisms to prevent recurrences;*

- *MCW's actual or potential violations of 42 U.S.C. § 1320c-5(a), which requires health care facilities, as a condition of Medicare payment and participation, to provide services only when medically necessary and of a quality that meets professionally recognized standards of health care;*

- *Dr. Stone's providing patient care that may have been so grossly substandard as to constitute worthless or substantially diminished services;*

- *Dr. Stone's performing operations that may have been unnecessary and non-standard;*

51

- *Dr. Stone's billing practices that may have been fraudulent; and*

- *Dr. Almassi's providing patient care to veterans that may have been so grossly substandard as to constitute worthless services.*

214. As Count I does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 214 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

215. *MCW knew Dr. Love was engaging in lawful acts in furtherance of efforts to stop violations of the FCA when he investigated and expressed concerns to MCW regarding those actual or potential FCA violations.*

215. As Count I does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 215 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

216. *Because Dr. Love was engaging in lawful acts in furtherance of efforts to stop violations of the FCA, MCW discriminated against Dr. Love in the terms and conditions of his employment, in violation of Section 3730(h)(l) of the FCA.*

216. As Count I does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 216 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

217. *Specifically, MCW discriminated against Dr. Love in the terms and conditions of his employment in the following manner: (1) placing Dr. Love on a leave of absence on May 8, 2014; (2) sending the Buck Email to numerous MCW and FMLH's employees on May 8, 2014; (3) informing Dr. Love, on May 20, 2014, that there was no longer a clinical role for him at MCW and FMLH; (4) threatening to terminate Dr. Love for cause on May 20, 2014; (5) excluding Dr. Love from faculty meetings as of May 26, 2014; (6) eliminating Dr. Love's name from MCW's call schedule as of May 27, 2014; (7) reducing Dr. Love's salary by approximately 25 percent as of July 1, 2014; and (8) revoking Dr. Love's privileges at the Zablocki VA on September 5, 2014.*

52

217.    As Count I does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 217 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

218.    *MCW's revoking Dr. Love's privileges at the Zablocki VA on September 5, 2014 was the final step of a months-long campaign by MCW to discriminate against Dr. Love in the terms and conditions of his employment in retaliation for his efforts to stop MCW's violations of the FCA.*

218.    As Count I does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 218 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

219.    *Because Dr. Love did not, in Section 7 of the Separation Agreement or elsewhere, release any of his claims that arose after August 26, 2014, Dr. Love did not release his claims based on MCW's revoking his privileges at the Zablocki VA on September 5,  2014.*

219.    As Count I does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 219 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

220.    *As a direct and proximate result of MCW's violations of Section 3730(h)(l) of the FCA, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish.*

220.    As Count I does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 220 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

## COUNT II
## DEFAMATION AGAINST MCW, FMLH, AND DR. PAGEL

*221.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 220 of this Complaint.*

212.    Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth

fully herein.

*222.    Dr. Pagel's Statements are false and were false when Dr. Pagel made them to Dr. Schroeder.*

222.    Defendant denies the allegations in Paragraph 222 of the First Amended Complaint.

*223.    Dr. Schroeder communicated Dr. Pagel's Statements to Dr. Kantamneni and Dr. Itani, among other physicians at St. Mary's Hospital.*

223.    Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 223 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*224.    Dr. Pagel made his Statements knowing they were false or, at the very least, recklessly disregarding their falsity.*

224.    Defendant denies the allegations in Paragraph 224 of the First Amended Complaint.

*225.    Dr. Pagel's Statements have damaged Dr. Love's reputation so as to lower him in the estimation of the medical community and have deterred potential employers, including St. Mary's Hospital, from hiring him.*

225.    Defendant denies the allegations in Paragraph 225 of the First Amended Complaint.

*226.    As a direct and proximate result of Dr. Pagel's making his Statements, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish.*

226.    Defendant denies the allegations in Paragraph 226 of the First Amended Complaint.

*227.    Because Dr. Pagel acted maliciously toward Dr. Love or, at the very least, in an intentional disregard of his rights, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the amount of the compensatory damages he recovers.*

227.    Defendant denies the allegations in Paragraph 227 of the First Amended Complaint.

54

*228.     When Dr. Pagel made his Statements, he was acting within the scope of his employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Pagel's actions.*

228.     The allegations in Paragraph 228 state legal conclusions to which no response is required. To the extent a response is required, Defendant denies that he is employed by MCW and FMLH, such that both entities could be held vicariously liable for his actions.

