## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| ROBERT B. LOVE, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDICAL COLLEGE OF WISCONSIN, INC., | ) | Case No. 2:15-cv-00650-LA |
| ALFRED C. NICOLOSI, M.D., | ) | |
| PAUL S. PAGEL, M.D., | ) | |
| DAVID C. WARLTIER, M.D., and | ) | |
| LARRY LINDENBAUM, M.D., | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————————— | ) | |

## THIRD AMENDED COMPLAINT

Plaintiff, Robert B. Love, M.D. ("Dr. Love"), by and through his undersigned attorneys, for his Third Amended Complaint against Defendants, Medical College of Wisconsin, Inc. ("MCW"), Alfred C. Nicolosi, M.D. ("Dr. Nicolosi"), Paul S. Pagel, M.D. ("Dr. Pagel"), David C. Warltier, M.D. ("Dr. Warltier"), and Larry Lindenbaum, M.D. ("Dr. Lindenbaum"), states as follows:

## PARTIES

1.      Plaintiff Dr. Love is a resident of Illinois.  Dr. Love is a surgeon, and he holds current Board Certifications in Surgery, Surgical Critical Care, and Cardiothoracic Surgery.

2.      Defendant MCW is a Wisconsin non-stock corporation with its principal place of business at 8701 Watertown Plank Road, Milwaukee, Wisconsin 53226.  MCW is affiliated with several hospitals, including Froedtert Memorial Lutheran Hospital, Inc. ("Froedtert") and Clement J. Zablocki Veterans' Affairs Medical Center (the "Zablocki VA").  The Zablocki VA, operated

by the Department of Veterans' Affairs, is one of MCW's major sites for medical and surgical training. MCW provides services and operates graduate medical programs at the Zablocki VA.

3.     Defendant Dr. Nicolosi is a resident of Wisconsin. He currently practices as a cardiothoracic surgeon at SSM Health Dean Medical Group and St. Mary's Hospital in Madison, Wisconsin (collectively, "St. Mary's Hospital"). Dr. Nicolosi formerly practiced as a cardiothoracic surgeon in the Division of Cardiothoracic Surgery at MCW.

4.     Defendant Dr. Pagel is a resident of Wisconsin. He is and was, at all times relevant hereto, Director of Cardiac Anesthesia at MCW.

5.     Defendant Dr. Warltier is a resident of Wisconsin. He is and was, at all times relevant hereto, Professor and Chairman of Anesthesiology at MCW.

6.     Defendant Dr. Lindenbaum is a resident of California. He was, at all times relevant hereto, Assistant Professor of Anesthesiology at MCW.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter in controversy is between citizens of different states.

8.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3730(h)(2) because Dr. Love's False Claims Act Retaliation claim herein arises out of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

9.      This Court has supplemental jurisdiction over Dr. Love's remaining state law claims under 28 U.S.C. § 1367(a) because the state law claims are so related to the False Claims Act Retaliation claim that they form part of the same case or controversy under Article III of the United States Constitution.

2

10.    Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Dr. Love's claims occurred in this judicial district.

## SUMMARY OF THE CASE

11.    In the summer of 2012, Dr. Love came to MCW as a world-renowned transplant and cardiothoracic surgeon with aspirations of leading the transformation of MCW's pedestrian adult cardiac surgery and heart and lung transplant divisions into market-leading, cutting-edge programs.

12.    Soon after he arrived, Dr. Love discovered that MCW was plagued by incompetence, corruption, and an ethos of prioritizing profits over patients. When Dr. Love blew the whistle and tried to institute reform, he encountered nothing but resistance from those accustomed to the old order, particularly Dr. Nicolosi and a cabal of anesthesiologists, which included Dr. Pagel, Dr. Warltier, and Dr. Lindenbaum. Over time, this resistance devolved into open hostility and, to quote one MCW physician, "anesthesia counter warfare."

13.    While Dr. Love was working to build MCW's adult cardiac surgery and heart and lung transplant programs, his enemies—Dr. Nicolosi, Dr. Pagel, Dr. Warltier, Dr. Lindenbaum, several other MCW anesthesiologists, and MCW's general counsel—were working to destroy him. They orchestrated an elaborate smear campaign designed to silence Dr. Love, to force him out of MCW, and to ruin his professional reputation. In attempt to gather ammunition for their campaign, they dug into and shared *private*, individually identifiable health information of numerous patients of MCW physicians—repeatedly violating federal criminal law in the process.

14.    By August 2014, Dr. Love's enemies had succeeded in forcing Dr. Love out of MCW, and MCW had induced him—through fraud—to sign a Separation Agreement that included

3

a full release of MCW and all of its agents, officers, and employees, a confidentiality provision, and a non-disparagement provision. MCW wanted him to go away quietly.

15.     Yet the smear campaign did not end with Dr. Love's departure from MCW. In late 2014 and early 2015, when Dr. Love was searching for a new position, Dr. Pagel and other MCW anesthesiologists continued to malign him so that he would never work again and so that he would have no credibility were he to expose the widespread corruption he had uncovered. They defamed him to hospitals throughout the country, and they torpedoed his candidacy for several positions. The result was the destruction of a career and reputation Dr. Love had built over a lifetime.

16.     With a family to support, Dr. Love had to abandon his search for an academic transplant and cardiothoracic surgery practice and accept a less-prestigious and lower-paying position as a thoracic surgeon at a community hospital. Dr. Love secured that position only because a former colleague at the community hospital did not take the accusations against Dr. Love at face value. Instead, she followed up and learned from the Chair of MCW's Department of Surgery that the accusations were not true, that Dr. Love's separation from MCW was not his fault, and that Dr. Love is a skilled surgeon. Dr. Love received an offer from the community hospital in 2015, and he has excelled there ever since. But Dr. Love's once-rewarding career as an academic transplant and cardiothoracic surgeon is over, and his once-sterling professional reputation has been forever tarnished.

## FACTS

### Dr. Love's Employment at MCW

17.     On April 26, 2012, Dr. Love accepted a position at MCW as Professor and Section Chief of Adult Cardiac Surgery and Director of the Thoracic Transplantation Program.

4

18.     Before joining MCW, Dr. Love practiced at Loyola University Medical Center in Maywood, Illinois ("Loyola Hospital"), where he served as Chairman of the Department of Cardiothoracic Surgery and Professor of Surgery, Microbiology, and Immunology.

19.     During Dr. Love's tenure at MCW, he played an integral role in MCW's effort to build its programs in Adult Cardiac Surgery, Heart Transplantation, Lung Transplantation, Heart Failure, and Mechanical Circulatory Support ("MCS").

20.     Dr. Love was also instrumental in building MCW's heart and lung transplant services.  Under Dr. Love's leadership, Froedtert acquired and implemented the clinical use of a full spectrum of modern MCS devices and became the first hospital in the United States to successfully implant the HeartWare Ventricular Assist Device ("VAD") outside of a clinical trial.

21.     After Dr. Love introduced the HeartWare VAD into clinical practice in December 2012, the six-month survival rate for MCW physicians' patients with long-term VAD implants improved to greater than 90 percent.  MCW also achieved market-leading outcomes for short-term VAD implant patients: the rescue rate of the sickest MCW physicians' patients was zero percent in 2012, 39 percent in 2013, and 57 percent in the first quarter of 2014, a trend that compares favorably to the Interagency Registry for Mechanically Assisted Circulatory Support benchmark of 25 percent.

22.     Dr. Love was instrumental in increasing the patient volume of transplants by MCW physicians. This allowed Froedtert's transplant program to obtain approval from the Centers for Medicare & Medicaid Services ("CMS") in 2013.

23.     Through Dr. Love's efforts, MCW added to its offered services Donor After Cardiac Death Lung Transplantations, which Dr. Love pioneered in the early 1990s as a way to increase donor lung utilization rates.

5

24.     At MCW, Dr. Love also established a research program and an Organ Recovery Lab, designed and acquired funding to purchase an Ex-Vivo Lung Perfusion device to implement preclinical lung recovery on discarded lungs, and assembled a collaborative group of researchers to study novel methods to assess lung recovery using optical coherence tomography analysis.

25.     Dr. Love helped MCW make crucial financial and strategic commitments toward the goal of supporting a larger volume transplant center with expanded complex cardiovascular and thoracic care.

26.     Dr. Love led the effort to build at Froedtert a new 20-bed Cardiovascular Intensive Care Unit ("ICU") adjacent to the operating rooms.

27.     Dr. Love also played a critical role in the design of two new cardiothoracic operating rooms at Froedtert and in the redesign of new cardiopulmonary bypass pumps and perfusion services.

28.     Dr. Love's duties at MCW included, but were not limited to, treating patients with cardiothoracic surgical complications, teaching surgical fellows, residents, and medical students, and training physicians' assistants who came to MCW with little or no prior clinical experience.

29.     At all times during Dr. Love's employment at MCW, Dr. Love served as a dedicated and professional physician and strived to improve the quality of MCW physicians' patient care.

## Dr. Love's Concerns Regarding Grossly Substandard Patient Care

30.     Dr. Love became concerned on                 2012, his first day as an MCW employee, that MCW physicians were providing grossly substandard patient care.

31.     On               2012, Claudius Mahr, D.O. ("Dr. Mahr"), the Medical Director of Cardiac Transplantation at MCW, brought Dr. Love to the ICU to ask his opinion on the proper

6

treatment of Patient #1, who was suffering complications after Zahir A. Rashid, M.D. ("Dr. Rashid"), Assistant Professor of Cardiothoracic Surgery at MCW, and Dr. Nicolosi had implanted a VAD in his heart. When Dr. Love first examined him, Patient #1's chest cavity was open, he was sedated, and an Automatic Implantable Cardioverter Defibrillator ("AICD") was delivering periodic shocks to his heart to counteract the ventricular tachycardia that the improper placement of his VAD induced.

33.     Dr. Love immediately recognized that Dr. Rashid and Dr. Nicolosi had implanted the VAD improperly such that it had caused irreversible damage to Patient #1's heart.

33.     During the afternoon of                 2012, at a meeting with several members of MCW's senior management, Dr. Love expressed his concerns that Dr. Rashid and Dr. Nicolosi had provided grossly substandard care to Patient #1. Dr. Love advised that the medically proper course of action would be to administer palliative care to Patient #1, because nothing could be done to salvage his heart and because continuing to use the AICD to deliver shocks to his heart would be tantamount to torture. Neither Dr. Rashid nor Dr. Nicolosi attended the meeting.

34.     Dr. Rashid and Dr. Nicolosi did not administer palliative care to Patient #1. Instead, they ordered the continuation of MCS and AICD treatment until Patient #1 died several days later.

35.     In an                 2012 meeting with several members of MCW's senior management, Dr. Love expressed his concerns that Dr. Rashid and Dr. Nicolosi had provided grossly substandard care to Patient #1.

36.     In             2012, Dr. Rashid implanted a VAD improperly in Patient #2. Although it was urgent that the VAD be replaced before it caused irreversible damage to Patient #2's heart, Dr. Rashid and Dr. Nicolosi denied that Dr. Rashid had implanted the VAD improperly and refused to perform surgery to replace it. Because Dr. Rashid and Dr. Nicolosi refused to correct the

7

complication, Dr. Love, who was out of the state at the time, intervened and arranged for Patient #2 to be transferred to Northwestern Memorial Hospital ("NMH") in Chicago to receive proper treatment.

37.     At NMH, Edward McGee, M.D. ("Dr. McGee") operated emergently on Patient #2, removing the improperly-placed VAD and implanting a new VAD properly.  Dr. McGee emailed Dr. Love intraoperative photographs showing that Dr. Rashid had placed the VAD in Patient #2's heart improperly.

38.     In the wake of that incident, Dr. Love showed the photographs and expressed concerns to several members of MCW's senior management regarding the grossly substandard patient care that Dr. Rashid and Dr. Nicolosi had provided.

39.     In July 2013, Dr. Love expressed concerns in person to several members of MCW's senior management regarding the grossly substandard care that Dr. Rashid had provided to Patient #3 and Patient #4, both of whom died after Dr. Rashid had performed minimally invasive aortic and mitral valve replacement surgery.

40.     On          2013, Dr. Love sent Lee A. Biblo, M.D. ("Dr. Biblo"), the Chief Medical Officer of MCW and Froedtert and Professor in the Division of Cardiology at MCW, the medical record numbers for Patient #3 and Patient #4 so that MCW physicians could conduct a Quality Assessment ("QA") review of those patients' cases.  Dr. Love followed up with Dr. Biblo repeatedly to inquire into whether MCW physicians had conducted QA reviews.

41.     MCW's senior management ignored Dr. Love's requests for several months and did not conduct QA reviews of Patient #3's and Patient #4's cases until February 28, 2014.  When the QA Review Committee finally reviewed those cases, it concluded as follows:

> Based on this review we feel that [Dr. Love] was justified in investigating these cases and asking [Dr. Rashid] to hold off on

minimally invasive cases during their evaluation of the cases. [Dr. Love] then asked that [Dr. Rashid] have a second surgeon present while doing minimally invasive cardiac surgery procedures after their review. We applaud [Dr. Love] for taking the initiative to review and the subsequent action since this falls clearly within [his] province....

Dr. Rashid should benefit from a focused professional practice (FPPE) related to minimally invasive as well as open valve procedures.

42. On                          2013, Izabela Jugovac, M.D. ("Dr. Jugovac"), an MCW anesthesiologist, and Andrew R. Schroeder, M.D. ("Dr. Schroeder"), then an MCW anesthesiology fellow, supervised a second-year resident who implanted a catheter in Patient #5 immediately before his scheduled cardiac surgery. The resident, Dr. Schroeder, and Dr. Jugovac placed the catheter improperly so that it lacerated Patient #5's superior vena cava, right atrium, and right ventricle, causing exsanguinating hemorrhage.

43. When Patient #5's vital signs began to worsen, Dr. Jugovac ordered an intraoperative fluoroscopy, which showed that the catheter had been placed incorrectly. On information and belief, neither Dr. Jugovac nor Dr. Schroeder was able to interpret the fluoroscopy image.

44. Dr. Jugovac summoned Wade Fischer, M.D. ("Dr. Fischer"), an MCW cardiac transplant surgeon, to the operating room.

45. Patient #5 then went into cardiac arrest, and Dr. Fischer called Dr. Love to the operating room to assist him.

46. Dr. Fischer and Dr. Love opened Patient #5's chest cavity and discovered the extensive injuries that the improperly-placed catheter had caused.

47. Dr. Fischer and Dr. Love performed a surgery that was far more complex than planned due to the extensive injuries that the improperly-placed catheter had caused. Dr. Fischer

9

and Dr. Love saved Patient #5's life, despite having to transfuse roughly 100 units of blood during the surgery.

48.     While Dr. Fischer and Dr. Love were performing the surgery on Patient #5, MCW anesthesiologists filed a confidential internal complaint, in which the anesthesiologists falsely alleged that Dr. Fischer and Dr. Love had unnecessarily opened Patient #5's chest cavity and caused complications.

49.     After Dr. Fischer and Dr. Love had completed the surgery on Patient #5, Lynn Fischer ("Ms. Fischer"), Froedtert's Vice President for Transplant, Heart, and Vascular Service Lines, informed Dr. Love of the anesthesiologists' complaint. Dr. Love then analyzed Patient #5's medical record and saw that, in violation of MCW protocol, it did not include the fluoroscopy image Dr. Jugovac had ordered. Dr. Love located the fluoroscopy machine and uploaded the image to the patient's medical record, which showed that the resident under Dr. Jugovac's and Dr. Schroeder's supervision had placed the catheter improperly.

50.     On                    2013, Dr. Love and Dr. Fischer were called to a meeting with numerous MCW anesthesiologists, including Judy R. Kersten, M.D. ("Dr. Kersten"), Kathy Lauer, M.D. ("Dr. Lauer"), Dr. Pagel, Dr. Jugovac, and Dr. Schroeder, and members of MCW's senior management.

51.     At that meeting, the anesthesiologists insisted that Dr. Love and Dr. Fischer had opened Patient #5's chest unnecessarily. Dr. Love responded by displaying the fluoroscopy image that proved the resident under Dr. Jugovac's and Dr. Schroeder's supervision had placed the catheter improperly, causing exsanguinating hemorrhage. Based on that indisputable evidence, Geoffrey C. Lamb, M.D. ("Dr. Lamb"), MCW's Associate Director of the Office of Joint Clinical Quality, submitted the case for a formal QA review of the anesthesiologists' performance.

52.     After the meeting, Dr. Warltier confronted Dr. Love and accused him of disparaging Dr. Jugovac.

53.     In late 2013 and early 2014, Dr. Love expressed concerns in person to several members of MCW's senior management, including Dr. Warltier, about the grossly substandard care that Dr. Jugovac and Dr. Schroeder had provided to Patient #5.

54.     Dr. Love also expressed concern that MCW anesthesiologists' routine practice of filing unfounded complaints of improper patient care against other doctors to protect themselves undermined the quality of MCW physicians' patient care. MCW's senior management did not take any meaningful action to discourage that routine practice.

55.     In          2014, Dr. Love performed complex, successful heart surgery on Patient #6. After the surgery, medical staff transported Patient #6 to the cardiac ICU. Patient #6 was stable, so Dr. Love went home.

56.     Approximately one hour later, medical staff notified Dr. Love that Patient #6 was in cardiac arrest in the ICU. Patient #6 had gone into ventricular fibrillation. The nurses in the ICU did not follow the medically proper protocol for treatment under the circumstances.

57.     Dr. Love arrived a few minutes later and found Patient #6 on the verge of death. Dr. Love attempted to save Patient #6's life. When Dr. Love opened Patient #6's chest cavity, however, he found that the medically improper care performed before Dr. Love arrived in the ICU had fractured Patient #6's ribs and lacerated her heart in multiple places, ultimately causing her death.

58.     In or about          2014, Dr. Love expressed concerns to several members of MCW's senior management about the grossly substandard care provided to Patient #6.

Specifically, Dr. Love expressed concerns that there was not on duty at all times a Code Team specially-trained in providing emergent care to heart surgery patients.

59.     On            2014, Dr. Fischer performed a heart transplant operation on Patient #7.  During that operation, the catheter that Sweeta D. Gandhi, M.D. ("Dr. Gandhi"), an MCW anesthesiologist, had placed in the area of Patient #7's heart before the surgery became dislodged.  The catheter, which was necessary to administer medication to aid in the transplanted heart's function, became dislodged because Dr. Gandhi had neglected to stitch it in place or secure it properly in any other way.

60.     As a result of the catheter's dislodging, Patient #7 suffered postoperative complications in the form of prolonged dysfunction of the transplanted heart, which led to infection, multisystem organ failure, and eventually death.

61.     An MCW anesthesiologist then filed a confidential internal complaint against Dr. Fischer, alleging that Dr. Fischer had provided improper patient care during the transplant operation.