**COUNT III**
**DEFAMATION**
**AGAINST MCW, FMLH, AND DR. LINDENBAUM**

*229.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 228 of this Complaint.*

229.     Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth fully herein.

*230.     Dr. Lindenbaum's Statements are false and were false when he made them to Dr. Bowe and Dr. Hatton.*

230.     As Count III does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge regarding the allegations in Paragraph 230 of the First Amended Complaint and therefore denies them.

*231.     Dr. Bowe and Dr. Hatton communicated Dr. Lindenbaum's Statements to members of UKCM's management, including, but not limited to, Dr. Zwischenberger.*

231.     As Count III does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 231 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*232.     Dr. Lindenbaum made his Statements knowing they were false or, at the very least, recklessly disregarding their falsity.*

232.     As Count III does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to

55

form a belief regarding the allegations in Paragraph 232 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

233.    *Dr. Lindenbaum's Statements have damaged Dr. Love's reputation so as to lower him in the estimation of the medical community and have deterred potential employers, including UKCM, from hiring him.*

233.    As Count III does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 233 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

234.    *As a direct and proximate result of Dr. Lindenbaum's making his Statements, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish.*

234.    As Count III does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 234 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

235.    *Because Dr. Lindenbaum acted maliciously toward Dr. Love or, at the very least, in an intentional disregard of his rights, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the amount of the compensatory damages he recovers.*

235.    As Count III does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 235 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

236.    *When Dr. Lindenbaum made his Statements, he was acting within the scope of his employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Lindenbaum's actions.*

236.     As Count III does not assert a claim against Defendant, no response is required.  To the

extent that any response is required, Defendant lacks knowledge or information sufficient to

form a belief regarding the allegations in Paragraph 236 of the First Amended Complaint and

therefore denies the same and demands strict proof thereof.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS
## AGAINST MCW, FMLH, AND DR. PAGEL

*237.     Plaintiff realleges and incorporates as if fully stated herein the allegations in
paragraphs 1 through 236 of this Complaint.*

237.     Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth

fully herein.

*238.     In October 2014, Dr. Love had a prospective contractual employment relationship
with St. Mary's Hospital.*

238.     Defendant lacks knowledge or information sufficient to form a belief regarding the

allegations in Paragraph 238 of the First Amended Complaint and therefore denies the same

and demands strict proof thereof.

*239.     By making his Statements to Dr. Schroeder on October 21, 2014, Dr. Pagel
interfered with Dr. Love's prospective contractual employment relationship with St.
Mary's Hospital.*

239.     Defendant denies the allegations in Paragraph 239 of the First Amended Complaint.

*240.     Dr. Pagel's primary purpose in making his Statements to Dr. Shroeder was to
interfere with Dr. Love's prospective contractual employment relationship with St.
Mary's Hospital, and Dr. Pagel knew that such interference was substantially certain to
occur as a result of his making his Statements.*

240.     Defendant denies the allegations in Paragraph 240 of the First Amended Complaint.

*241.     As a result of Dr. Pagel's making his Statements, St. Mary's Hospital terminated its
prospective contractual employment relationship with Dr. Love.*

241.     Defendant denies the allegations in Paragraph 241 of the First Amended Complaint.

57

*242. As a result of St. Mary's Hospital terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish.*

242. Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 242 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*243. Dr. Pagel was neither justified nor privileged in making his Statements to Dr. Schroeder.*

243. Defendant denies the allegations in Paragraph 243 of the First Amended Complaint.

*244. Because Dr. Pagel acted maliciously toward Dr. Love or, at the very least, in an intentional disregard of his rights, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the amount of the compensatory damages he recovers.*

244. Defendant denies the allegations in Paragraph 244 of the First Amended Complaint.

*245. When Dr. Pagel made his Statements, he was acting within the scope of his employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Pagel's actions.*

245. Paragraph 245 of the First Amended Complaint states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies that he is employed by MCW and FMLH, such that both entities could be held vicariously liable for his actions.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST MCW, FMLH, AND DR. LINDEBAUM

*246. Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 245 of this Complaint.*

246. Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth fully herein.