62.     On            2014, during a 90-minute meeting with several members of MCW's senior management, Dr. Love expressed concerns about the grossly substandard care Dr. Gandhi had provided to Patient #7.  Also, Dr. Love reiterated his concern that MCW anesthesiologists' routine practice of filing unfounded complaints of improper patient care by other doctors to protect themselves undermined the quality of MCW physicians' patient care.

63.     MCW's senior management again took no meaningful action to discourage that practice.

12

64.     On              2014, Patient #8 died at Froedtert due to traumatic head injuries. Patient #8 was an organ donor, and his kidneys, liver, and one lung were suitable for transplantation.

65.     While MCW critical care physicians withdrew life-sustaining therapies from Patient #8, who had not yet been declared brain dead, Dr. Love waited in the operating room to procure Patient #8's lung, David C. Cronin, M.D., an MCW abdominal transplant surgeon, waited to procure Patient #8's kidneys, and a liver transplant surgeon from another hospital, waited to procure Patient #8's liver for a potential recipient there.

66.     MCW anesthesiologists ordered the medical staff not to remove Patient #8's breathing tube at the same time they withdrew all other life-sustaining therapies, in violation of written MCW policies. As a result, Patient #8's liver was destroyed unnecessarily.

67.     While Dr. Love waited to procure Patient #8's lung, George Haasler, M.D. ("Dr. Haasler"), Professor and Section Chief of Adult General Thoracic Surgery at MCW, prepared the intended recipient, Patient #9, for surgery. Dr. Love informed Dr. Haasler that only one of the donor's lungs was suitable for transplantation. Nevertheless, Dr. Haasler made a bilateral chest incision in Patient #9 for the transplantation of two lungs. Dr. Gandhi put the patient under general anesthesia, and Dr. Haasler placed Patient #9 on cardiopulmonary bypass, before critical care physicians had even set a time for withdrawing life-sustaining therapies from Patient #8. Dr. Haasler's and Dr. Gandhi's actions violated the standard protocol of waiting until organs have been procured and approved for transplantation before commencing surgery on Patient #9.

68.     With Dr. Love's assistance, Dr. Haasler successfully transplanted one lung in Patient #9. Yet Dr. Haasler and Dr. Gandhi had subjected Patient #9 to needless trauma by making a bilateral chest incision when only a unilateral chest incision was necessary and by placing the

13

patient on cardiopulmonary bypass and putting the patient under general anesthesia for hours longer than necessary.

69. On or about        2014, in a meeting with several members of MCW's senior management and two executives of the Wisconsin Donor Network (the "WDN"), Dr. Love expressed concerns about the grossly substandard care the anesthesiologists had provided by causing the destruction of Patient #8's healthy liver, and about the grossly substandard care Dr. Haasler and Dr. Gandhi had provided by subjecting Patient #9 to needless trauma.

70. As with all of the concerns Dr. Love had expressed previously, MCW's senior management, on information and belief, took no meaningful action to address the concerns Dr. Love expressed about those incidents.

### Dr. Love's Concerns Regarding the Quality Assessment Program

71. Throughout his tenure at MCW, Dr. Love repeatedly expressed concerns to members of MCW's senior management about MCW's insufficient QA program.

72. Dr. Love explained that MCW's insufficient QA program contributed to MCW physicians' grossly substandard patient care and was in violation of CMS rules and regulations requiring health care facilities, as a condition of participation in Medicare, to track adverse patient events, analyze their causes, and implement actions and mechanisms to prevent recurrences.

### Dr. Love's Concerns Regarding Dr. Stone

73. Between September 1, 2012 and August 31, 2015, Christopher D. Stone, M.D. ("Dr. Stone") was a faculty member and employee of MCW who practiced as a cardiothoracic surgeon at the Kenosha Medical Center ("KMC").

74. Starting on September 1, 2012, MCW had a contract with KMC for MCW physicians, including Dr. Stone, to provide cardiothoracic surgery there. MCW had the unilateral

right to terminate Dr. Stone, Dr. Stone received his paycheck from MCW, and Dr. Stone was subject to MCW's policies and procedures governing faculty conduct.

75.     Throughout Dr. Love's tenure at MCW, he repeatedly expressed concerns that Dr. Stone, as a faculty member and employee of MCW, had provided grossly substandard patient care and had performed unnecessary and non-standard operations on patients for the purpose of defrauding Medicare.

76.     Even before Dr. Stone became a faculty member and employee of MCW, members of MCW's senior management were aware of Dr. Stone's providing grossly substandard patient care and performing unnecessary and non-standard operations for the purpose of defrauding Medicare.

77.     On August 30, 2012, Mark W. Lodes, M.D. ("Dr. Lodes"), the President of F&MCW Community Physicians, reported concerns about Dr. Stone's conduct to Joseph E. Kerschner, M.D. ("Dr. Kerschner"), the Dean and Executive Vice President of MCW, Douglas B. Evans, M.D. ("Dr. Evans"), Professor and Chairman of the Department of Surgery at MCW, James S. Tweddell, M.D. ("Dr. Tweddell"), Chair of the Division of Cardiothoracic Surgery at MCW, and Dr. Love.

78.     In response to the concerns Dr. Lodes raised, Dr. Kerschner sent Dr. Lodes, Dr. Love, and Dr. Tweddell an email on the morning of August 31, 2012.  In that email, Dr. Kerschner stated, "We believe that the case brought forward suggests that Dr. Stone performed unnecessary surgery" for the purpose of defrauding Medicare.  Nevertheless, Dr. Kerschner counseled against MCW's terminating Dr. Stone.   Dr. Kerschner warned, "There is a financial risk to the enterprise given the large number of cases that Dr. Stone does – we discussed the importance of 'doing the right thing' – but we need to understand the financial implications of this."

15

79.     On September 3, 2012, Dr. Tweddell responded to Dr. Kerschner's August 31, 2012 email, informing Dr. Kerschner of the cardiothoracic surgery faculty's position that "[i]f we embrace, as a colleague, someone who has performed unnecessary surgery [for the purpose of defrauding Medicare] we are also embracing that unethical and completely unacceptable behavior."

80.     Despite that entreaty, Dr. Kerschner took no action to remove Dr. Stone. Dr. Kerschner anticipated that Dr. Stone would generate significant revenue for MCW, in part by committing Medicare fraud.

81.     On September 4, 2012, Dr. Lodes sent an email to Dr. Kerschner, John Raymond, M.D. ("Dr. Raymond"), MCW's President and CEO, and Sarah D. Cohn ("Ms. Cohn"), MCW's general counsel, among other recipients. In that email, Dr. Lodes advised that "it is in our interest to get some of our vascular physicians on staff [at KMC] for the purposes of coverage" before taking any action against Dr. Stone to "prepare us for stepping into more of the business should Dr. Stone leave."

82.     After September 1, 2012, the day Dr. Stone became an MCW faculty member and employee, he continued to provide grossly substandard patient care and to perform unnecessary and non-standard operations for the purpose of defrauding Medicare.

83.     Dr. Love complained to members of MCW's senior management that retaining Dr. Stone was unethical and tantamount to condoning Dr. Stone's conduct.

84.     Dr. Love and Dr. Tweddell offered Ms. Cohn their unequivocal opinions that Dr. Stone had performed unnecessary surgery in the case Dr. Kerschner referred to in his August 31, 2012 email. Nevertheless, Ms. Cohn retained Jeffrey Milliken, M.D. ("Dr. Milliken"), a cardiothoracic surgeon at UC Irvine Health, to provide an independent opinion on the case.

16

85.     On October 18, 2012, Dr. Milliken submitted to Ms. Cohn only a two-page draft report.  In that draft report, Dr. Milliken expressed doubts that the surgeries had been necessary, but he concluded, "There is not enough information in the records to make a definitive determination that the surgeries were indicated."  On information and belief, Ms. Cohn neither provided Dr. Milliken with additional records nor received a final version of his report.

86.     In December 2012, Dr. Love met with Ms. Cohn and told her that Dr. Stone's presence on the MCW faculty was a "clear and present danger" to MCW and its patients.  At that meeting, Dr. Love expressed the following concerns:

- Dr. Lodes had a "black book" documenting Dr. Stone's grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices at KMC;

- Rick Schmidt ("Mr. Schmidt"), the Chief Executive Officer of United Hospital Group in Kenosha, had implored MCW, at a meeting at KMC that Dr. Love attended, to remove Dr. Stone and hire a replacement surgeon;

- Dr. Love believed that Dr. Stone was committing Medicare fraud because documents related to Dr. Stone's billing reflected inflated Relative Value Units ("RVUs") that were not commensurate with the treatment he was providing; and

- Dr. Stone was performing unnecessary and non-standard operations on patients for the purpose of defrauding Medicare.

87.     Also in December 2012, Dr. Love hand-delivered to Ms. Cohn a letter addressed to Dr. Kerschner in which Dr. Love again expressed these concerns.

88.     In early 2013, Dr. Love attempted to recruit Nick V. Augelli, M.D. ("Dr. Augelli"), an experienced and well-respected cardiothoracic surgeon, to replace Dr. Stone at KMC.

89.     MCW's senior management resisted Dr. Love's efforts to recruit Dr. Augelli to replace Dr. Stone.  They decided that Dr. Stone would remain in his practice at KMC and on the faculty of MCW.

90.     Dr. Love criticized that decision to members of MCW s senior management, including Ms. Cohn, Dr. Evans, Dr. Tweddell, and Gary R. Seabrook, M.D. ("Dr. Seabrook"), Professor and Section Chief of the Division of Vascular Surgery at MCW.  Dr. Love continued to entreat them to terminate Dr. Stone in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.

91.     For instance, on March 1, 2013, Dr. Love submitted to Ms. Cohn a letter in which he advocated for Dr. Stone's termination in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.

92.     In his March 1, 2013 letter to Ms. Cohn, Dr. Love wrote the following:

> MCW faculty of Vascular and CT Surgery have knowledge of multiple cases that he has performed and subsequently sent here for complications or further surgery where the surgery was either not indicated, was clearly out of the bounds of clearly established practice, or where those practices have resulted in direct harm to the patient.  Additionally, there are many cases of even more aberrant and out of bounds patient care that are known throughout our fellow Physician Community.   Some of those issues, such as patient abandonment, are addressed in the information given to us [by Mr. Schmidt] in the December 21 meeting at [KMC].  MCW cannot be partner to allowing this to go on and be a haven for the continuation of this activity.
>
> ...
>
> The volume of clinical activity reported to MCW formally during the process of entering into an agreement with Dr. Stone, through CVG, about 24,000 RVU's in one year, [is] unprecedented, incredible and in my opinion impossible to achieve through lawful documentation and billing practice.  Certainly it is safe to assume that more than 50% of his cases are Medicare primary which would fall under CMS regulations for fraud etc.  That claim of RVU

activity is in our possession and has been seen by a number of faculty members by now, all of whom share the same incredulity.

93. In March 2014, Dr. Seabrook corresponded with Dr. Evans, Dr. Tweddell, Dr. Love, Daniel J. DeBehnke, M.D. ("Dr. DeBehnke"), MCW's Chief Clinical Integration Officer, and Jonathon D. Truwit, M.D. ("Dr. Truwit"), the Enterprise Chief Medical Officer and Senior Administrative Dean of MCW, about multiple patients who had received grossly substandard care from Dr. Stone and about the scheme Dr. Stone had used to bill for operations he had not performed.

94. For example, on                   2014, Dr. Seabrook wrote an email to those physicians about an incident in which Dr. Stone had performed an unnecessary and non-standard operation on Patient #10 but had described a different procedure in his post-operative report.

95. In response to that email, Dr. Tweddell stated, "I think this is more than a quality issue. The procedure described in detail in the operative report is not the procedure that was performed."

96. Dr. Seabrook then sent an email to Dr. Tweddell, noting that MCW was "accustomed to this practice of Dr. Stone performing unnamed operations."

97. In that email, Dr. Seabrook described in detail Dr. Stone's fraudulent billing practices: "Many of [Dr. Stone's] procedures are performed in increments. Staging the revascularization avoids the multiple procedure reduction modifier so if procedures are performed on different days, you can charge more for the same work. Of course, the patient must endure several operations."

98. In                   2014, Dr. Seabrook also corresponded with Dr. Evans, Dr. Tweddell, Dr. Love, Dr. DeBehnke, and Dr. Truwit about Patient #11, who had received grossly substandard care from Dr. Stone. Dr. Seabrook noted that Dr. Stone had performed an aorta-popliteal bypass

19

graft implantation on Patient #11 that was a "completely unconventional and unindicted surgical operation" and left Patient #11 in a debilitated state.

99.     In a series of meetings in March through May of 2014, Dr. Love continued to urge members of MCW's senior management to terminate Dr. Stone in light of his grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.

100.    Even after Dr. Love stopped practicing at MCW, other MCW physicians continued to express concerns about Dr. Stone's grossly substandard patient care, unnecessary and non-standard operations, and fraudulent billing practices.

101.    On             2014, for example, Dr. Seabrook wrote an email to Dr. Truwit, Dr. DeBehnke, Dr. Evans, and Ms. Cohn about an incident in which Dr. Stone had performed a non-standard operation and then failed to diagnose or treat a serious surgical complication—obvious arm ischemia with persistent sensory and motor defects—for six weeks. Dr. Seabrook asked, "How can we continue to accept this well established and well known unacceptable care under the Froedtert and Medical College brand? Do we not have an obligation to protect patients from ongoing exposure to this pattern of care?"

102.    On             2014, Dr. Evans responded only to Dr. Seabrook and wrote, "Moral compass simply not active – money and politics trumping patient care – nothing more disappointing. I have done all possible and was ordered to stand down yesterday."

103.    On             2014, Dr. Evans sent a follow-up email to Dr. Seabrook, asking, "Did you ever get a response [from Dr. Truwit, Dr. DeBehnke, or Ms. Cohn]?"

104.    On             2014, Dr. Seabrook replied to Dr. Evans, "No response. They should make rounds and note the patient's completely useless left arm."

105. Later on          2014, Dr. Evans replied to Dr. Seabrook, "No moral compass – nothing can be so sad."

106. MCW's senior management allowed Dr. Stone to continue operating on patients until August 2015.

## Dr. Love's Concerns Regarding Dr. Almassi

107. Dr. Love also expressed concerns to members of MCW's senior management about Hossein G. Almassi, M.D. ("Dr. Almassi"), the Section Chief of Cardiac Surgery at the Zablocki VA and a faculty member and employee of MCW.

108. Before Dr. Love even arrived at MCW, Dr. Evans and Dr. Tweddell told him that Dr. Almassi would be relieved of his clinical duties because he had provided grossly substandard patient care to veterans at the Zablocki VA.

109. On or about June 11, 2012, Dr. Evans requested of Michael D. Erdmann, M.D., Associate Dean and Professor at MCW and Chief of Staff at the Zablocki VA, that Dr. Almassi be removed from his full-time appointment at the Zablocki VA.

110. On June 22, 2012, Dr. Kerschner sent Ms. Cohn an email in which he acknowledged, "I do know that there have been some quality concerns about Dr. Almassi," but Dr. Kerschner expressed his opposition to Dr. Almassi's removal because "given Dr. Almassi's age and ethnicity ... MCW is at risk for an EEOC lawsuit."

111. On June 25, 2012, Ms. Cohn sent Dr. Kerschner an email in which she counseled against removing Dr. Almassi because "there is considerable legal risk if we permit [Dr. Evans] to force Dr. Almassi out of the chief position at the VA. Very superficially, it looks like a 60 something non-Caucasian male being forced out to benefit [Dr. Love]." Apparently, Ms. Cohn was more concerned about MCW's being subjected to a frivolous employment discrimination

lawsuit by Dr. Almassi than she was about veterans' being subjected to grossly substandard patient care.

112. On July 30, 2012, Dr. Evans offered to meet with Dr. Kerschner, along with Dr. Tweddell, to discuss his and Dr. Tweddell's opinion that Dr. Almassi should be removed from his appointment at the Zablocki VA because he had provided grossly substandard patient care to veterans. Dr. Evans wrote, "The clinical concerns regarding [Dr. Almassi's] performance are well-known with him being asked to leave Froedtert in 2006. Additional concerns have been raised by the Department of Medicine (Division of Cardiovascular Medicine) and the faculty staffing the Intensive Care Unit at the [Zablocki VA]."

113. On August 1, 2012, Dr. Kerschner discussed Dr. Evans's memo with Ms. Cohn, and they decided not to remove Dr. Almassi from his full-time appointment at the Zablocki VA, even though Froedtert had determined six years earlier that Dr. Almassi was unfit to care for civilians.

114. Throughout his tenure at MCW, Dr. Love witnessed first-hand the grossly substandard care that Dr. Almassi provided to veterans.

115. For example, in _____ 2013, Dr. Almassi performed a routine aortic valve replacement surgery on Patient #12, a veteran. During the operation, Dr. Almassi inadvertently disconnected Patient #12's aorta from his left ventricle. As a result, Patient #12 was unable to come off cardiopulmonary bypass.

116. After operating on Patient #12 for roughly ten hours, Dr. Almassi called Dr. Love to request that MCW physicians implant a VAD in Patient #12 at the Zablocki VA and then transfer him to Froedtert.

22

117. Dr. Love declined Dr. Almassi's request because he believed it would be unsafe to perform a VAD implantation at the Zablocki VA, where such a procedure had never been performed.

118. Instead, Patient #12 was transferred to Froedtert on a cardiopulmonary bypass machine, and Dr. Love and Dr. Rashid implanted a VAD in the patient there. Patient #12 died two days later because his heart had sustained irreversible damage as a result of the operation Dr. Almassi had performed.

119. In a March 13, 2014 email to Dr. Evans and Dr. Tweddell, Dr. Love expressed his concerns about MCW's failure to take any meaningful steps toward removing Dr. Almassi from the MCW faculty and the Zablocki VA medical staff.

120. Between March 2014 and April 2014, Dr. Love and other MCW physicians, including Dr. Evans, Dr. Tweddell, Dr. Biblo, and Dr. Rashid, met on multiple occasions to discuss Dr. Love's concerns and to develop a plan to transition Dr. Almassi out of the Zablocki VA.

121. During a March 13, 2014 meeting, Dr. Love and Dr. Evans both insisted that MCW needed to take action to relieve Dr. Almassi of his clinical duties as soon as possible because he was providing grossly substandard patient care to veterans.

122. In April 2014, Dr. Evans informed Dr. Love that he had assigned Dr. Rashid to take over control of the Zablocki VA cardiac program from Dr. Almassi.

123. Dr. Rashid, who had a close personal relationship with Dr. Almassi, took no action to relieve Dr. Almassi of his clinical duties.

124. When he learned that Dr. Rashid had taken no action against Dr. Almassi, Dr. Love complained to Dr. Evans and urged him to pursue an effective means of removing Dr. Almassi.