58

*247.   In December 2014, Dr. Love had a prospective contractual employment relationship with UKCM.*

247.   As Count V does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 247 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*248.   By making his Statements to Dr. Bowe and Dr. Hatton, Dr. Lindenbaum interfered with Dr. Love's prospective contractual employment relationship with UKCM.*

248.   As Count V does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 248 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*249.   Dr. Lindenbaum's primary purpose in making his Statements to Dr. Bowe and Dr. Hatton was to interfere with Dr. Love's prospective contractual employment relationship with UKCM, and Dr. Lindenbaum knew that such interference was substantially certain to occur as a result of his making his Statements to Dr. Bowe and Dr. Hatton.*

249.   As Count V does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 249 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*250.   As a result of Dr. Lindenbaum's making his Statements to Dr. Bowe and Dr. Hatton, UKCM terminated its prospective contractual employment relationship with Dr. Love.*

250.   As Count V does not assert a claim against Defendant, no response is required.  To the extent that any response is required, Defendant lacks knowledge or information regarding the allegations in Paragraph 250 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

59

*251. As a result of UKCM's terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, humiliation, emotional distress, and mental pain and anguish.*

251.    As Count V does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 251 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*252. Dr. Lindenbaum was neither justified nor privileged in making his Statements to Dr. Bowe and Dr. Hatton.*

252.    As Count V does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 252 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*253. Because Dr. Lindenbaum acted maliciously toward Dr. Love or, at the very least, in an intentional disregard of his rights, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the amount of the compensatory damages he recovers.*

253.    As Count V does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 253 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

*254. When Dr. Lindenbaum made his Statements, he was acting within the scope of his employment at MCW and FMLH. Accordingly, MCW and FMLH are vicariously liable for Dr. Lindenbaum's actions.*

254.    As Count V does not assert a claim against Defendant, no response is required. Paragraph 254 further asserts a legal conclusion, to which no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to

60

form a belief regarding the allegations in Paragraph 254 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

## COUNT VI
## BREACH OF CONTRACT
## AGAINST MCW

255. *Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 254 of this Complaint.*

255. Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth fully herein.

256. *Dr. Love entered into the Separation Agreement with MCW on August 26, 2014.*

256. As Count VI does not assert a claim against Defendant, no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 256 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

257. *The Separation Agreement is a valid and enforceable contract.*

257. As Count VI does not assert a claim against Defendant, no response is required. Paragraph 257 further asserts a legal conclusion, to which no response is required. To the extent that any response is required, Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 257 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

258. *Section 12 of the Separation Agreement provides, in part, as follows:*

> *Dr. Love, on the one hand, and MCW's officers, on the other hand, agree not to make disparaging remarks about each other. If, after the date of this Agreement, MCW's officers are contacted by third parties regarding Dr. Love, they will provide an explanation (and limit any discussion) as to the circumstances surrounding Dr. Love's employment and termination consistent with that contained in the reference letter, attached as Exhibit B. MCW will make its officers*

61

*aware of this provision of this Agreement for purposes of assuring their compliance therewith.*

258.    As Count VI does not assert a claim against Defendant, no response is required. To the extent that any response is required, any contractual term speaks for itself and is the best evidence of its contents.

*259.    Dr. Pagel is an officer of MCW.*

259.    Defendant denies the allegations in Paragraph 259 of the First Amended Complaint.

*260.    In Dr. Pagel's Statements, he made disparaging remarks about Dr. Love.*

260.    The allegations in Paragraph 260 state a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 260 of the First Amended Complaint.

*261.    Because Dr. Pagel made his Statements to Dr. Schroeder, MCW breached Section 12 of the Separation Agreement.*

261.    The allegations in Paragraph 261 state a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 261 of the First Amended Complaint.

*262.    As a result of MCW's breaching Section 12 of the Separation Agreement, St. Mary's Hospital terminated its prospective contractual employment relationship with Dr. Love.*

262.    Defendant denies the allegations of Paragraph 262 of the First Amended Complaint.

263.    As a result of St. Mary's Hospital terminating its prospective contractual employment *relationship* with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, and lost future earnings and employment benefits.

263.    Defendant lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 263 of the First Amended Complaint and therefore denies the same and demands strict proof thereof.