125. Nevertheless, MCW did not remove Dr. Almassi.

126.    Dr. Almassi is still operating on veterans at the Zablocki VA.

**Dr. Nicolosi's Malice toward Dr. Love**

127.    Dr. Nicolosi harbored malice toward Dr. Love, starting as soon as Dr. Love began working at MCW and continuing through at least 2015.

128.    On January 22, 2013, Michael P. Cinquegrani, M.D. ("Dr. Cinquegrani"), the Director of the Heart and Vascular Service Line at MCW, informed Dr. Love that Dr. Nicolosi "continues to childishly abdicate his role and responsibilities." As a result, Dr. Cinquegrani met with Dr. Nicolosi, with Dr. Tweddell's "knowledge and approval," on January 31, 2013, to make it "unambiguous to [Dr. Nicolosi] that he is expected to be a team player and leader in heart [transplant]."

129.    On February 18, 2013, Dr. Tweddell wrote Dr. Evans, "The unprofessional behavior on [Dr. Nicolosi]'s part really can't be tolerated. If [Dr. Love] doesn't want to work with him I think [Dr. Nicolosi] should get his one year notice [of termination] and if he has another event then he is dismissed with cause immediately."

130.    On March 16, 2013, Dr. Evans advised Dr. Nicolosi to start searching for a cardiothoracic surgeon position at another hospital because MCW intended to terminate him.

131.    On June 15, 2013, Dr. Nicolosi refused to perform rounds on Dr. Love's patients when he was on call.

132.    On June 20, 2013, Dr. Love and Ms. Fischer enacted a new policy that no elective cardiac surgeries could be scheduled on weekends at Froedtert. The purpose of this new policy was to ensure that the weekday operating room staff would gain experience. Dr. Nicolosi resented this change in policy because his personal preference was to schedule elective cardiac surgery cases on weekends.

133. On June 28, 2013, Dr. Nicolosi privately requested that Dr. Rashid perform rounds on his patients when Dr. Love was on call. On June 30, 2013, after Dr. Tweddell learned of Dr. Nicolosi's request, he emailed Dr. Rashid and Dr. Love, "A surreptitious, secret call schedule is unprofessional and simply will not be tolerated."

134. By 2013, Dr. Nicolosi had practiced at MCW for approximately 20 years, and many MCW physicians and executives, particularly Ms. Cohn and several long-tenured anesthesiologists, including Dr. Pagel and Dr. Lauer, were fiercely loyal to Dr. Nicolosi.

135. These physicians and executives were vocal in opposing Dr. Tweddell's and Dr. Evans's decision to terminate Dr. Nicolosi. For example, on September 21, 2013, Dr. Pagel wrote Dr. Kerschner:

> I am writing to you today to let you know that MCW is very close to losing southeastern Wisconsin's best adult cardiac surgeon. Retaining Dr. Alfred C. Nicolosi, Professor of Cardiothoracic Surgery, should be a top priority for you and MCW.
>
> ...
>
> On behalf of my colleagues in cardiac anesthesiology, intensive care, and cardiopulmonary perfusion, I urge you to meet with Al as soon as possible. It would be a tragedy for MCW to lose this exceptionally skilled surgeon, outstanding teacher, trustworthy colleague, and loyal friend. Faculty retention starts with Al Nicolosi.

136. In September 2013, Dr. Lauer told Ms. Fischer that she believed MCW should terminate Dr. Love instead of Dr. Nicolosi.

137. On September 24, 2013, Dr. Nicolosi submitted to Dr. Kerschner his letter of resignation from MCW. In that letter, Dr. Nicolosi alleged that Dr. Love, Dr. Fischer, and Dr. Mahr had engaged in "substandard, often inept, sometimes dangerous, and in many instances, frankly dishonest and unethical medical and surgical practices." In truth, Dr. Love's, Dr. Fischer's, and Dr. Mahr's practices were not substandard, inept, dangerous, dishonest, or unethical.

138.     Dr. Nicolosi submitted his September 24, 2013 resignation letter because Dr. Evans had told him that MCW intended to terminate him and because he had found a position at Maine Medical Partners in Portland, Maine ("Maine Medical").

139.     On September 25, 2013, Dr. Kerschner forwarded Dr. Nicolosi's September 24, 2013 resignation letter to Ms. Cohn and asked for her advice on how to respond.

140.     Later on September 25, 2013, Ms. Cohn advised Dr. Kerschner to meet with Dr. Nicolosi and "get detail and background" on "his view that there is substandard, sometimes dangerous and frankly dishonest practice occurring." Ms. Cohn also advised, "I suggest that we not discuss with Froedtert until after your meeting tomorrow and we know what information might be forthcoming for us jointly to investigate."

141.     Dr. Kerschner met with Dr. Nicolosi on September 26, 2013.

142.     During the September 26, 2013 meeting, Dr. Nicolosi handed Dr. Kerschner a letter in which Dr. Nicolosi leveled the following accusations against Dr. Love:

- Dr. Love attempted to replace a patient's aortic valve and aortic root with a graft without a valve.

- Dr. Love had such poor patient outcomes that he had to turn to Dr. Nicolosi for assistance.

- After Dr. Love requested Dr. Nicolosi's assistance, Dr. Nicolosi helped Dr. Love with his next VAD implantation. Dr. Nicolosi performed "flawlessly" during this procedure, and without his assistance, Dr. Love's mismanagement of the patient would have resulted in the patient's death.

- Dr. Love was so lacking in surgical judgment that he willfully perpetrated billing fraud by providing "unnecessary, inappropriate treatments" to patients whom Dr. Mahr had referred to him.

- Dr. Love had unnecessarily implanted a VAD in a 19-year-old male patient who did not require any mechanical circulatory support, and the patient suffered complications that caused him a "significant disability."

- Dr. Love attempted to transplant a heart from a donor with Downs Syndrome and did not do so only because Dr. Tweddell intervened.

- Dr. Love fabricated reports of surgical outcomes to his superiors to cover up his own incompetence.

- Dr. Love, as well as Dr. Mahr and Dr. Fischer, had engaged in "Gestapo-like intimidation tactics" to silence "physicians and nurses who have voiced their concerns."

143. All of the accusations in Dr. Nicolosi's September 26, 2013 letter were false and malicious.

144. On September 27, 2013, Dr. Kerschner emailed Dr. Nicolosi's September 26, 2013 letter to Cathy Buck, M.S.N., R.N. ("Ms. Buck"), Froedtert's President, Dr. Biblo, Dr. DeBehnke, and Ms. Cohn, among other recipients. In his cover note, Dr. Kerschner wrote, "In the end of my looking at this I support Bob Love and his leadership of adult CT and put faith in his personnel decisions. Also, it is clear that Dr. Nicolosi has had a great deal of difficulty in leading in the past and collaborating in both the past and currently."

## Dr. Nicolosi's Unlawful Accessing of Private Patient Records

145.    In late September or early October 2013, after Dr. Nicolosi had tendered his resignation, Dr. Tweddell asked Ms. Cohn to investigate whether Dr. Nicolosi had accessed any of Dr. Love's or Dr. Fischer's patients' private medical records to look for information underlying the accusations in his September 26, 2013 letter.

146.    Ms. Cohn then instructed Daniel Wickeham ("Mr. Wickeham"), MCW's Vice President of Corporate Compliance and Risk Management and HIPAA Compliance Officer, and Christine Santiago ("Ms. Santiago"), MCW's Manager of Clinical Compliance, to investigate.

147.    On October 9 and 10, 2013, Mr. Wickeham and Ms. Santiago reported to Ms. Cohn the results of their investigation.

148.    Mr. Wickeham and Ms. Santiago reported that between October 1, 2012 and September 30, 2013, Dr. Love, Dr. Fischer, or both had treated 70 patients to whom Dr. Nicolosi had provided no care.  Mr. Wickeham and Ms. Santiago also reported that Dr. Nicolosi had accessed the private medical records of 52 of these 70 patients.

149.    Mr. Wickeham and Ms. Santiago further reported that they had performed an in-depth analysis of the medical records of ten of those 52 patients, including two patients whose cases Dr. Nicolosi mentioned in his September 26, 2013 letter.  They confirmed that Dr. Nicolosi had accessed these ten patients' records and that Dr. Nicolosi had no involvement in any of their care.

150.    In addition, Mr. Wickeham advised Ms. Cohn, "[A]ssuming there was no clinical or valid reason for Dr. Nicolosi to be in the medical records ... we are required to send breach notifications to these patients and notify OCR/HHS [the Office for Civil Rights at the Department of Health and Human Services]."

28

151.    There was no clinical or valid reason for Dr. Nicolosi to have accessed the private medical records.  Yet, on information and belief, neither Ms. Cohn nor any other representative of MCW sent breach notifications to the patients or notified OCR/HHS.

152.    Dr. Nicolosi accessed Dr. Love's and Dr. Fischer's patients' private medical records with the intent to use individually identifiable health information to inflict malicious harm on Dr. Love and Dr. Fischer.

153.    By accessing Dr. Love's and Dr. Fischer's patients' private medical records and knowingly obtaining individually identifiable health information with the intent to use that information to inflict malicious harm, Dr. Nicolosi committed 52 violations of 42 U.S.C.S. § 1320d-6, a federal criminal statute.

154.    Between October 17, 2013 and October 21, 2013, Dr. Biblo, Dr. DeBehnke, and Dr. Lamb performed a thorough QA review of the six patients' cases that Dr. Nicolosi mentioned in his September 26, 2013 letter.  Dr. Biblo, Dr. DeBehnke, and Dr. Lamb concluded that Dr. Love had not provided substandard care to any of those patients.

155.    On October 22, 2013, Dr. Tweddell wrote Dr. Kerschner and Ms. Cohn:

> I remain very concerned about [Dr. Nicolosi's] continued presence in the hospital and on the service.  He continues to be difficult, non communicative and destructive to the mission.
>
> My understanding was we were going to look at his medical records inquiries ... in Epic [Froedtert's electronic health record ("EHR") software] and see if he was accessing charts on patients other than his own.  I was told that in fact, he had accessed records for patients other than his own and that as a consequence his dismissal was imminent.  (He has already been subject of an investigation into improper use of the EHR.)  Can I get an update on his status?  He continues to be very angry as was evident in his letter.  He continues to attempt to undermine the current leadership.  My primary concern is the division of CT surgery and the impact of a chronic, angry malcontent on the service but I am concerned [Dr. Nicolosi's] mind set places his patients at risk.  This could potentially jeopardize [Dr.

Nicolosi's] future and this is unnecessary. Surely we can ask him to go now. This would be better for all concerned.

156.    Rather than respond to Dr. Tweddell's email, Ms. Cohn forwarded it to Dr. Kerschner. Ms. Cohn wrote to Dr. Kerschner:

> It appears that the [department] leadership continue to be angry and punitive; but I want [Dr. Nicolosi] to leave, if he needs to, in a more pleasant frame of mind that [sic] he would be [sic] if Drs. Evans and Tweddell relieve him of his clinical responsibilities.

157.    Ms. Cohn advised Dr. Kerschner to give Dr. Nicolosi a two-month paid vacation until his planned separation date of December 29, 2013.

158.    Dr. Kerschner replied that he "would be very happy to do this."

## Conspiracy to Destroy Dr. Love's Reputation and Career

159.    By September 11, 2013, Dr. Nicolosi and numerous MCW anesthesiologists, including Dr. Warltier, Dr. Pagel, Dr. Lauer, Marc S. Eiseman, M.D. ("Dr. Eiseman"), Dr. Kersten, Jonathan O. Shoopman, M.D. ("Dr. Shoopman"), and Christopher J. Plambeck, M.D. ("Dr. Plambeck") (collectively, the "Anesthesiologist Co-Conspirators"), all harbored malice toward Dr. Love.

160.    The Anesthesiologist Co-Conspirators harbored malice toward Dr. Love because he had investigated and complained to management about the grossly substandard patient care MCW anesthesiologists had provided. The Anesthesiologist Co-Conspirators also harbored malice toward Dr. Love because they were loyal to Dr. Nicolosi, and they blamed Dr. Love for forcing him out of MCW.

161.    Ms. Cohn likewise harbored malice toward Dr. Love because she was loyal to Dr. Nicolosi, and she blamed Dr. Love for forcing him out of MCW.

162.    Ms. Cohn also harbored malice toward Dr. Love because he had repeatedly complained to her about Dr. Stone's Medicare fraud.  Ms. Cohn knew Dr. Love was a whistleblower who posed a legal and financial threat to MCW.

163.    Beginning no later than September 2013, Dr. Nicolosi, Ms. Cohn, and the Anesthesiologist Co-Conspirators embarked on a smear campaign designed to silence Dr. Love, to force him out of MCW, and to ruin his professional reputation.  Acting together and out of a shared feeling of malice toward Dr. Love, they hatched a plan to manufacture career-ending charges of incompetence against Dr. Love and his main ally, Dr. Fischer.  Their objective was to force Dr. Love to resign or, if he fought back, to prompt MCW to fire him.

164.    Toward that end, between September 11, 2013 and November 18, 2013, Dr. Nicolosi, Ms. Cohn, and the Anesthesiologist Co-Conspirators acted in concert, outside of MCW and Froedtert's official QA review process, to compile a list of cases in which they alleged that Dr. Love and Dr. Fischer had provided substandard care.

165.    Between September 11, 2013 and November 18, 2013, the Anesthesiologist Co-Conspirators and Ms. Cohn circulated amongst themselves several drafts of this list of cases, which included patients' names, initials, and medical record numbers.

166.    For instance, on September 15, 2013, Dr. Shoopman emailed a draft of the list to Dr. Kersten.  The draft of the list that Dr. Shoopman emailed to Dr. Kersten on September 15, 2013, included 14 cases.  Four of those 14 cases were among the six cases Dr. Nicolosi described in his September 26, 2013 letter.

167.    Also, on September 23, 2013, one of the Anesthesiologist Co-Conspirators faxed, from the anesthesia department at the Zablocki VA, a list of five cases with detailed—and false—narratives written from Dr. Eiseman's first-person perspective.  Dr. Eiseman described the two

cases Dr. Nicolosi mentioned in his September 26, 2013 letter that were not among the four cases included in Dr. Shoopman's September 15, 2013 list.

168.    Dr. Shoopman's September 15, 2013 list and Dr. Eiseman's September 23, 2013 list included, collectively, all six of the cases that Dr. Nicolosi described in his September 26, 2013 letter.  As Mr. Wickeham and Ms. Santiago discovered during their investigation, Dr. Nicolosi had improperly accessed at least two of these patients' private medical records.  Thus, Dr. Nicolosi, Dr. Shoopman, Dr. Kersten, and Dr. Eiseman acted in concert, outside of MCW and Froedtert's official QA review process and in violation of 42 U.S.C.S. § 1320d-6, for the purpose of injuring Dr. Love in his reputation and profession.

169.    Dr. Nicolosi violated 42 U.S.C.S. § 1320d-6, not only by knowingly obtaining individually identifiable health information relating to Dr. Love's and Dr. Fischer's patients, but also by knowingly disclosing individually identifiable health information to Dr. Shoopman, Dr. Kersten, and Dr. Eiseman.  Dr. Nicolosi violated 42 U.S.C.S. § 1320d-6 with the intent to use individually identifiable health information to inflict malicious harm on Dr. Love and Dr. Fischer.

170.    During an October 1, 2013 conversation with Ms. Cohn, Dr. Kersten falsely accused Dr. Love of drafting operative reports to "spin" complications and of providing substandard care in three of the cases included on the list that Dr. Kersten, Dr. Eiseman, and Dr. Shoopman had compiled.

171.    On November 8, 2013, Ms. Cohn received the final version of the list Dr. Eiseman, Dr. Kersten, and Dr. Shoopman had compiled.

172.    On November 18, 2013, Ms. Cohn emailed Dr. Biblo a version of the list that included condensed descriptions of 18 of Dr. Love's and Dr. Fischer's cases, along with the

patients' initials and medical record numbers. Ms. Cohn requested that Dr. Biblo conduct a QA review of the cases on the list.

173. In her November 18, 2013 email to Dr. Biblo, Ms. Cohn wrote, "Some of these will already be on your list [of the six cases Dr. Nicolosi cited in his September 26, 2013 letter], but I did not separate those out." Indeed, Ms. Cohn included in her November 18, 2013 email five of the six cases Dr. Nicolosi had cited in his September 26, 2013 letter.

174. On November 19, 2013, Ms. Cohn emailed to Dr. Biblo descriptions of two additional cases, along with the patients' initials and medical record numbers. One of these was the sixth case Dr. Nicolosi had cited in his September 26, 2013 letter.

175. Ms. Cohn violated 42 U.S.C.S. § 1320d-6 by knowingly disclosing to Dr. Biblo individually identifiable health information that Dr. Nicolosi, Dr. Shoopman, Dr. Kersten, and Dr. Eiseman had obtained and disclosed to each other unlawfully. Ms. Cohn violated 42 U.S.C.S. § 1320d-6 with the intent to use individually identifiable health information to inflict malicious harm on Dr. Love and Dr. Fischer.

176. After November 20, 2013, Ms. Cohn and the Anesthesiologist Co-Conspirators continued to act in concert to level false accusations that Dr. Love and Dr. Fischer had provided substandard patient care.

177. On December 12, 2013, Dr. Kersten spoke to Ms. Cohn and made baseless accusations that Dr. Love and Dr. Fischer had provided substandard care to five patients.

178. On January 30, 2014, Ms. Cohn met with Dr. Biblo and Sue Huerta ("Ms. Huerta"), Froedtert's Vice President for Quality and Patient Safety, and "talked them into" conducting a QA review of five of Dr. Love's and Dr. Fischer's cases that Ms. Cohn had listed in her November 18, 2013 email to Dr. Biblo.

179.     On January 31, 2014, the QA Review Committee completed its review of those five cases, which included two of the cases that Dr. Nicolosi described in his September 26, 2013 letter. The QA Review Committee found no cases in which Dr. Love or Dr. Fischer had provided substandard care.

180.     On February 27, 2014, Dr. Biblo and Ms. Huerta, representing the QA Review Committee, met with Dr. Love, Dr. Tweddell, and Dr. Evans to report their findings.  Dr. Biblo informed Dr. Love that the QA Review Committee had reviewed a total of 20 of his and Dr. Fischer's cases and found none in which Dr. Love or Dr. Fischer had provided substandard care. On information and belief, Dr. Biblo had determined that the complaints regarding 15 of the 20 cases were so patently invalid as not to merit formal review.

181.     During the February 27, 2014 meeting, Dr. Biblo also reported that the QA Review Committee had thoroughly analyzed Dr. Nicolosi's September 26, 2013 letter and determined, unanimously, that all of Dr. Nicolosi's allegations against Dr. Love were false.

## Anesthesia Counter Warfare

182.     Despite the QA Review Committee's conclusions, the co-conspirators redoubled their efforts to smear Dr. Love and to ruin not only his position at MCW but also his reputation and career.