62

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## <u>AGAINST ALL DEFENDANTS</u>

*264.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 263 of this Complaint.*

264.    Defendant repeats and reasserts its answers to each of the Paragraphs above as if set forth

fully herein.

*265.    As described above, Defendants engaged in a protracted campaign to ruin Dr. Love's career and well-earned reputation.*

265.    Defendant denies the allegations in Paragraph 265 of the First Amended Complaint.

*266.    Defendants' conduct was intentioned to cause Dr. Love emotional distress.*

266.    Defendant denies the allegations in Paragraph 266 of the First Amended Complaint.

*267.    Defendants' conduct was extreme and outrageous.*

267.    Defendant denies the allegations in Paragraph 267 of the First Amended Complaint.

*268.    Dr. Love suffered an extreme disabling emotional response to Defendant's conduct.*

268.    Defendant denies the allegations in Paragraph 268 of the First Amended Complaint.

*269.    Defendants' conduct was a cause, in-fact of Dr. Love's emotional distress.*

269.    Defendant denies the allegations in Paragraph 269 of the First Amended Complaint.

*270.    As a result of Defendants' conduct, Dr. Love suffered damages and continues to suffer damages.*

270.    Defendant denies the allegations in Paragraph 270 of the First Amended Complaint.

*271.    Because Defendants acted maliciously toward Dr. Love or, at the very least, in an intentional disregard of his rights, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the amount of the compensatory damages he recovers.*

271.    Defendant denies the allegations in Paragraph 271 of the First Amended Complaint.

272.    Defendant denies all allegations not specifically admitted to herein.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's complaint fails to state claims against Defendant upon which relief can be granted.

2.    Dr. Pagel was acting within the scope of his employment as a federal employee, and as a result, Dr. Pagel is not a proper defendant in this action pursuant to the doctrine of sovereign immunity and the Federal Tort Claims Act.

3.    Plaintiff's claims against Dr. Pagel set forth in Counts II, IV, and VII are barred by the doctrine of sovereign immunity and the Federal Tort Claims Act.

5.    Plaintiff's claims against Dr. Pagel set forth in Counts II, IV, and VII are barred because Plaintiff failed to exhaust administrative remedies.

6.    Plaintiff's claims against Dr. Pagel set forth in Counts II, IV, and VII are barred by the exclusive remedy provision of the Wisconsin Workers' Compensation Act.

7.    The statements alleged in the First Amended Complaint that Plaintiff attributes to Dr. Pagel were either truthful statements and/or statements of opinion and not defamatory as a matter of law.

8.    The statements alleged in the First Amended Complaint that Plaintiff attributes to Dr. Pagel were privileged and/or justified.

9.    The statements alleged in the First Amended Complaint that Plaintiff attributes to Dr. Pagel were made in good faith and therefore subject to civil immunity under Wis. Stat. §§ 146.37 and 895.487.

10.    The statements alleged in the First Amended Complaint that Plaintiff attributes to Dr. Pagel were protected by his Constitutional right to free speech.

64

11.     This Court lacks subject matter jurisdiction over the state law claims against Defendant.

12.     Upon information and belief, Plaintiff has failed and in failing to mitigate his damages.

13.     Defendant reserves the right to add affirmative defenses that become known through the course of discovery.

## PRAYER FOR RELIEF

WHEREFORE, DEFENDANT PAUL S. PAGEL, M.D. demands judgment in his favor, dismissing plaintiff's claims against him in the First Amended Complaint on their merits together with the costs and disbursements of this action.

65

Dated this 16th day of February, 2017.

                                          *s/Amy Schmidt Jones*
                                          Amy Schmidt Jones
                                          Michael Best & Friedrich LLP
                                          100 East Wisconsin Avenue, Suite 3300
                                          Milwaukee, Wisconsin 53202
                                          Telephone:  414-271-6560
                                          Fax:  414-277-0656
                                          E-mail:  asjones@michaelbest.com

                                          Judson D. Stelter
                                          Michael Best & Friedrich LLP
                                          170 South Main Street, Suite 1000
                                          Salt Lake City, Utah 84101
                                          Telephone: 385-695-6454
                                          Fax: 801-931-2500
                                          Email: jdstelter@michaelbest.com

                                          Attorneys for Defendant Paul S. Pagel, M.D.

210491-0001\20385539.3

66