183.     On                2014, Dr. Kersten spoke to Ms. Cohn and made baseless accusations that Dr. Love had provided substandard care to two patients, including Patient #6, who had died because two nurses had improperly performed chest compressions on her in the ICU.

184.     On                2014, Dr. Lauer spoke to Ms. Cohn and made another baseless accusation that Dr. Love had provided substandard care to Patient #6.

185.    On April 1, 2014, Dr. Schroder made a baseless accusation to Dr. Pagel that Dr. Love had provided substandard care to a patient who had died because he suffered an unsalvageable cardiac injury before surgery.

186.    Dr. Pagel encouraged Dr. Schroder to email to Dr. Warltier a detailed description of his accusation, and Dr. Schroeder did so.  Dr. Warltier then forwarded Dr. Schroeder's complaint to Dr. Lauer.

187.    On          2014, Dr. Kersten spoke to Ms. Cohn and recounted to her in detail Dr. Schroeder's baseless accusation, as well as two other baseless complaints that Dr. Love and Dr. Fischer had provided substandard care to patients.

188.    On April 9, 2014, Ms. Cohn met with Dr. Biblo, Dr. Truitt, and Ms. Huerta and urged them to conduct another QA review of Dr. Love's and Dr. Fischer's cases.  This meeting occurred only weeks after Dr. Biblo and the rest of the QA Review Committee had unanimously absolved Dr. Love and Dr. Fischer of providing any substandard patient care.

189.    On April 25, 2014, Dr. Plambeck spoke to Ms. Cohn, outside of MCW and Froedtert's official QA review process.  Disclosing the patients' names, Dr. Plambeck falsely accused Dr. Love and Dr. Fischer of providing substandard patient care in two cases.

190.    Through that conversation, Dr. Plambeck violated 42 U.S.C.S. § 1320d-6 by knowingly disclosing two patients' individually identifiable health information with the intent to use it to inflict malicious harm on Dr. Love and Dr. Fischer.

191.    By April 2014, the MCW anesthesiologists' vendetta against Dr. Love and Dr. Fischer had become apparent to MCW's senior management.

192.    For instance, on April 26, 2014, Dr. Seabrook sent Dr. Evans an email recognizing Dr. Love's and Dr. Fischer's competence and addressing the MCW anesthesiologists' enmity toward the two surgeons.  Dr. Seabrook wrote:

> Lots of issues Friday with emergency cardiac cases.  Considerable anesthesia counter warfare attempting to derail cases—questioning indications, suggesting ethics consults, not wanting to run a second room.  I think they would prefer the old pattern of doing two heart cases a week....  Bob Love and Wade Fischer were very engaged and managed a series of very complicated patients efficiently.

193.    On May 7, 2014, Dr. Warltier sent Dr. Biblo, Dr. Evans, and Dr. Tweddell—but not Dr. Love or Dr. Fischer—a letter to which Dr. Warltier attached charts showing the medical record numbers of patients on whom Dr. Love and Dr. Fischer had performed surgical procedures in 2014, the dates and types of those procedures, and whether each patient died.  The purpose of that letter was to level charges of incompetence against Dr. Love and Dr. Fischer and, ultimately, to force them out.

194.    Dr. Warltier, Dr. Kersten, and Dr. Lauer compiled the information outside of MCW and Froedtert's official QA review process and were motivated not by any concerns for patient safety but, rather, by malice toward Dr. Love and Dr. Fischer.

195.    In compiling and circulating the charts attached to Dr. Warltier's May 7, 2014 letter, Dr. Warltier, Dr. Kersten, and Dr. Lauer, acting in concert, violated 42 U.S.C.S. § 1320d-6 by knowingly accessing and disclosing individually identifiable health information of Dr. Love's and Dr. Fischer's patients with the intent to use that information to inflict malicious harm on Dr. Love and Dr. Fischer.

### MCW's Retaliation against Dr. Love

196.    MCW forced out Dr. Love and Dr. Fischer on May 8, 2014.

197.    The decision to force out Dr. Love and Dr. Fischer could not have been related to any legitimate concerns about the treatment they provided to Patient #7 because the QA Review Committee completed its review of Patient #7's case on May 15, 2014, nine days after MCW made the decision to force out Dr. Love and Dr. Fischer.  Moreover, the QA Review Committee did not conclude that Dr. Love or Dr. Fischer had provided substandard care in that case.

198.    On June 16, 2014, someone drafted a "Report to Froedtert Quality Committee concerning CT Service mortalities in March and April, 2014" (the "Report").  The purpose of the Report was to justify, after the fact, MCW's forcing out Dr. Love and Dr. Fischer six weeks earlier.

199.    According to the Report, five of Dr. Love's patients died after surgery in March and April 2014.

200.    The author concluded that two of Dr. Love's patients who died after surgery in March and April 2014 were "not salvageable" and that Patient #6, who suffered a "[l]ethal injury to heart from CPR" that two nurses performed improperly, was "[c]ertainly a high-risk patient." The author did not criticize Dr. Love's treatment of any of those three patients.

201.    The author questioned Dr. Love's judgment in treating the other two patients who died after surgery.

202.    First, the author questioned Dr. Love's decision to perform coronary bypass graft surgery on a moderate-risk patient who ultimately died from infection because the patient "had minimal CAD [coronary artery disease]."  This criticism was baseless, as the patient's preoperative history and physical note stated, "Cardiac cath showed *significant 2 vessel CAD*."

203.    Second, the author criticized Dr. Love's surgical judgment in a case in which a moderate-risk patient died from liver failure three days after surgery, writing, "Why not perform a bypass graft to the RCA [right coronary artery] immediately rather than support the patient on

ECMO for 24 hours and then return to the OR and do an RCA bypass graft?" This criticism was baseless, as the patient's preoperative history and physical note stated, "RCA: Angiography showed no evidence of disease."

204.    In addition, the author criticized Dr. Love for his "lack of oversight" of Dr. Fischer (who had over two decades of experience as a heart transplant surgeon) in the heart transplant Dr. Fischer performed on Patient #7. The author criticized Dr. Fischer for failing to heed Dr. Gandhi's purported warning that one of the patient's pressure readings was high. But Dr. Gandhi could not possibly have informed Dr. Fischer of that pressure reading because only Dr. Fischer had been in a position to measure that pressure accurately.

205.    The author concluded that each of the two patients of Dr. Fischer who died after surgery in March and April 2014 was a "[h]igh-risk patient." The author offered no criticisms of Dr. Fischer's treatment of either patient.

206.    Although the author crafted the Report in an attempt to justify MCW's earlier decision to force out Dr. Love, the author succeeded only in creating a document that proves MCW had no legitimate basis to do that.

207.    Indeed, in late 2013 and early 2014, the other cardiothoracic surgeons at MCW gave Dr. Love only the highest marks on their confidential evaluations of his performance.

208.    On November 7, 2013, Dr. Rashid signed a Clinical Competence Evaluation on which he gave Dr. Love the highest possible ratings based on his "daily" observations. Dr. Rashid recommended Dr. Love for the continuation of his hospital privileges "without reservation."

209.    On November 22, 2013, Dr. Fischer signed a Clinical Competence Evaluation. Like Dr. Rashid, Dr. Fischer gave Dr. Love the highest possible ratings based on his "daily"

observations, and he recommended Dr. Love for the continuation of his hospital privileges "without reservation."

210.    On April 15, 2014, Dr. Tweddell signed a Clinical Competence Evaluation.  Dr. Tweddell also gave Dr. Love the highest possible ratings based on his "weekly" observations, and he recommended Dr. Love for the continuation of his hospital privileges "without reservation."  In addition, Dr. Tweddell wrote "Excellent CT surgeon" in the comments section.

211.    On May 8, 2014, the very day that MCW placed Dr. Love on a leave of absence, Christopher Rokkas, M.D. ("Dr. Rokkas"), then an Assistant Professor of Cardiothoracic Surgery at MCW, signed a Clinical Competence Evaluation.  Dr. Rokkas gave Dr. Love the highest possible rating based on his "daily" observations, and he recommended Dr. Love for the continuation of his hospital privileges "without reservation."

212.    These Clinical Competence Evaluations show there was no valid basis for MCW to force out Dr. Love.

213.    Dr. Evans met with Dr. Love during the afternoon of May 8, 2014, and announced that he had decided to terminate Dr. Fischer.

214.    Dr. Love informed Dr. Evans that terminating Dr. Fischer would undermine MCW's ability to provide adequate care to heart transplant patients and would expose the approximately 20 patients awaiting transplants at Froedtert to unreasonable risk.

215.    Dr. Love also informed Dr. Evans that if he were to terminate Dr. Fischer, Froedtert could no longer represent itself as a transplant center in accordance with UNOS/OPTN requirements and CMS regulations.

216.     Dr. Love told Dr. Evans he did not want to retain his title as Section Chief of Adult Cardiac Surgery were Dr. Evans to terminate Dr. Fischer.  Dr. Love did not surrender any of his surgical privileges.

217.     At the conclusion of the May 8, 2014 meeting, Dr. Evans indicated that he and Dr. Tweddell would meet with Dr. Love the following week.  Dr. Evans also instructed Dr. Love to take a leave of absence until after that meeting.  Dr. Evans did not suggest that MCW or Froedtert would revoke any of Dr. Love's privileges or responsibilities.

218.     On the evening of May 8, 2014, Ms. Buck sent an email to numerous MCW and Froedtert employees announcing, "Drs. Wade Fischer and Robert Love are currently on a leave of absence and will no longer perform cardiac surgery here."

219.     On May 23, 2014, Ms. Buck sent a clarifying email to members of MCW and Froedtert's senior management, explaining, "In reference to my email of May 8th regarding Dr. Bob Love, please understand that he is on a leave of absence.   He is still a member of the medical staff and there has been no hospital action [by Froedtert] with respect to his privileges."

220.     Based on the myriad unethical practices he had witnessed during his employment at MCW and the lack of detail he had received about his upcoming meeting with Dr. Evans and Dr. Tweddell, Dr. Love believed it would be in his best interest for his counsel, James Gardner ("Mr. Gardner"), to attend that meeting.

221.     In a May 19, 2014 email, Ms. Cohn insisted that it was "not appropriate" for Mr. Gardner to attend Dr. Love's meeting with Dr. Evans and Dr. Tweddell.  That meeting never occurred.

222.     Mr. Gardner and Ms. Cohn spoke by telephone on May 20, 2014.  During that call, Ms. Cohn attempted to coerce Dr. Love into resigning, which he did three months later.  Ms. Cohn

declared that there was no longer a clinical role for Dr. Love at MCW and that Dr. Love had only two options: resign from MCW or undergo a formal tenure revocation hearing after being on unpaid leave for several months. Ms. Cohn assured Mr. Gardner that the tenure revocation hearing would result in Dr. Love's termination for cause.

223.    On May 26, 2014, Dr. Tweddell informed Dr. Love that he would not be allowed to attend any future cardiothoracic surgery faculty meetings.

224.    As of May 27, 2014, MCW eliminated Dr. Love's name from its call schedule.

225.    On July 1, 2014, MCW reduced Dr. Love's salary by approximately 25 percent.

### Dr. Love's Fraudulently Induced Separation Agreement

226.    On August 26, 2014, Dr. Love entered into a Separation Agreement with MCW (the "Separation Agreement") after a lengthy negotiation process between Ms. Cohn and Mr. Gardner. A copy of the Separation Agreement is attached hereto as Exhibit A.

227.    In the course those negotiations, Ms. Cohn cited as fact to Mr. Gardner specific accusations by the Anesthesiologist Co-Conspirators that Dr. Love had provided substandard patient care. Ms. Cohn used those accusations to convince Mr. Gardner to advise Dr. Love to sign the Separation Agreement. Unbeknownst to Mr. Gardner, all of those allegations were false.

228.    Under the Separation Agreement, MCW agreed to pay Dr. Love a reduced salary through April 1, 2015, which MCW did.

229.    In Section 7 of the Separation Agreement, Dr. Love released all of his claims against MCW and its employees and agents "relating to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement…."

230.    Dr. Love did not, in Section 7 of the Separation Agreement or elsewhere, release any claims that arose after August 26, 2014, the effective date of the Separation Agreement.

231. Section 7 of the Separation Agreement also provides that "Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards … any obligations that MCW owed to Dr. Love under … this Agreement…."

232. Dr. Love has not released any claims regarding obligations that the Separation Agreement imposed on MCW.

233. Section 11 of the Separation Agreement provides that "Dr. Love and MCW agree that the terms of this Agreement and the discussions leading to its execution are confidential, and he will not disclose any information concerning its terms to anyone at any time, except to his significant other, immediate family, legal counsel, accountants or tax advisors, unless compelled to do so under subpoena or other judicial process."

234. Under Section 11 and Section 12 of the Separation Agreement, Dr. Love was bound not to disclose to any potential employer the existence or terms of the Separation Agreement or the discussions leading to its execution.

235. Section 12 of the Separation Agreement provides, in part, as follows:

> Dr. Love, on the one hand, and MCW's officers, on the other hand, agree not to make disparaging remarks about each other. If, after the date of this Agreement, MCW's officers are contacted by third parties regarding Dr. Love, they will provide an explanation (and limit any discussion) as to the circumstances surrounding Dr. Love's employment and termination consistent with that contained in the reference letter, attached as Exhibit B. MCW will make its officers aware of this provision of this Agreement for purposes of assuring their compliance therewith.

236. Exhibit B to the Separation Agreement is a reference letter to be signed by Dr. Tweddell and Dr. Evans and to be used by Dr. Love in finding a new position. The reference letter details Dr. Love's numerous accomplishments during his tenure at MCW. The reference letter then explains the circumstances surrounding Dr. Love's departure as follows:

Despite many obstacles, surgical volume and revenue have grown since Dr. Love joined us. As one might expect, not all stake holders were aligned with Dr. Love's vision and he encountered resistance to the new direction that he proposed for this hospital. In addition, competitive realities within the Milwaukee medical community created challenges we did not anticipate when Dr. Love was recruited. In the end, senior leadership of this medical campus, after much discussion in which Dr. Love took a leading role, has decided that the best approach given these realities is to grow a cardiology and cardiac surgery clinical program with a model of multiple points of access rather than a single flagship program. Ultimately, the organization and Dr. Love feel that the direction he has outlined as his vision for program growth is no longer aligned with its direction. Dr. Love agrees that it is best for him to seek another opportunity better matched to his leadership and personal goals for his own practice in Cardiothoracic Surgery. Much has been accomplished but ultimately the enterprise has decided to go in a different direction.

237. Dr. Tweddell and Dr. Evans's reference letter concludes with the following unqualified endorsement:

In his time here, Dr. Love has demonstrated an excellent work ethic and a commitment to program development. His accomplishments, as outlined above, have been many and have bettered our facilities. We wish Dr. Love well in future endeavors and support him fully.

238. When Dr. Love signed the Separation Agreement, he reasonably relied on MCW to disclose all information material to his separation from MCW, and he justifiably trusted that MCW would disclose to him all such information.

239. When Dr. Love signed the Separation Agreement on August 26, 2014, he was not aware that Ms. Cohn, acting in concert with Dr. Nicolosi and the Anesthesiologist Co-Conspirators, had perpetrated their covert, months-long conspiracy, involving numerous violations of 42 U.S.C.S. § 1320d-6, to injure Dr. Love in his reputation and profession; nor had any person or entity disclosed the existence of this conspiracy to Dr. Love.

43

240.     Had Dr. Love been aware of the conspiracy, he would not have signed the Separation Agreement.

241.     The Separation Agreement is void in its entirety because Ms. Cohn, MCW's agent, induced Dr. Love to sign the Separation Agreement by fraudulently concealing from him that she, Dr. Nicolosi, and the Anesthesiologist Co-Conspirators had conspired to injure Dr. Love in his reputation and profession.

### Dr. Nicolosi's Defamatory Statements to Dr. Raymond and Dr. Pagel

242.     On May 12, 2014, while he was an employee of Maine Medical, Dr. Nicolosi still harbored malice toward Dr. Love.  On that date, Dr. Nicolosi wrote the following to Dr. Raymond:

> [Dr. Love and Dr. Fischer] were allowed to continue operating on patients long after I had brought the problems to light, often with horrendous outcomes, including many unnecessary deaths.... While the frightening surgical results were clearly known by everyone participating in the care of the patients, leaders in the clinical service, including Drs. Biblo and Cinquegrani failed to take action.

> It is my understanding that [Dr. Love and Dr. Fischer] were finally relieved of their clinical duties last week and are no longer allowed to perform cardiac surgical procedures there.

243.     Dr. Nicolosi's written statements that Dr. Love "operat[ed] on patients ... often with horrendous outcomes, including many unnecessary deaths," that Dr. Love had "frightening surgical results," and that Dr. Love was no "longer allowed to perform cardiac surgical procedures" at Froedtert ("Dr. Nicolosi's Statements") were false and malicious.

244.     On May 13, 2014, Dr. Nicolosi forwarded his May 12, 2014 email to Dr. Pagel.

245.     Dr. Pagel interpreted Dr. Nicolosi's Statements to mean exactly as Dr. Nicolosi had intended:  that Dr. Love had lost his surgical privileges at Froedtert due to incompetence.

246.     Dr. Love, however, was then and is now a competent cardiothoracic surgeon, and he never lost his surgical privileges at Froedtert for any reason.

44

247.    Dr. Pagel republished the substance of Dr. Nicolosi's Statements to Dr. Schroeder.

**Dr. Warltier's Defamatory Statement to Dr. Pagel**

248.    At some point between May 8, 2014 and October 21, 2014, Dr. Warltier told Dr. Pagel that Dr. Love had lost his surgical privileges at Froedtert due to incompetence ("Dr. Warltier's Statement").

249.    Dr. Warltier's Statement was false and malicious.

250.    Dr. Love was then and is now a competent cardiothoracic surgeon, and he never lost his surgical privileges at Froedtert for any reason.

**Dr. Pagel's Defamatory Statements to St. Mary's Hospital**

251.    Immediately after Dr. Love's separation from MCW, he attempted to move forward with his career and find a new position as a cardiothoracic surgeon.

252.    In July 2014, Dr. Love told Vijay K. Kantamneni, M.D. ("Dr. Kantamneni"), the Chair of the Department of Cardiovascular Surgery at St. Mary's Hospital, that he was searching for a position as a cardiothoracic surgeon.  Dr. Kantamneni encouraged Dr. Love to apply for an open cardiothoracic surgeon position at St. Mary's Hospital.

253.    Dr. Love was enthusiastic about the possibility of joining St. Mary's Hospital's Department of Surgery because doing so would allow him to practice in Madison, where his ailing wife and his daughter with special needs reside in the family home.  In addition, Dr. Love at the time had longstanding personal and professional relationships with several St. Mary's Hospital physicians, including Dr. Kantamneni.

254.    Dr. Kantamneni has known Dr. Love since 1989, when Dr. Kantamneni was practicing as a general surgery resident at the University of Wisconsin Hospital in Madison, Wisconsin ( "UW Hospital"), and Dr. Love was practicing there as a cardiothoracic surgery fellow.

255.    Between 1989 and 1993, Dr. Love and Dr. Kantamneni worked together on numerous surgical cases at UW Hospital.

256.    Dr. Love and Dr. Kantamneni kept in touch and routinely consulted with each other on surgical matters between 1993 and 2006, when Dr. Kantamneni practiced at St. Mary's Hospital and Dr. Love practiced at UW Hospital.

257.    Based on Dr. Kantamneni's experience working and consulting with Dr. Love between 1993 and 2006, Dr. Kantamneni believed Dr. Love was an excellent cardiothoracic surgeon.

258.    On or shortly before October 21, 2014, Dr. Schroeder learned that Dr. Love would soon be interviewing for the cardiothoracic surgeon position at St. Mary's Hospital.

259.    At that time, Dr. Schroeder was an anesthesiologist at St. Mary's Hospital. Between 2009 through 2014, he had been a resident and fellow at MCW.  When he was a fellow at MCW, Dr. Schroeder had been on the cardiac anesthesia team that placed the catheter improperly in Patient #5 and then attempted to deflect blame for Patient #5's near-death by leveling false accusations against Dr. Love.

260.    On October 21, 2014, Dr. Schroeder contacted Dr. Pagel by text message for the purpose of eliciting statements regarding Dr. Love's technical competence and surgical outcomes that Dr. Schroeder could repeat to other physicians at St. Mary's Hospital for their consideration in deciding whether to hire Dr. Love.  A copy of the text message exchange between Dr. Schroeder and Dr. Pagel is attached hereto as Exhibit B.

261.    Dr. Schroeder texted to Dr. Pagel the following statements:

> I hate to be the guy trying to torpedo someone's career but I really don't want him to work here

> Unfortunately a bunch of people here worked with him when he was at UW when he was apparently great

46

262.    In response to Dr. Schroeder's text messages, Dr. Pagel texted to Dr. Schroeder the following statements ("Dr. Pagel's Statements to St. Mary's Hospital"):

> U need to be loud and in their faces. Tell them that he lost his privileges at MCW cuz of incompetence and that there r [sic] multiple malpractice cases pending. They can call anybody here to verify the story. Or have them call Al!!!!
>
> I'll b [sic] happy to tell them that he's a threat to public health.
>
> 17 dead in four months [January through April 2014]. That's more than John Wayne Gacy and Jeffrey Dahmer combined during any 4 month period of their serial murders.

263.    Dr. Schroeder understood that when Dr. Pagel wrote, "Al," he was referring to Dr. Nicolosi.

264.    On October 21, 2014, during a discussion of Dr. Love's candidacy at a meeting of cardiac anesthesia and cardiac surgery physicians at St. Mary's Hospital, Dr. Schroeder read aloud Dr. Pagel's Statements to St. Mary's Hospital. Dr. Schroeder did not read aloud his own text messages to Dr. Pagel.

265.    Dr. Kantamneni, the primary decision-maker in the hiring process for the cardiothoracic surgeon position, and Bradley Schmidt, M.D. ("Dr. Schmidt"), the Medical Director of Inpatient Specialties at St. Mary's Hospital, were present at this meeting.

266.    Dr. Schroeder informed the St. Mary's Hospital physicians present at the meeting that he had received from an MCW physician the text messages containing Dr. Pagel's Statements to St. Mary's Hospital.

267.    Dr. Schroeder's repeating Dr. Pagel's Statements to St. Mary's Hospital effectively ended Dr. Love's candidacy before he even interviewed because they created enough doubt about Dr. Love's technical competence and surgical judgment in Dr. Kantamneni's mind and in the minds of his colleagues that they could no longer consider Dr. Love for the open position.

268.    Dr. Schroeder was intent on preventing St. Mary's from hiring Dr. Love.    On October 22, 2014, Dr. Schroeder sent Dr. Schmidt an email inviting him to contact Dr. Pagel directly:

> I just wanted to follow up on our discussion about Bob Love from yesterday by giving you a reference to check with at MCW who can corroborate some of the concerns I've raised about Dr. Love.  I think I made my point yesterday, but I just wanted to be sure nobody thinks I have some personal vendetta against Dr. Love that has no basis in fact.  My reference can also speak to the fact that Dr. Love's issues at Froedtert didn't stem only from "differences of opinion" between him and hospital administration as he apparently has alluded to per Dr. Kantamneni....

269.    Dr. Schmidt did not contact Dr. Pagel.

270.    Dr. Schmidt interviewed Dr. Love on October 23, 2014.  Although Dr. Schmidt had heard Dr. Schroeder read from Dr. Pagel's text messages two days earlier, Dr. Schmidt did not inform Dr. Love of any of Dr. Pagel's accusations or his comparison of Dr. Love to Jeffrey Dahmer and John Wayne Gacy.  Dr. Schmidt chose not to give Dr. Love the chance to refute the accusations or clear his good name.

271.    On October 23, 2014, Muhammed M. Itani, M.D. ("Dr. Itani"), the Chief of Cardiac Anesthesiology at St. Mary's Hospital, interviewed Dr. Love in person for the cardiothoracic surgeon position at St. Mary's Hospital.

272.    Dr. Itani first met Dr. Love in 2003, when Dr. Itani was a critical care fellow at UW Hospital and Dr. Love was practicing there as a cardiothoracic surgeon.

273.    While Dr. Itani was practicing at the William S. Middleton Veterans Hospital in Madison, Wisconsin and Dr. Love was practicing at UW Hospital, they worked together on several surgical cases.

274.    Dr. Love made a positive impression on Dr. Itani during his interview at St. Mary's Hospital on October 23, 2014.

48

275. As of October 23, 2014, Dr. Itani's opinion of Dr. Love as a physician, based on Dr. Love's professional reputation and on Dr. Itani's own experience working with him, was that he was a good cardiothoracic surgeon.

276. On October 23, 2014, after Dr. Itani interviewed Dr. Love, Dr. Schroeder approached Dr. Itani to discuss Dr. Love's candidacy for the cardiothoracic surgeon position.

277. During that discussion, Dr. Schroeder informed Dr. Itani of Dr. Pagel's Statements to St. Mary's Hospital. Dr. Itani interpreted Dr. Pagel's Statements to St. Mary's Hospital as statements of fact.

278. Dr. Kantamneni and Dr. Itani were surprised by Dr. Pagel's Statements to St. Mary's Hospital because they conflicted with their own experiences working with Dr. Love.

279. Based on Dr. Pagel's Statements to St. Mary's Hospital, Dr. Kantamneni and Dr. Itani recommended that St. Mary's Hospital not hire Dr. Love for the cardiothoracic surgeon position. In view of their recommendations, St. Mary's Hospital decided not to hire Dr. Love.

280. Had Dr. Schroeder not communicated Dr. Pagel's Statements to St. Mary's Hospital to Dr. Kantamneni and Dr. Itani, they both would have recommended that St. Mary's Hospital hire Dr. Love for the cardiothoracic surgeon position, and Dr. Love would have received and accepted an offer of employment.

281. By October 23, 2014, Dr. Pagel's Statements to St. Mary's Hospital had ended Dr. Love's chances of receiving an offer for the cardiothoracic surgeon position at St. Mary's Hospital.

282. Dr. Kantamneni later informed Dr. Love that Dr. Pagel's Statements to St. Mary's Hospital were "very damaging, shocking and knocked [Dr. Love] out of the job."

283. Dr. Pagel's Statements to St. Mary's Hospital were all false and malicious.

49

284.     Dr. Pagel's statement that "[Dr. Love] lost his privileges at MCW [because] of incompetence" was false because neither Froedtert nor the Zablocki VA ever revoked Dr. Love's privileges, and because Dr. Love was then and is now a competent cardiothoracic surgeon.

285.     Margo Shoup, M.D. ("Dr. Shoup") is currently Dr. Love's direct supervisor at Northwestern Medicine in the Western Region, formerly known as Cadence Physician Group ("Cadence").

286.     Dr. Shoup spoke to Dr. Evans by telephone on January 29, 2015. During that conversation, Dr. Evans assured Dr. Shoup that Dr. Love is a good surgeon, that the circumstances surrounding Dr. Love's separation from MCW were unfortunate, and that Dr. Love's departure was the result of problems at MCW that were "beyond his control."

287.     Those statements, Dr. Tweddell and Dr. Evans's reference letter, and the Clinical Competence Evaluations of Dr. Love that Dr. Rashid, Dr. Fischer, Dr. Tweddell, and Dr. Rokkas completed between November 2013 and May 2014, belie Dr. Pagel's statement that Dr. Love had lost his privileges at MCW because of incompetence.

288.     Dr. Pagel's statement "that there [are] multiple malpractice cases pending" against Dr. Love was also false. On February 26, 2015, MCW sent Cadence a letter stating:

> Robert Love's coverage under The Medical College of Wisconsin Professional Liability Insurance Program began:
>
> August 15, 2012 through July 01, 2015
>
> Insured does not have a Claim History on file.

A copy of the February 26, 2015 letter is attached hereto as Exhibit C.

289.     At the time of Dr. Pagel's Statements to St. Mary's Hospital, there were no past or pending malpractice cases against Dr. Love arising out of his practice at MCW.

290.     Dr. Pagel's statement that "[Dr. Love] is a threat to public health" was also false. Dr. Evans's statements to Dr. Shoup, Dr. Tweddell and Dr. Evans's reference letter, and the glowing Clinical Competence Evaluations by the MCW cardiothoracic surgeons, along with Dr. Love's entire professional record, belie that accusation.

291.     Dr. Pagel's statement that 17 of Dr. Love's patients suffered perioperative deaths in the four-month period from January through April 2014 was false.  Only five of Dr. Love's patients suffered perioperative deaths during that period.

292.     One of those five patients was Patient #6, who died solely because nurses improperly performed chest compressions on her after Dr. Love's successful surgery.  Three others were patients on the verge of death who had suffered unsalvageable cardiac injuries before surgery. The fifth was a patient with 25.2 percent probability of perioperative death based on Euroscore cardiac surgery risk calculator tool who died because her right ventricle was too weak to endure the stress of surgery.  None of those patients' deaths could reasonably be blamed on Dr. Love, and Dr. Love did not deviate from the applicable standard of care in providing treatment to any of them.

293.     Dr. Pagel's assertion that Dr. Love is more dangerous than John Wayne Gacy and Jeffrey Dahmer combined was false and outrageous and reflects the malice Dr. Pagel continued to harbor against Dr. Love, even as Dr. Love was searching for a new position.  John Wayne Gacy was a notorious serial killer who raped and murdered 33 boys and young men between 1972 and 1978.  Jeffrey Dahmer was a notorious serial killer who raped, murdered, dismembered, and, in some cases, ate 17 men and boys between 1978 and 1991.  Dr. Love is a loving husband and father of three who has dedicated the past 35 years to saving the lives of thousands of people.

294.     Dr. Pagel continues to harbor malice toward Dr. Love.  Indeed, in answering Dr.

Love's First Set of Interrogatories, Dr. Pagel reiterated his outrageous assertion that Dr. Love is

more dangerous than John Wayne Gacy and Jeffrey Dahmer combined.  Contrasting those two

psychopaths with Dr. Love, Dr. Pagel declared in an interrogatory answer, "Neither John Wayne

Gacy or [sic] Jeffrey Dahmer killed 17 people in a four-month period, either individually or in

combination."

### Dr. Lindenbaum's Defamatory Statements to UKCM

295.     In late 2014, the University of Kentucky College of Medicine ("UKCM") recruited

Dr. Love for the position of Director of the University of Kentucky Transplant Center and Chief

of Thoracic Transplantation, a position for which Dr. Love was highly qualified.

296.     Although accepting the position at UKCM would have required Dr. Love to live

apart from his family, he was excited by the position's prestige and high salary.

297.     In December 2014, Dr. Love visited UKCM twice to interview for the position

298.     During his first visit, on December 1, 2014, Dr. Love met with Theodore S. Wright,

M.D. ("Dr. Wright"), Professor of Cardiac Surgery, Joseph B. Zwischenberger, M.D. ("Dr.

Zwischenberger"), Chair of the Department of Surgery, and Sibu P. Saha, M.D. ("Dr. Saha"),

Professor of Cardiothoracic Surgery.

299.     After Dr. Love's first visit, Dr. Saha called Dr. Love and informed him that

UKCM's cardiothoracic surgery faculty had agreed unanimously to extend him an offer.

300.     On December 22, 2014, Dr. Love returned to UKCM and had dinner with Dr.

Zwischenberger and Dr. Saha.  At that dinner, those physicians confirmed the offer and discussed

its terms with Dr. Love.  By the end of the dinner, Dr. Love had agreed in principle with Dr.

Zwischenberger and Dr. Saha that he would accept the position at UKCM under a five-year

contract.

301.    On December 23, 2014, Dr. Love met with Michael Karpf, M.D. ("Dr. Karpf"), UKCM's Executive Vice President for Health Affairs. Dr. Karpf and Dr. Love agreed in principle to the terms of Dr. Love's employment. Also, Dr. Karpf asked Dr. Love to recruit Maher A. Baz, M.D. ("Dr. Baz"), a Critical Care Specialist at Indiana University Health, to join UKCM as a pulmonologist.

302.    Dr. Love recruited Dr. Baz, and Dr. Baz, enthusiastic about having the opportunity to practice with Dr. Love, joined UKCM.

303.    On or about December 29, 2014, Dr. Lindenbaum interviewed for a position at UKCM. At that time, Dr. Lindenbaum harbored malice toward Dr. Love because Dr. Love had investigated and expressed concerns about MCW anesthesiologists' providing grossly substandard patient care and because Dr. Lindenbaum was loyal to Dr. Nicolosi and blamed Dr. Love for Dr. Nicolosi's ouster from MCW.

304.    During his December 29, 2014 interview, Dr. Lindenbaum made false statements that reflected negatively on Dr. Love's professional competence ("Dr. Lindenbaum's Statements") to UKCM physicians, including Dr. Edwin A. Bowe, M.D. ("Dr. Bowe"), Chairman of the Department of Anesthesiology, and Dr. Kevin W. Hatton, M.D. ("Dr. Hatton"), a critical care specialist.

305.    Dr. Lindenbaum's Statements included the following: (1) Dr. Love is an incompetent surgeon who had terrible patient outcomes; (2) MCW had terminated Dr. Love with cause for that reason; and (3) Dr. Love had effectively destroyed MCW and Froedtert's transplant program through his incompetence.

306.    Dr. Bowe and Dr. Hatton communicated Dr. Lindenbaum's Statements to members of UKCM's management, including, but not limited to, Dr. Zwischenberger.

307.    On January 5, 2015, Dr. Saha informed Dr. Love that UKCM had decided to withdraw its offer.

308.    UKCM withdrew its employment offer to Dr. Love as a direct result of Dr. Lindenbaum's Statements.

## Dr. Pagel's Defamatory Statements to UKCM

309.    On December 30, 2014, after Dr. Lindenbaum made his Statements, Dr. Bowe asked Dr. Lindenbaum to provide names of other MCW anesthesiologists who would discuss their opinions of Dr. Love with Dr. Bowe and Dr. Saha.

310.    Later on December 30, 2014, Dr. Lindenbaum emailed Dr. Pagel's name and contact information to Dr. Bowe.

311.    On or about December 30, 2014, Dr. Bowe spoke to Dr. Pagel by telephone.

312.    During his telephone call with Dr. Bowe, Dr. Pagel made false statements regarding Dr. Love ("Dr. Pagel's Statements to UKCM"), which were substantively the same as Dr. Pagel's Statements to St. Mary's Hospital.

313.    UKCM withdrew its employment offer to Dr. Love as a direct result of Dr. Pagel's Statements to UKCM.

## Ms. Cohn's Confirmation of Dr. Pagel's Defamatory Statements

314.    On January 29, 2015, Dr. Evans sent Dr. Tweddell and Ms. Cohn an email in which he wrote:

> Talked with Bob Love – he is obviously very upset and feels that Anesthesia is sabotaging him at all job possibilities – esp Kentucky.
>
> He also feels that UW [Hospital] and St. Mary's [Hospital] were inappropriately contacted ... by Anesthesia.  He claims that he virtually had the St. Mary's position.  He also stated that some negative comments regarding him have been attributed to me (by Anesthesia).

Would it be helpful for us to meet with Anesthesia and confront this – if we did this, we would need your help here Sarah?

I am placing a call to Kentucky and to a center in Chicago [i.e., Dr. Shoup at Cadence] to investigated / support him in an appropriate way.

315.   Ms. Cohn forwarded Dr. Evans's email to Dr. Kerschner, writing:

Wanted you to know this.  I hear it was Paul Pagel who talked with Kentucky – and when Tweddell told him to stop, Dr. P. said he would say what he needed to say.

I am not inclined to be the intermediary unless you think I should.

316.   Dr. Kerschner replied to Ms. Cohn as follows:

Thank you for the information.

There is no reason for our faculty to be actively speaking negatively.

But it will be difficult to silence people who wish to speak out.

I also think that we have given Bob a fairly "raw deal" in some regards.

I am happy to be involved if necessary.  I don't know that it requires your intervention unless you think there is risk to MCW from a legal perspective in some of this = Bob Love coming after MCW employees for slander, etc.  Please let me know if you think there is risk there.

317.   In her reply to Dr. Kerschner, Ms. Cohn stated:

As you know, I don't think Bob got a raw deal, but there is no reason to rehash that:

I am not worried from a risk perspective; our settlement agreement only restricts officers in what they can say – we never agree to even try to constrain 5000 employees.  And I agree that we will not be able to silence faculty who have an opinion – and a defense to a defamation action is that the information was true.  So they [sic] we would battle publicly about Bob's issues, which will hurt him more than MCW overall.  But that is not something I would like to happen since as you know, there are issues in the whole mess.

55

318. This email exchange shows that after Dr. Love signed the Separation Agreement and was searching for a new position, Ms. Cohn knew that Dr. Pagel and other MCW anesthesiologists were continuing their efforts to destroy Dr. Love's reputation and to sabotage his career, but Ms. Cohn did nothing to stop it.

319. This email exchange also shows that Ms. Cohn anticipated this lawsuit and intended for MCW to defend against it using the Separation Agreement she had fraudulently induced Dr. Love to sign and the trumped up charges of "Bob's issues" she had compiled in furtherance of the conspiracy against Dr. Love.

### Dr. Love's Position at Cadence

320. After Dr. Love learned of Defendants' interference with his prospective positions at St. Mary's Hospital and UKCM, he realized he had to broaden his job search and accept the first surgeon position offered to him, even if doing so would diminish his professional status and force him to live apart from his family.

321. In January 2015, Dr. Love asked Dr. Shoup whether there was an open surgeon position at Cadence, which is a community hospital-based physician group located in the western suburbs of Chicago.

322. Dr. Shoup has known Dr. Love since 2006, when he joined her former practice group at Loyola Hospital as Professor and Vice Chairman and Surgical Director of Lung Transplantation.

323. Dr. Shoup invited Dr. Love to interview at Cadence for an open thoracic surgeon position.

324. At around the time of Dr. Love's interview at Cadence in February 2015, Dr. Shoup discussed his candidacy with Karen Brasl, M.D. ("Dr. Brasl"), a trauma surgeon who had practiced

at MCW contemporaneously with Dr. Love but had never operated with him. During that discussion, Dr. Brasl stated, "everything [Dr. Love] touched turned into a disaster" at MCW.

325.    On January 29, 2015, shortly after Dr. Shoup spoke to Dr. Brasl, Dr. Shoup called Dr. Evans to discuss Dr. Love's candidacy.

326.    Dr. Shoup called Dr. Evans to inquire into the accuracy of Dr. Brasl's statement because Dr. Shoup had known Dr. Evans professionally for over 10 years, respected him as a surgeon, and believed him to be an honest and trustworthy person.

327.    During Dr. Shoup's discussion with Dr. Evans, Dr. Evans told her that Dr. Brasl's statement was not true, that the circumstances surrounding Dr. Love's separation from MCW were not Dr. Love's fault, and that Dr. Love is a good surgeon.

328.    Because Dr. Shoup knew Dr. Love to be an excellent surgeon with a high level of technical competence and surgical judgment, because Dr. Evans refuted Dr. Brasl's disparaging statement regarding Dr. Love, and because MCW had confirmed that there were no pending or past malpractice cases against Dr. Love arising out of his practice at MCW, Cadence offered Dr. Love the thoracic surgeon position.

329.    Dr. Love gratefully accepted Cadence's offer and began practicing there on April 1, 2015.

330.    Dr. Love continues to practice at Cadence and has exhibited a high level of technical competence and surgical judgment throughout his time there.

331.    Dr. Love's accepting the position at Cadence has diminished his professional status for the following reasons:

- the Cadence position is as a member of a community hospital-based physician group rather than as a member of the faculty of an academic hospital;

- the Cadence position is as a staff physician rather than as a department chief;

- in the Cadence position, Dr. Love performs only thoracic surgery, so he has had to permanently relinquish his practices in cardiac surgery and cardiothoracic transplant surgery, the field in which he built an international reputation; and

- Dr. Love's salary at Cadence is significantly lower than the salary he earned at MCW, the salary he would have earned at St. Mary's Hospital or at UKCM, or the salary he would have earned as a cardiothoracic surgeon at another academic hospital.

332.    In addition to diminishing his professional status, Dr. Love's accepting the Cadence position has forced him to live apart from his wife and daughter, who are unable to relocate to the western suburbs of Chicago.

## COUNT I
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
## AGAINST MCW

333.    Dr. Love realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 332 of this Complaint.

334.    Section 3730(h)(1) of the False Claims Act ("FCA") provides as follows:

Any employee ... shall be entitled to all relief necessary to make that employee ... whole, if that employee … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

335.    Dr. Love engaged in lawful acts in furtherance of efforts to stop violations of the FCA when he investigated and expressed concerns to MCW regarding the following actual or potential FCA violations:

- MCW physicians' providing patient care that may have been so grossly substandard as to constitute worthless services;

- MCW physicians' actual or potential violations of CMS regulations requiring health care facilities, as a condition of Medicare payment and participation, to track adverse patient events, analyze their causes, and implement actions and mechanisms to prevent recurrences;

- MCW physicians' actual or potential violations of 42 U.S.C. §1320c-5(a), which requires health care facilities, as a condition of Medicare payment and participation, to provide services only when medically necessary and of a quality that meets professionally recognized standards of health care;

- Dr. Stone's providing patient care that may have been so grossly substandard as to constitute worthless or substantially diminished services;

- Dr. Stone's performing operations that may have been unnecessary and non-standard;

- Dr. Stone's billing practices that may have been fraudulent; and

- Dr. Almassi's providing patient care to veterans that may have been so grossly substandard as to constitute worthless services.

336.    MCW knew Dr. Love was engaging in lawful acts in furtherance of efforts to stop violations of the FCA when he investigated and expressed concerns to MCW regarding these actual or potential FCA violations.

337.   Because Dr. Love was engaging in lawful acts in furtherance of efforts to stop actual or potential violations of the FCA, MCW discriminated against Dr. Love in the terms and conditions of his employment, in violation of Section 3730(h)(1) of the FCA.

338.   Specifically, MCW discriminated against Dr. Love in the terms and conditions of his employment in the following manner:  (1) placing Dr. Love on a leave of absence on May 8, 2014; (2) informing Dr. Love, on May 20, 2014, that there was no longer a clinical role for him at MCW; (3) threatening to terminate Dr. Love for cause on May 20, 2014; (4) excluding Dr. Love from faculty meetings as of May 26, 2014; (5) eliminating Dr. Love's name from MCW's call schedule as of May 27, 2014; and (6) reducing Dr. Love's salary by approximately 25 percent as of July 1, 2014.

339.   The Separation Agreement, including Section 7 thereof, is void because MCW fraudulently induced Dr. Love to sign it, so Dr. Love has not released any of his claims based on MCW's discriminatory conduct.

340.   As a direct and proximate result of MCW's violations of Section 3730(h)(1) of the FCA, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost earnings and other employment benefits, lost future earnings and employment benefits, and emotional distress.

341.   Under Section 3730(h)(2) of the FCA, Dr. Love is entitled to recover:  (1) two times the amount of his lost past earnings and other employment benefits, plus interest, through the date of the jury's verdict; (2) the amount of his lost future earnings and other employment benefits after the date of the jury's verdict; (3) compensation for his emotional distress equal to his total lost earnings; and (4) compensation for his litigation costs and reasonable attorneys' fees.  Assuming

a verdict date in January 2020, these respective amounts are: (1) in excess of $8,000,000; (2) in excess of $7,000,000; (3) in excess of $9,000,000; and (4) in excess of $2,000,000.

## COUNT II
## DEFAMATION AGAINST DR. NICOLOSI

342.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 341 of this Complaint.

343.    Dr. Nicolosi's Statements are false and were false when Dr. Nicolosi made them to Dr. Pagel.

344.    Dr. Pagel republished Dr. Nicolosi's Statements to Dr. Schroeder.

345.    Dr. Schroeder, in turn, communicated Dr. Nicolosi's Statements to Dr. Kantamneni and Dr. Itani, among other physicians at St. Mary's Hospital.

346.    Dr. Nicolosi's Statements reflected negatively on Dr. Love's professional competence and character.

347.    Dr. Nicolosi made his Statements knowing they were false.

348.    Dr. Nicolosi made his Statements with malice.

349.    Dr. Nicolosi's Statements have so harmed Dr. Love's reputation that they have lowered him in the estimation of the medical community and have deterred others, including Dr. Kantamneni, Dr. Itani, and St. Mary's Hospital, from associating with him.

350.    The Wisconsin Worker's Compensation Act (the "WCA") does not pre-empt Dr. Love's claims based on Dr. Nicolosi's Statements because Dr. Nicolosi made his Statements, and Dr. Nicolosi's Statements caused Dr. Love injury, after MCW had placed Dr. Love on a leave of absence on May 8, 2014.

61

351.    The Separation Agreement, including Section 7 thereof, is void because MCW fraudulently induced Dr. Love to sign it, so Dr. Love has not released any of his claims based on Dr. Nicolosi's Statements.

352.    As a direct and proximate result of Dr. Nicolosi's making his Statements, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits, humiliation, mental anguish, and damage to his reputation.  Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his humiliation, for his mental anguish, and for damage to his reputation.  The amounts of these damages are:  (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; (2) in excess of $9,000,000 for his humiliation; (3) in excess of $9,000,000 for his mental anguish; and (4) in excess of $9,000,000 for damage to his reputation.

353.    Because Dr. Nicolosi was motivated by malice in making his Statements, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers.  The amount of recoverable punitive damages exceeds $72,000,000.

## COUNT III
## DEFAMATION
## AGAINST MCW AND DR. WARLTIER

354.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 353 of this Complaint

355.    Dr. Warltier's Statement is false and was false when Dr. Warltier made it to Dr. Pagel.

356.    Dr. Pagel republished Dr. Warltier's Statement to Dr. Schroeder.

357.    Dr. Schroeder, in turn, repeated Dr. Warltier's Statement to Dr. Kantamneni and Dr. Itani, among other physicians at St. Mary's Hospital.

358.    Dr. Warltier's Statement reflected negatively on Dr. Love's professional competence and character.

359.    Dr. Warltier made his Statement knowing it was false.

360.    Dr. Warltier made his Statement with malice.

361.    Dr. Warltier's Statement has so harmed Dr. Love's reputation that it has lowered him in the estimation of the medical community and has deterred others, including Dr. Kantamneni, Dr. Itani, and St. Mary's Hospital, from associating with him.

362.    The WCA does not pre-empt Dr. Love's claims based on Dr. Warltier's Statement because Dr. Warltier made his Statement, and Dr. Warltier's Statement caused Dr. Love injury, after MCW had placed Dr. Love on a leave of absence on May 8, 2014.

363.    The Separation Agreement, including Section 7 thereof, is void because MCW fraudulently induced Dr. Love to sign it, so Dr. Love has not released any of his claims based on Dr. Warltier's Statement.

364.    When Dr. Warltier made his Statement, he was acting within the scope of his employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Warltier's actions.

365.    As a direct and proximate result of Dr. Warltier's making his Statement, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits, humiliation, mental anguish, and damage to his reputation.  Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his humiliation, for his mental anguish, and for damage to his reputation.  The amounts of these damages are:  (1) in excess of $9,000,000 for Dr.

63

Love's lost past and future earnings and other employment benefits; (2) in excess of $9,000,000 for his humiliation; (3) in excess of $9,000,000 for his mental anguish; and (4) in excess of $9,000,000 for damage to his reputation.

366.    Because Dr. Warltier was motivated by malice in making his Statement, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers.   The amount of recoverable punitive damages exceeds $72,000,000.

**COUNT IV**
**DEFAMATION**
**AGAINST MCW AND DR. PAGEL**

367.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 366 of this Complaint.

368.    Dr. Pagel's Statements to St. Mary's Hospital are false and were false when Dr. Pagel made them to Dr. Schroeder.

369.    Upon receiving Dr. Pagel's Statements to St. Mary's Hospital, Dr. Schroeder repeated them to Dr. Kantamneni and Dr. Itani, among other physicians at St. Mary's Hospital.

370.    Dr. Pagel's Statements to St. Mary's Hospital reflected negatively on Dr. Love's professional competence and character.

371.    Dr. Pagel made his Statements to St. Mary's Hospital knowing they were false.

372.    Dr. Pagel made his Statements to St. Mary's Hospital with malice.

373.    Dr. Pagel's Statements to St. Mary's Hospital were not privileged under Wis. Stat. § 895.87 because Dr. Pagel was not Dr. Love's "employer" under the Wisconsin statutory—or any—definition and because neither Dr. Love nor St. Mary's Hospital requested a job reference from Dr. Pagel.

374.    Dr. Pagel's Statements to St. Mary's Hospital have so harmed Dr. Love's reputation that they have lowered him in the estimation of the medical community and have deterred others, including Dr. Kantamneni, Dr. Itani, and St. Mary's Hospital, from associating with him.

375.    The WCA does not pre-empt Dr. Love's claims based on Dr. Pagel's Statements to St. Mary's Hospital because Dr. Pagel made his Statements to St. Mary's Hospital, and Dr. Pagel's Statements to St. Mary's Hospital caused Dr. Love injury, after MCW placed Dr. Love on a leave of absence on May 8, 2014.

376.    Dr. Pagel was not acting within the scope of his employment as a federal employee when he made his Statements to St. Mary's Hospital.

377.    When Dr. Pagel made his Statements to St. Mary's Hospital, he was acting within the scope of his employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Pagel's actions.

378.    As a direct and proximate result of Dr. Pagel's making his Statements to St. Mary's Hospital, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits, humiliation, mental anguish, and damage to his reputation.  Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his humiliation, for his mental anguish, and for damage to his reputation.  The amounts of these damages are:  (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; (2) in excess of $9,000,000 for his humiliation; (3) in excess of $9,000,000 for his mental anguish; and (4) in excess of $9,000,000 for damage to his reputation.

379.    Because Dr. Pagel was motivated by malice in making his Statements to St. Mary's Hospital, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the

total amount of the compensatory damages he recovers. The amount of recoverable punitive damages exceeds $72,000,000.

<div align="center">

**COUNT V**
**DEFAMATION**
**AGAINST MCW AND DR. LINDENBAUM**

</div>

380.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 379 of this Complaint.

381.    Dr. Lindenbaum's Statements are false and were false when he made them to Dr. Bowe and Dr. Hatton.

382.    Dr. Bowe and Dr. Hatton repeated Dr. Lindenbaum's Statements to members of UKCM's management, including, but not limited to, Dr. Zwischenberger.

383.    Dr. Lindenbaum's Statements reflected negatively on Dr. Love's professional competence and character.

384.    Dr. Lindenbaum made his Statements knowing they were false.

385.    Dr. Lindenbaum made his Statements with malice.

386.    Dr. Lindenbaum's Statements were not privileged under Wis. Stat. § 895.87 because Dr. Lindenbaum was not Dr. Love's "employer" under the Wisconsin statutory—or any—definition and because neither Dr. Love nor UKCM requested a job reference from Dr. Lindenbaum.

387.    Dr. Lindenbaum's Statements have so harmed Dr. Love's reputation that they have lowered him in the estimation of the medical community and have deterred others, including Dr. Zwischenberger, Dr. Saha, Dr. Karpf, Dr. Bowe, Dr. Hatton, and UKCM, from associating with him.

388. The WCA does not pre-empt Dr. Love's claims based on Dr. Lindenbaum's Statements because Dr. Lindenbaum made his Statements, and Dr. Lindenbaum's Statements caused Dr. Love injury, after MCW placed Dr. Love on a leave of absence on May 8, 2014.

389. When Dr. Lindenbaum made his Statements, he was acting within the scope of his employment by MCW. Accordingly, MCW is vicariously liable for Dr. Lindenbaum's actions.

390. As a direct and proximate result of Dr. Lindenbaum's making his Statements, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits, humiliation, mental anguish, and damage to his reputation. Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his humiliation, for his mental anguish, and for damage to his reputation. The amounts of these damages are: (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; (2) in excess of $9,000,000 for his humiliation; (3) in excess of $9,000,000 for his mental anguish; and (4) in excess of $9,000,000 for damage to his reputation.

391. Because Dr. Lindenbaum was motivated by malice in making his Statements, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers. The amount of recoverable punitive damages exceeds $72,000,000.

### COUNT VI
### DEFAMATION
### AGAINST MCW AND DR. PAGEL

392. Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 391 of this Complaint.

393.    Dr. Pagel's Statements to UKCM are false and were false when Dr. Pagel made them to Dr. Bowe.

394.    Dr. Pagel's Statements to UKCM reflected negatively on Dr. Love's professional competence and character.

395.    Dr. Pagel made his Statements to UKCM knowing they were false.

396.    Dr. Pagel made his Statements to UKCM with malice.

397.    Dr. Pagel's Statements to UKCM were not privileged under Wis. Stat. § 895.87 because Dr. Pagel was not Dr. Love's "employer" under the Wisconsin statutory—or any—definition.

398.    Dr. Pagel's Statements to UKCM have so harmed Dr. Love's reputation that they have lowered him in the estimation of the medical community and have deterred others, including Dr. Zwischenberger, Dr. Saha, Dr. Karpf, Dr. Bowe, Dr. Hatton, and UKCM, from associating with him.

399.    The WCA does not pre-empt Dr. Love's claims based on Dr. Pagel's Statements to UKCM because Dr. Pagel made his Statements to UKCM, and Dr. Pagel's Statements to UKCM caused Dr. Love injury, after MCW had placed Dr. Love on a leave of absence on May 8, 2014.

400.    Dr. Pagel was not acting within the scope of his employment as a federal employee when he made his Statements to UKCM.

401.    When Dr. Pagel made his Statements to UKCM, he was acting within the scope of his employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Pagel's actions.

402.    As a direct and proximate result of Dr. Pagel's making his Statements to UKCM, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits, humiliation, mental anguish, and damage

68

to his reputation. Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his humiliation, for his mental anguish, and for damage to his reputation. The amounts of these damages are: (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; (2) in excess of $9,000,000 for his humiliation; (3) in excess of $9,000,000 for his mental anguish; and (4) in excess of $9,000,000 for damage to his reputation.

403.     Because Dr. Pagel was motivated by malice in making his Statements to UKCM, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers. The amount of recoverable punitive damages exceeds $72,000,000.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST MCW AND DR. PAGEL

404.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 403 of this Complaint.

405.     In October 2014, Dr. Love had a prospective contractual employment relationship with St. Mary's Hospital.

406.     By making his Statements to St. Mary's Hospital, Dr. Pagel interfered with Dr. Love's prospective contractual employment relationship with St. Mary's Hospital.

407.     Dr. Pagel intentionally interfered with Dr. Love's prospective contractual employment relationship with St. Mary's Hospital.

408.     Dr. Pagel's primary purpose in making his Statements to St. Mary's Hospital was to interfere with Dr. Love's prospective contractual employment relationship with St. Mary's

69

Hospital, and Dr. Pagel knew that such interference was substantially certain to occur as a result of his making his Statements to St. Mary's Hospital.

409.    Dr. Pagel's Statements to St. Mary's Hospital were a substantial factor in causing St. Mary's Hospital to terminate its prospective contractual employment relationship with Dr. Love.

410.    Dr. Pagel was neither justified nor privileged in making his Statements to St. Mary's Hospital because he acted with ill will or an improper motive toward Dr. Love.

411.    Dr. Pagel was not acting within the scope of his employment as a federal employee when he made his Statements to St. Mary's Hospital.

412.    When Dr. Pagel made his Statements to St. Mary's Hospital, he was acting within the scope of his employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Pagel's actions.

413.    As a result of St. Mary's Hospital's terminating its prospective contractual employment relationship with him, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits and emotional distress.  Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his emotional distress.  The amounts of these damages are:  (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; and (2) in excess of $9,000,000 for his emotional distress.

414.    Because Dr. Pagel was motivated by malice in making his Statements to St. Mary's Hospital, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers.  The amount of recoverable punitive damages exceeds $36,000,000.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST MCW AND DR. LINDENBAUM

415.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 414 of this Complaint.

416.     In December 2014, Dr. Love had a prospective contractual employment relationship with UKCM.

417.     By making his Statements to Dr. Bowe and Dr. Hatton, Dr. Lindenbaum interfered with Dr. Love's prospective contractual employment relationship with UKCM.

418.     Dr. Lindenbaum intentionally interfered with Dr. Love's prospective contractual employment relationship with UKCM

419.     Dr. Lindenbaum's primary purpose in making his Statements to Dr. Bowe and Dr. Hatton was to interfere with Dr. Love's prospective contractual employment relationship with UKCM, and Dr. Lindenbaum knew that such interference was substantially certain to occur as a result of his making his Statements to Dr. Bowe and Dr. Hatton.

420.     Dr. Lindenbaum's Statements to Dr. Bowe and Dr. Hatton were a substantial factor in causing UKCM to terminate its prospective contractual employment relationship with Dr. Love.

421.     Dr. Lindenbaum was neither justified nor privileged in making his Statements to Dr. Bowe and Dr. Hatton because he acted with ill will or an improper motive toward Dr. Love.

422.     When Dr. Lindenbaum made his Statements, he was acting within the scope of his employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Lindenbaum's actions.

423.     As a result of UKCM's terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits, and emotional

distress. Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his emotional distress. The amounts of these damages are: (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; and (2) in excess of $9,000,000 for his emotional distress.

424.    Because Dr. Lindenbaum was motivated by malice in making his Statements, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers. The amount of recoverable punitive damages exceeds $36,000,000.

## COUNT IX
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST MCW AND DR. PAGEL

425.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 424 of this Complaint.

426.    In December 2014, Dr. Love had a prospective contractual employment relationship with UKCM.

427.    By making his Statements to UKCM, Dr. Pagel interfered with Dr. Love's prospective contractual employment relationship with UKCM.

428.    Dr. Pagel intentionally interfered with Dr. Love's prospective contractual employment relationship with UKCM.

429.    Dr. Pagel's primary purpose in making his Statements to UKCM was to interfere with Dr. Love's prospective contractual employment relationship with UKCM, and Dr. Pagel knew that such interference was substantially certain to occur as a result of his making his Statements to UKCM.

430.     Dr. Pagel's making his Statements to UKCM was a substantial factor in causing UKCM to terminate its prospective contractual employment relationship with Dr. Love.

431.     Dr. Pagel was neither justified nor privileged in making his Statements to UKCM because he acted with ill will or an improper motive toward Dr. Love.

432.     Dr. Pagel was not acting within the scope of his employment as a federal employee when he made his Statements to UKCM.

433.     When Dr. Pagel made his Statements to UKCM, he was acting within the scope of his employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Pagel's actions.

434.     As a result of UKCM's terminating its prospective contractual employment relationship with Dr. Love, he has suffered damages and continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits and emotional distress.  Dr. Love is entitled to compensation, in an amount equal to that of his lost past and future earnings and other employment benefits, for his emotional distress.  The amounts of these damages are:  (1) in excess of $9,000,000 for Dr. Love's lost past and future earnings and other employment benefits; and (2) in excess of $9,000,000 for his emotional distress.

435.     Because Dr. Pagel was motivated by malice in making his Statements to UKCM, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers.  The amount of recoverable punitive damages exceeds $36,000,000.

**COUNT X**
**CIVIL CONSPIRACY**
**AGAINST MCW, DR. NICOLOSI, DR. PAGEL, AND DR. WARLTIER**

436.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 435 of this Complaint.

437.    Between on or about September 11, 2013 and on or about May 8, 2014, Dr. Nicolosi, Dr. Pagel, and Dr. Warltier, along with non-parties Ms. Cohn, Dr. Lauer, Dr. Eiseman, Dr. Kersten, Dr. Shoopman, and Dr. Plambeck, acted in concert to induce MCW to force out Dr. Love.

438.    Dr. Nicolosi, Dr. Pagel, and Dr. Warltier came to a mutual understanding to try to accomplish the objective of inducing MCW to force out Dr. Love.

439.    Dr. Nicolosi, Dr. Pagel, and Dr. Warltier all voluntarily and intentionally participated in accomplishing the objective of inducing MCW to force out Dr. Love.

440.    Dr. Nicolosi, Dr. Pagel, and Dr. Warltier accomplished their objective of inducing MCW to force out Dr. Love through unlawful means.  Specifically, they knowingly obtained and disclosed to each other individually identifiable health information for Dr. Love's patients with the intent to use that information to inflict malicious harm on Dr. Love, in violation 42 U.S.C.S. § 1320d-6.

441.    Dr. Nicolosi carried out overt acts to further the conspiracy's objective, including, but not limited to, the following:

- unlawfully accessing at least 52 patients' private medical records with the intent to use individually identifiable health information to inflict malicious harm on Dr. Love and Dr. Fischer;

- falsely accusing Dr. Love of "substandard, often inept, sometimes dangerous, and in many instances, frankly dishonest and unethical medical and surgical practices" in his September 24, 2013 letter to Dr. Kerschner;

- leveling numerous false accusations against Dr. Love in his September 26, 2013 letter to Dr. Kerschner; and

74

- disclosing unlawfully-obtained individually identifiable health information to Dr. Shoopman, Dr. Kersten, and Dr. Eiseman to assist them in leveling false accusations that Dr. Love and Dr. Fischer had provided substandard patient care.

442. Dr. Pagel carried out overt acts to further the conspiracy's objective, including, but not limited to, encouraging Dr. Schroeder, on April 1, 2014, to lodge a baseless complaint against Dr. Love with Dr. Warltier, outside of MCW and Froedtert's official QA review process.

443. Dr. Warltier carried out overt acts to further the conspiracy's objective, including, but not limited to, the following:

- forwarding Dr. Schroeder's April 1, 2014 email to Dr. Lauer;

- circulating, on May 7, 2014, the medical record numbers of patients on whom Dr. Love and Dr. Fischer performed surgical procedures in early 2014, the dates and types of those procedures, and whether each patient died; and

- knowingly accessing and disclosing individually identifiable health information of Dr. Love's and Dr. Fischer's patients, in violation of 42 U.S.C.S. § 1320d-6, with the intent to use that information to inflict malicious harm on Dr. Love and Dr. Fischer.

444. The WCA does not pre-empt Dr. Love's conspiracy claims because Dr. Love suffered his resultant injury after MCW had placed him on a leave of absence on May 8, 2014.

445. Dr. Pagel was not acting within the scope of his employment as a federal employee when he acted in concert with Dr. Nicolosi, Dr. Warltier, and others to induce MCW to force out Dr. Love.

446.    When Dr. Pagel acted in concert with Dr. Nicolosi, Dr. Warltier, and others to induce MCW to force out Dr. Love, he was acting within the scope of his employment by MCW. Accordingly, MCW is vicariously liable for Dr. Pagel's actions.

447.    When Dr. Nicolosi and Dr. Warltier acted in concert with Dr. Pagel and others to induce MCW to force out Dr. Love, they were acting within the scope of their employment by MCW. Accordingly, MCW is vicariously liable for Dr. Warltier's, Dr. Lindenbaum's, and Dr. Nicolosi's actions.

448.    As a result of Dr. Nicolosi, Dr. Pagel, and Dr. Warltier's inducing MCW to force out Dr. Love through unlawful means, he has suffered damages, starting on July 1, 2014, when MCW reduced Dr. Love's salary by approximately 25 percent, and he continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits. Dr. Love is entitled to compensation in an amount in excess of $9,000,000 for his lost past and future earnings and other employment benefits.

449.    Because Dr. Nicolosi, Dr. Pagel, and Dr. Warltier were all motivated by malice, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers. The amount of recoverable punitive damages exceeds $18,000,000.

## COUNT XI
## CIVIL CONSPIRACY UNDER WIS. STAT. § 134.01
## AGAINST MCW, DR. NICOLOSI, DR. PAGEL, AND DR. WARLTIER

450.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 449 of this Complaint.

451.    Between on or about September 11, 2013 and on or about May 8, 2014, Dr. Nicolosi, Dr. Pagel, and Dr. Warltier, along with non-parties Ms. Cohn, Dr. Lauer, Dr. Eiseman,

Dr. Kersten, Dr. Shoopman, and Dr. Plambeck, acted in concert to injure Dr. Love in his reputation and profession by inducing MCW to force him out.

452.    Dr. Nicolosi, Dr. Pagel, and Dr. Warltier mutually undertook the common purpose to injure Dr. Love in his reputation and profession by inducing MCW to force him out.

453.    Dr. Nicolosi, Dr. Pagel, and Dr. Warltier acted with a common purpose to injure Dr. Love in his reputation and profession by inducing MCW to force him out.

454.    Dr. Nicolosi, Dr. Pagel, and Dr. Warltier all acted maliciously in carrying out their common purpose to injure Dr. Love in his reputation and profession by inducing MCW to force him out.

455.    The WCA does not pre-empt Dr. Love's conspiracy claims because Dr. Love suffered his resultant injury after MCW had placed him on a leave of absence on May 8, 2014.

456.    Dr. Pagel was not acting within the scope of his employment as a federal employee when he acted in concert with Dr. Nicolosi and Dr. Warltier to induce MCW to force out Dr. Love.

457.    When Dr. Nicolosi, Dr. Pagel, and Dr. Warltier acted in concert with others to induce MCW to force out Dr. Love, they were acting within the scope of their employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Nicolosi's, Dr. Pagel's, and Dr. Warltier's actions.

458.    As a result of Dr. Nicolosi's, Dr. Pagel's, and Dr. Warltier's maliciously injuring Dr. Love in his reputation and profession, he has suffered damages, starting on July 1, 2014, when MCW reduced Dr. Love's salary by approximately 25 percent, and he continues to suffer damages, including, but not limited to, lost past and future earnings and other employment benefits.  Dr. Love is entitled to compensation in an amount in excess of $9,000,000 for his lost past and future earnings and other employment benefits.

459.     Because Dr. Nicolosi, Dr. Pagel, and Dr. Warltier were all motivated by malice, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers.  The amount of recoverable punitive damages exceeds $18,000,000.

<div align="center">

**COUNT XII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**<u>AGAINST ALL DEFENDANTS</u>**

</div>

460.     Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 459 of this Complaint.

461.     As described above, Dr. Nicolosi, Dr. Pagel, Dr. Warltier, and Dr. Lindenbaum engaged in a two-year, vindictive campaign to ruin Dr. Love's career and well-earned reputation.

462.     Dr. Nicolosi's, Dr. Pagel's, Dr. Warltier's, and Dr. Lindenbaum's conduct was intended to cause Dr. Love emotional distress.

463.     Dr. Nicolosi's, Dr. Pagel's, Dr. Warltier's, and Dr. Lindenbaum's conduct was extreme and outrageous, such that the average member of the community would find the conduct to be a complete denial of Dr. Love's dignity as a person.

464.     Dr. Nicolosi's, Dr. Pagel's, Dr. Warltier's, and Dr. Lindenbaum's conduct had a substantial effect in producing Dr. Love's emotional distress.

465.     Dr. Love suffered an extreme disabling emotional response to Dr. Nicolosi's, Dr. Pagel's, Dr. Warltier's, and Dr. Lindenbaum's conduct, in that, starting in or about August 2014, Dr. Love has been unable to function in other relationships because of the emotional distress caused by their conduct.

466.     Because Dr. Nicolosi's, Dr. Pagel's, Dr. Warltier's, and Dr. Lindenbaum's conduct caused Dr. Love injury after MCW had placed him on a leave of absence on May 8, 2014, the WCA does not pre-empt Dr. Love's claims.

467.     Dr. Pagel was not acting within the scope of his employment as a federal employee when he made engaged in the campaign to ruin Dr. Love's career and well-earned reputation.

468.     When Dr. Pagel, Dr. Warltier and Dr. Lindenbaum engaged in the campaign to ruin Dr. Love's career and reputation, and for part of the time Dr. Nicolosi was engaged in that campaign, they were acting within the scope of their employment by MCW.  Accordingly, MCW is vicariously liable for Dr. Pagel's, Dr. Warltier's, Dr. Lindenbaum's, and Dr. Nicolosi's actions.

469.     As a result of Dr. Nicolosi's, Dr. Pagel's, Dr. Warltier's, and Dr. Lindenbaum's, conduct, Dr. Love has suffered damages and continues to suffer damages, including, but not limited to, emotional distress.  Dr. Love is entitled to compensation in an amount in excess of $9,000,000 for his emotional distress.

470.     Because Dr. Nicolosi, Dr. Pagel, Dr. Warltier, and Dr. Lindenbaum were all motivated by malice, Dr. Love is entitled, under WIS. STAT. § 895.043, to punitive damages equal to twice the total amount of the compensatory damages he recovers.  The amount of recoverable punitive damages exceeds $18,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Robert B. Love, M.D., respectfully requests this Court to enter judgment in his favor and against Defendants and to grant him the following relief:

A.     On Count I, an award of compensatory damages, under 31 U.S.C. § 3730(h)(2), in excess of $26,000,000 against MCW;

B.      On Count II, an award of compensatory damages in excess of $36,000,000 and punitive damages in excess of $72,000,000 against Dr. Nicolosi;

C.      On Count III, an award of compensatory damages in excess of $36,000,000 and punitive damages in excess of $72,000,000 against MCW and Dr. Warltier;

D.      On Count IV, an award of compensatory damages in excess of $36,000,000 and punitive damages in excess of $72,000,000 against MCW and Dr. Pagel;

E.      On Count V, an award of compensatory damages in excess of $36,000,000 and punitive damages in excess of $72,000,000 against MCW and Dr. Lindenbaum;

F.      On Count VI, an award of compensatory damages in excess of $36,000,000 and punitive damages in excess of $72,000,000 against MCW and Dr. Pagel;

G.      On Count VII, an award of compensatory damages in excess of $18,000,000 and punitive damages in excess of $36,000,000 against MCW and Dr. Pagel;

H.      On Count VIII, an award of compensatory damages in excess of $18,000,000 and punitive damages in excess of $36,000,000 against MCW and Dr. Lindenbaum;

I.      On Count IX, an award of compensatory damages in excess of $18,000,000 and punitive damages in excess of $36,000,000 against MCW and Dr. Pagel;

J.      On Count X, an award of compensatory damages in excess of $9,000,000 and punitive damages in excess of $18,000,000 against MCW, Dr. Nicolosi, Dr. Pagel, and Dr. Warltier;

K.      On Count XI, an award of compensatory damages in excess of $9,000,000 and punitive damages in excess of $18,000,000 against MCW, Dr. Nicolosi, Dr. Pagel, and Dr. Warltier;

L.    On Count XII, an award of compensatory damages in excess of $9,000,000 and

punitive damages in excess of $18,000,000 against all Defendants; and

M.    Such other and further relief as this Court may deem just and proper.

Dated:        August 9, 2018                Respectfully submitted,

/s/ Alexander R. Hess
Edward F. Ruberry
Alexander R. Hess
RUBERRY, STALMACK & GARVEY, LLC
10 South LaSalle Street, Suite 1800
Chicago, Illinois 60603
Phone: (312) 466-8050
Fax: (312) 488-8055
ed.ruberry@rsg-law.com
alex.hess@rsg-law.com

*Attorneys for Plaintiff, Robert B. Love, M.D.*

# EXHIBIT A

# SEPARATION AGREEMENT

This Separation Agreement is made by and between Robert Love, M.D. ("Dr. Love") and The Medical College of Wisconsin, Inc. ("MCW"), a Wisconsin non-profit corporation (collectively, the "Parties").

## BACKGROUND

Dr. Love's administrative appointment as Chief of Division of Cardiothoracic Surgery, Department of Surgery has ended. Dr. Love remains employed by MCW as a Professor of Surgery, with tenure. Dr. Love has decided to terminate his employment relationship with MCW, and the Parties have agreed to resolve all of the matters between them based upon a mutual understanding without further expenditure of time, effort or money.

NOW, THEREFORE, for good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree as follows:

1. **Resignation.** Dr. Love will resign as Professor of Surgery on April 1, 2015 (the "Resignation Date"). Dr. Love agrees that the execution of this Agreement shall effect his resignation from MCW effective April 1, 2015 if he has not resigned effective on an earlier date, in which case he will notify MCW promptly of the prior resignation date. Should Dr. Love accept employment outside MCW prior to April 1, 2015, he shall resign from MCW prior to commencing that other employment, which earlier date shall be deemed the "Resignation Date" hereunder. Between the Effective Date of this Agreement and the Resignation Date, Dr. Love will remain on a leave. Dr. Love shall not perform any duties during the leave, except with respect to his research, as set forth in Section 6. Dr. Love will have access to an administrative assistant in the Department of Surgery for up to 10 hours per week of administrative time and will be given an MCW mailing address for use until the Resignation Date.

2. **Vacate Office; Email Account; Equipment.** Dr. Love represents that he will remove his personal property from MCW and return to MCW all of its property, whether owned or leased by it, by the Resignation Date of this Agreement. Access to Dr. Love's MCW email account will cease upon the Resignation Date.

3. **Compensation.** Dr. Love will be paid his current monthly base salary of $51,250.00 commencing July 1, 2014 through April 1, 2015 (that paycheck will be issued in early April). All monthly payments will continue to be subject to the legally required withholdings and customary benefit costs. While Dr. Love remains on the MCW payroll, he shall have access to his usual employee benefits and 403(b) participation, and any benefits provided by or through the Department of Surgery, on such terms as are provided to tenured faculty of that Department. Should Dr. Love resign prior to April 1, 2015, MCW's obligations under this Section shall cease, except that an amount equivalent to the base salary continuation not yet paid to Dr. Love under this Section shall be added to the Severance Payment described in Section 4 below.

4. **Severance Payment.** MCW will pay Dr. Love a single, lump sum severance payment of $350,000, increased by any amounts owing to Dr. Love pursuant to the last sentence of Section 3, above (the "Severance Payment"). The amount of the Severance Payment is not reduced, and the timing of the payment of the Severance Payment does not change, if the Resignation Date occurs prior to April 1, 2015. The Severance Payment shall be subject to all legally required withholdings, including but not limited to deductions for federal and state taxes. In order to qualify for the Severance Payment, Dr. Love must execute, after the Resignation Date, a second release in the form attached hereto as Exhibit A, and the rescission period must expire without revocation by Dr. Love, provided that such rescission period ends prior to April 30, 2015. MCW will promptly deliver the payment to Dr. Love by directly depositing this amount in the bank account in which the payments under Section 1 hereof are being deposited within fourteen (14) days after the expiration of the rescission period, but in all events no later than June 1, 2015.

1

5.      **COBRA**.  Commencing on the first day of the first calendar month after the Resignation Date, MCW shall offer Dr. Love and his dependents, if applicable, a continuation of health and dental benefits coverage as required under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Continuation of health and/or dental coverage shall be subject to timely payment of premiums by or on behalf of Dr. Love and his dependents, if applicable, to the third party administrators that administer MCW's health and dental benefit plans.  It is Dr. Love's responsibility to pay these premiums if benefit coverage is to continue.  Dr. Love shall retain all other rights under COBRA.

6.      **Research Laboratory**.  MCW will continue to fund Dr. Love's research laboratory (the "Laboratory") at its current staffing and supply level through September 30, 2014.  MCW will store any frozen research specimens/samples at its expense until the Resignation Date.  At any time before that date, Dr. Love may arrange to have the frozen specimens/samples transferred/shipped to another institution at his expense (or paid by the receiving institution).  If Dr. Love is not successful in transferring the samples as of the Resignation Date, then the samples will be destroyed or otherwise disposed of by MCW at its expense. Any and all research supplies and equipment purchased during Dr. Love's employment with MCW will remain the property of MCW and the Department of Surgery.

7.      **Release of Claims.**  In exchange for the benefits and payment to him described in this Agreement, Dr. Love hereby irrevocably and unconditionally releases, waives, and fully and forever discharges MCW and its past and current agents, servants, officers, trustees, insurers, attorneys and employees and their respective successors and assigns (the "Released Parties") from and against any and all claims, liabilities, obligations, covenants, rights, demands, attorney fees and/or costs and damages of any nature whatsoever, whether known or unknown, anticipated or unanticipated, relating to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement, including without limitation, any and all claims relating to or arising out of his employment by MCW, the termination thereof (which the parties acknowledge has been agreed to by both prior to execution of this agreement) and arising under the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), the Wisconsin Family Medical Leave Act or the Federal Family Medical Leave Act of 1993 (the "Claims"). Notwithstanding anything contained herein to the contrary, Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards, (i) any obligations that MCW owes to Dr. Love under (A) this Agreement, and (B) the welfare benefit plans and qualified retirement plans of MCW, and (ii) any and all indemnification rights that Dr. Love may have by contract, under the By-Laws of MCW and pursuant to any insurance that MCW carries.

8.      **Compliance with Older Workers Benefit Protection Act**.  Dr. Love and MCW acknowledge that it is their mutual intent that Dr. Love's release and discharge of the Released Parties from liability under the ADEA (the "Release") contained in Section 7 of this Agreement fully comply with the Older Workers Benefit Protection Act.  Accordingly, this Agreement requires, and Dr. Love agrees, that:

(a)      The Release of his rights or claims under the ADEA is his knowing and voluntary act;

(b)      This Release shall apply only to rights and claims arising prior to the Effective Date of this Agreement, and the Release shall not apply to rights or claims that arise after the Effective Date of this Agreement;

(c)      He is releasing rights or claims under the ADEA in exchange for consideration consisting of continued monthly salary payments at his current salary through April 1, 2015 (minus legally required deductions and benefit costs), and but for this Agreement, Dr. Love acknowledges that he would not otherwise be entitled to the payment described in Section 3;

(d)      He has been advised in writing by MCW to consult with an attorney prior to executing this Agreement and has done so;

2

(e)        He has been given a period of at least 21 days within which to consider this Agreement;

(f)        He has the right to revoke this Agreement for a period of seven (7) days after his execution of this Agreement, and none of the terms and provisions of this Agreement shall become effective or enforceable until the revocation period has expired. In computing the seven-day period, the day the Agreement is executed by Dr. Love shall not be included, and the last day of the seven-day period shall be included. If the last day of the period falls on a Saturday, Sunday, or holiday, the last day of the revocation period shall be the next business day following the Saturday, Sunday, or holiday.

(g)        He has read and fully understands the terms of this Agreement.

(h)        Should Dr. Love elect to revoke this Agreement, the compensation set forth in Sections 3 and 4 shall cease, and Dr. Love shall be paid in an amount to be determined, or shall resign without condition.

9.      **Effective Date**. The effective date of this Agreement (the "Effective Date") shall be the day following the revocation period referred to in Section 8 of this Agreement, unless this Agreement is revoked by Dr. Love during that period by written notice.

10.     **Non-Admission**. Neither the negotiations concerning this Agreement, nor the actual provision of consideration set forth in this document, nor the drafting or execution of this document by either party shall be construed as an acknowledgment or admission by either party of any liability to the other party, other than under this Agreement, or to any other individual or entity of any wrongdoing under federal, state or local law.

11.     **Confidentiality**. Dr. Love and MCW agree that the terms of this Agreement and the discussions leading to its execution are confidential, and he will not disclose any information concerning its terms to anyone at any time, except to his significant other, immediate family, legal counsel, accountants or tax advisors, unless compelled to do so under subpoena or other judicial process.

12.     **Non-Disparagement.**

(a)        Dr. Love, on the one hand, and MCW's officers, on the other hand, agree not to make disparaging remarks about each other. If, after the date of this Agreement, MCW's officers are contacted by third parties regarding Dr. Love, they will provide an explanation (and limit any discussion) as to the circumstances surrounding Dr. Love's employment and termination consistent with that contained in the reference letter, attached as Exhibit B. MCW will make its officers aware of this provision of this Agreement for purposes of assuring their compliance therewith.

(b)        MCW and Dr. Love have agreed to the terms of a reference letter, attached as Exhibit B. Five (5) originals of that document shall be provided to Dr. Love on the Effective Date. MCW shall provide additional originals of the reference letter in accordance with Dr. Love's request or in response to the request of a prospective employer.

13.     **Entire Agreement.** This Agreement contains, and the terms constitute, the entire agreement of the parties concerning all matters affecting Dr. Love's employment with MCW and supersede all prior agreements, understandings and practices concerning such matters, including without limitation, any prior employment agreements Dr. Love may have had with MCW, the provisions of any MCW personnel documents, handbooks or policies and any prior customs or practices of MCW with respect to bonuses, severance pay, vacation pay, sick pay, fringe benefits or otherwise. Notwithstanding the foregoing, the terms of all welfare benefit and retirement plans of MCW shall continue to apply to Dr. Love and his family in accordance with their terms.

14.     **Notices.** Any notice required under this Agreement shall be in writing and be deemed given when received by email, by in-person delivery or overnight delivery as follows:

3

To MCW: Sarah Cohn, Office of the General Counsel, Medical College of Wisconsin.

To Dr. Love: James Gardner, Lawton & Cates, SC,

15. **Governing Law; Binding Effect.** This Agreement shall be governed by the laws of the State of Wisconsin, without regard to principles of conflicts of laws. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, assigns, heirs and personal representatives.

16. **Severability.** If any provision of this Agreement shall be contrary to the laws of Wisconsin or any other applicable law, at the present time or in the future, such provision shall be deemed null and void, but such shall not affect the enforceability of the remaining provisions of this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the date last below written.

Date: _Aug. 26, 2014_     By: _____
                                Robert Love, M.D.

The Medical College of Wisconsin, Inc.

Date: _____     By: _____
                                     John R. Raymond, Sr., MD
                                     President and CEO

4

# AGREEMENT

This Agreement is made by and between Robert Love, M.D. ("Dr. Love") and The Medical College of Wisconsin, Inc. ("MCW"), a Wisconsin non-profit corporation (collectively, the "Parties").

# BACKGROUND

Dr. Love and MCW have entered into a Separation Agreement effective _____, 2014 (the "Separation Agreement") under the terms of which, they have agreed to terminate their employment relationship and resolve all of the matters between them based upon a mutual understanding without further expenditure of time, effort or money.  Because Dr. Love's employment with MCW did not end until _____, a further release is a condition precedent to Dr. Love's receipt of certain severance benefits described in the Separation Agreement.

NOW, THEREFORE, for good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree as follows:

1.      The Separation Agreement is incorporated by reference into this Agreement.

2.      **Release of Claims.**

In exchange for the benefits and payment to him described in this Agreement, Dr. Love hereby irrevocably and unconditionally releases, waives, and fully and forever discharges MCW and its past and current agents, servants, officers, trustees, insurers, attorneys and employees and their respective successors and assigns (the "Released Parties") from and against any and all claims, liabilities, obligations, covenants, rights, demands, attorney fees and/or costs and damages of any nature whatsoever, whether known or unknown, anticipated or unanticipated, relating to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement, including without limitation, any and all claims relating to or arising out of his employment by MCW or the termination thereof and arising under the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), the Wisconsin Family Medical Leave Act or the Federal Family Medical Leave Act of 1993. Notwithstanding anything contained herein to the contrary, Dr. Love is not releasing the Released Parties from, or waiving any Claims as regards, (i) any obligations that MCW owes to Dr. Love under (A) the Separation Agreement, and (B) the welfare benefit plans and qualified retirement plans of MCW, and (ii) any and all indemnification rights that Dr. Love may have by contract, under the By-Laws of MCW and pursuant to any insurance that MCW carries.

3.      **Compliance with Older Workers Benefit Protection Act.**  Dr. Love and MCW acknowledge that it is their mutual intent that Dr. Love's release and discharge of the Released Parties from liability under the ADEA (the "Release") contained in Section 2 of this Agreement

fully comply with the Older Workers Benefit Protection Act. Accordingly, this Agreement requires, and Dr. Love agrees, that:

>     (a)    The Release of his rights or claims under the ADEA is his knowing and voluntary act;

>     (b)    This Release shall apply only to rights and claims arising prior to the Effective Date of this Agreement, and the Release shall not apply to rights or claims that arise after the Effective Date of this Agreement;

>     (c)    He is releasing rights or claims under the ADEA in exchange for consideration consisting of a severance payment as described in Section 4 of the Separation Agreement (minus legally required deductions), and but for this Agreement, Dr. Love acknowledges that he would not otherwise be entitled to the payment described therein;

>     (d)    He has been advised in writing by MCW to consult with an attorney prior to executing this Agreement;

>     (e)    He has been given a period of at least 21 days within which to consider this Agreement;

>     (f)    He has the right to revoke this Agreement for a period of seven (7) days after his execution of this Agreement, and none of the terms and provisions of this Agreement shall become effective or enforceable until the revocation period has expired. In computing the seven-day period, the day the Agreement is executed by Dr. Love shall not be included, and the last day of the seven-day period shall be included. If the last day of the period falls on a Saturday, Sunday, or holiday, the last day of the revocation period shall be the next business day following the Saturday, Sunday, or holiday.

>     (g)    He has read and fully understands the terms of this Agreement.

4.    **Effective Date.**  The effective date of this Agreement (the "Effective Date") shall be the day following the revocation period referred to in Subsection 3(f) of this Agreement, unless the Agreement is revoked in writing by Dr. Love during that period. Any revocation shall be delivered to Vice President and General Counsel, Office of the General Counsel, Medical College of Wisconsin, 8201 Watertown Plank Road, Milwaukee, WI 53226.

5.    **Non-Admission.**  Neither the negotiations concerning this Agreement, nor the actual provision of consideration set forth in this document, nor the drafting or execution of this document by either party shall be construed as an acknowledgment or admission by either party of any liability to the other party, other than under this Agreement, or to any other individual or entity of any wrongdoing under federal, state or local law.

6.    **Entire Agreement.**  This Agreement, and the Separation Agreement, contain, and their terms constitute, the entire agreement of the Parties concerning all matters affecting Dr. Love's employment with MCW and supersede all prior agreements, understandings and practices

concerning such matters, including without limitation, any prior employment agreements Dr. Love may have had with MCW, the provisions of any MCW personnel documents, handbooks or policies and any prior customs or practices of MCW with respect to bonuses, severance pay, fringe benefits or otherwise. Notwithstanding the foregoing, the terms of all welfare benefit and retirement plans of MCW shall continue to apply to Dr. Love and his family in accordance with their terms.

7.     **Governing Law; Binding Effect.**  This Agreement shall be governed by the laws of the State of Wisconsin, without regard to principles of conflicts of laws.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, assigns, heirs and personal representatives.

8.     **Severability.**  If any provision of this Agreement shall be contrary to the laws of Wisconsin or any other applicable law, at the present time or in the future, such provision shall be deemed null and void, but such shall not affect the enforceability of the remaining provisions of this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the date last below written.

Date:  _Aug. 26, 2014_          _____
                                                 Robert Love,  M.D.


The Medical College of Wisconsin, Inc.

Date:  _____          By:  _____
                                                              John R. Raymond, Sr., MD
                                                              President and CEO

065128-0010\8548956.1

To Whom It May Concern:

We are writing this letter in support of Dr. Robert Love in our capacity as Chief of the Division of Cardiothoracic Surgery and Chair of the Department of Surgery at the Medical College of Wisconsin (MCW). We have had the pleasure of working with Dr. Love since his recruitment to MCW in 2012 following a national search for new leadership in Adult Cardiac Surgery and Thoracic Transplantation. Historically, these programs had not enjoyed the attention and investment of resources necessary to compete with other area hospitals. In 2009 and 2010, MCW and Froedtert Hospital committed to restructuring the adult practice in cardiovascular disease including cardiology and CT surgery in an effort to enhance program development. Dr. Love joined MCW in the fall of 2012 as section head of adult cardiac surgery.

When Dr. Love joined us, his clinical practice and focus was first directed towards establishing a modern, state of the art heart failure, MCS, and transplant program. Among the first issues addressed by Dr. Love included creating a dedicated heart team in the OR; something not previously established at this hospital. After much work and leadership by Dr. Love, this came to fruition in September of 2013, only one year after his arrival. Dr. Love led the efforts to relocate and redesign the plans for a new CVICU from a ten-bed unit into a twenty-bed state of the art unit immediately adjacent to the OR. Dr. Love restructured the clinical leadership of the CVICU with Dr. Love serving as the Surgical Director because of his Board Certification in Critical Care; this new unit will open in July. Additionally, Dr. Love played a key role in the design of two new cardiothoracic operating rooms and the purchase, outfitting, and redesign of new CPB pumps and perfusion services.

Dr. Love's practice was largely focused on MCS, heart failure, and transplantation. The six-month survival for patients with long-term VAD implants has been greater than 90% since December of 2012 when Dr. Love introduced the HeartWare device into the clinical practice. The short-term device results for the rescue of the sickest patients, or salvage category, were 0% in 2012 (2 patients), 39% in 2013 (20 patients), and 57% in Q1 of 2014 (15 patients), which compares favorably to the INTERMACS benchmark of 25%.

As a direct result of Dr. Love's leadership, Froedtert Hospital has acquired and implemented the clinical use of a full spectrum of modern MCS devices. This includes the first implantation in North America of the HeartWare HVAD outside of a clinical trial. Dr. Love played a critical role in the growth of the Adult Heart Failure/Transplant/MCS program. Dr. Love's presence and experience has also been instrumental in bringing the Lung Transplant Program volume up to the point of achieving CMS approval in 2013. During his time here, Dr. Love has been the Service Line Director for Thoracic Transplantation within the comprehensive Transplant Center. Under Dr. Love, our program now has added DCD Lung Transplantations (which Dr. Love pioneered in the early 90's as a way to increase lung utilization). Dr. Love has also established a research program and an Organ Recovery Lab, acquired funding to purchase an EVLP rig to do preclinical lung recovery on discarded lungs, and established a collaborative

group of researchers studying novel methods to assess lung recovery during EVLP using optical coherence tomography (OCT) analysis.

Despite many obstacles, surgical volume and revenue have grown since Dr. Love joined us. As one might expect, not all stake holders were aligned with Dr. Love's vision and he encountered resistance to the new direction that he proposed for this hospital. In addition, competitive realities within the Milwaukee medical community created challenges we did not anticipate when Dr. Love was recruited. In the end, the senior leadership of this medical campus, after much discussion, in which Dr. Love took a leading role, has decided that the best approach given these realities is to grow a cardiology and cardiac surgery clinical program with a model of multiple points of access rather than a single flagship program. Ultimately, the organization and Dr. Love feel that the direction he has outlined as his vision for program growth is no longer aligned with its direction. Dr. Love agrees that it is best for him to seek another opportunity better matched to his leadership and personal goals for his own practice in Cardiothoracic Surgery. Much has been accomplished, but ultimately the enterprise has decided to go in a different direction.

In his time here, Dr. Love has demonstrated an excellent work ethic and a commitment to program development. His accomplishments, as outlined above, have been many and have bettered our facilities. We wish Dr. Love well in future endeavors and support him fully.


Sincerely,


Dr. James S. Tweddell
The S. Bert Litwin Chair,
Cardiothoracic Surgery,
Children's Hospital of Wisconsin,
Professor of Surgery and Pediatrics,
Chair, Division Cardiothoracic Surgery,
Medical College of Wisconsin.
jtweddell@chw.org
Office - 414.266.2638
Cell – 414.573.1146

Dr. Douglas B. Evans
Professor in Surgery and Chair
Medical College of Wisconsin
devans@mcw.edu
Office – 414.805.5706

# EXHIBIT B

Oct 21, 2014, 09:31

So I'll give you one guess who is interviewing for a cardiac surgery position at St. Mary's Madison this Thursday....

Bob Love.

Ding ding ding!  We have a winner, or loser as the case may be

I hate to be the guy trying to torpedo someone's career but I really don't want him to work here

Unfortunately a bunch of people here worked with him when he was at UW





iMessage

DEAN000040

DEAN000041

Unfortunately a bunch of people here worked with him when he was at UW when he was apparently great

U need to loud and in their faces. Tell them that he lost his privileges at MCW cuz of incompetence and that there r multiple malpractice cases pending

. They can call anybody here to verify the story. Or have them call Al!!!!

Yeah I have been doing that. Going to bring it to the director of inpatient



iMessage

●●●○○ U.S. Cellular LTE 09:02 86%

Messages (2) **Paul** Details

Yeah I have been doing that. Going to bring it to the director of inpatient sercvices today though. Just wanted some take home points to give them.

We just fired a locums cv guy for similar issues so I am hoping they will stay away from bob

Can I give them your VA number to check as a reference?

Of course. I'll b happy to tell them that he's a threat to public health.

Oct 21, 2014, 13:08

iMessage 

DEAN000042

Oct 21, 2014, 13:08

What was it, 17 perioperative deaths between Jan and April that finally broke the camel's back?

Just trying to get my figures straight

17 dead in 4 months. That's more than John Wayne Gacy and Jeffrey Dahmer combined during any 4 month period of their serial murders.

Oct 22, 2014, 15:23

The office number at the VA is 4-2417 (its incorrect in the email...

iMessage



DEAN000043

# EXHIBIT C



**MEDICAL COLLEGE OF WISCONSIN**

### INDIVIDUAL INSURED CLAIM HISTORY

### THE MEDICAL COLLEGE OF WISCONSIN, INC.
### PROFESSIONAL LIABILITY INSURANCE PROGRAM

**DATE:** 2/26/2015

**TO:** Whom It May Concern

**FROM:** Risk Management Department

**RE:** Robert Love MD

Robert Love's coverage under The Medical College of Wisconsin Professional Liability Insurance Program began:

August 15, 2012 through July 01, 2015

Insured does not have a Claim History on file.

8701 Watertown Plank Road
PO Box 26509
Milwaukee, WI 53226
(414) 955-3150