**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ROBERT LOVE,**
        **Plaintiff,**

      **v.**                           **Case No. 15-C-0650**

**MEDICAL COLLEGE OF**
**WISCONSIN et al.,**
        **Defendants.**

---

### DECISION AND ORDER

Plaintiff Dr. Robert Love is a surgeon who was formerly employed by the defendant Medical College of Wisconsin (MCW). His relationship with MCW deteriorated and he was obliged to seek new employment. He claims that his former MCW colleagues, defendants Paul Pagel and Larry Lindenbaum, defamed him to prospective employers and interfered with his prospective contracts with those prospective employers. He has also named MCW as a defendant on the theory of vicarious liability, claiming that Drs. Pagel and Lindenbaum were acting within the scope of their employment at MCW when they engaged in the alleged tortious conduct. Discovery has closed, and defendants have moved for summary judgment on these claims, defendants Lindenbaum and MCW filing a joint motion and defendant Pagel filing a separate motion.[1]

---

[1] The operative complaint included certain other claims which have not been dismissed, but plaintiff has indicated that he will no longer pursue them. See ECF No. 298 at 2, n.1. In addition, Dr. Dr. Pagel also requested a clarification that my dismissal of Counts X and XI at ECF No. 227 applies to him, as he was not a movant on the motion that gave rise to the dismissal. Dr. Love did not oppose this request, and it is therefore granted. The only claims I must address in resolving defendants' motions for

# I.    FACTS

The summary judgment record reveals the following facts.

## A. *Dr. Love's Employment and Separation from MCW*

Dr. Love began working at MCW in August, 2012 as Professor and Section Chief of Adult Cardiac Surgery. In that role, he supervised all the cardiothoracic surgeons in the adult cardiac surgery section and was responsible for reviewing the quality of care provided by the people working in his department.

Dr. Love was also afforded surgical privileges at Froedtert Memorial Lutheran Hospital ("Froedtert") while employed as a professor at MCW. The term "surgical privileges" as used here refers to a physician's authorization to use hospital surgical facilities. Surgical privileges are governed by hospital medical staff bylaws and are not the same as an employment agreement. Being placed on a leave of absence is not the same as revocation of hospital privileges. Loss of hospital privileges is deeply damaging to a physician's career and may pose an insurmountable obstacle to future employment. ECF No. 321 at 43, ¶¶ 7, 9.[2]

_____

summary judgment are for defamation and for tortious interference with contractual relations.

[2] Dr. Love proposed the facts in this paragraph (regarding the difference between a leave of absence and loss of privileges, and the seriousness of a loss of privileges) in support of his opposition to Dr. Pagel's motion for summary judgment, and Dr. Pagel does not dispute them. Because Dr. Love presented a different set of proposed facts in his response to Dr. Lindenbaum's motion, Dr. Lindenbaum has not had the opportunity to indicate whether or not he disputes these facts, which do have some bearing on the claims against Dr. Lindenbaum. Because the facts are of the nature of general background information, and because I am to draw inferences and resolve factual disputes in Dr. Love's (i.e., the non-movant's) favor, I will draw on these facts in my analysis of Dr. Lindenbaum's motion even though Dr. Lindenbaum has not had the opportunity to formally respond to them.

Conflict developed between Dr. Love and others in the MCW cardiothoracic surgery department. The parties dispute the basis of the conflict—whether it was due to personality clashes, or clinical and administrative shortcomings of Dr. Love.

It is undisputed for purposes of summary judgment that many anesthesiologists, perfusionists and mid-level providers resented and resisted the institutional changes Dr. Love implemented upon his arrival at MCW in August, 2012, particularly the decisions to accept higher-acuity cardiac patients and to perform more, and more complex, cardiac surgical procedures.

In September, 2013, Dr. Al Nicolosi, who had practiced cardiothoracic surgery at MCS for many years, resigned from the program. In a resignation letter to the Dean of MCW, he stated:

> In light of profound and seemingly irreconcilable differences of both a professional and ethical nature with certain members of the Froedtert & Medical College Heart and Vascular Program, who are conducting substandard, often inept, sometimes dangerous, and in many instances frankly dishonest and unethical medical and surgical practices, and because of my utter disdain for the fact that leaders in the program, as well as leaders in both the department of surgery and hospital administration are not only ignoring but helping to conceal the problems I describe, I find the atmosphere in this institution so repugnant that to continue practicing here would amount to complete abandonment of my professional and personal principles.

ECF No. 302-7. In a follow-up letter to the Dean of MCW, he detailed various episodes where he believed Dr. Love had made poor and unethical decisions both in the course of surgery and in the administration of the heart surgery program. ECF No. 302-8. In a subsequent email exchange among hospital administrators, however, Dr. James Tweddell, the Chair of MCW's Division of Cardiovascular Surgery, described Dr.

3

Nicolosi as a "chronic angry malcontent." ECF No. 302-9 at 3. Dr. Nicolosi left MCW in late 2013. Shortly before Dr. Nicolosi tendered his resignation letter, defendant Dr. Pagel emailed the Dean to advocate for Dr. Nicolosi, calling Dr. Nicolosi a "superstar" and a "loyal friend." ECF No. 321, p. 50, ¶ 36. In May 2014, Dr. Nicolosi sent a letter to MCW's president referring to illegal practices and "horrendous outcomes, including many unnecessary deaths" at MCW, and criticizing the leadership at MCW for allowing the alleged problems to happen. The MCW president sent a letter in response which Dr. Nicolosi forwarded to Dr. Pagel, with a cover note saying "I don't get a sense that any of the leaders will be held accountable. If whitewash had an odor, I would be smelling it right now." *Id.,* ¶ 37.

Also in 2013 and continuing into 2014, several cardiac anesthesiologists began privately speaking with Dr. David Warltier, the Chair of the Department of Anesthesiology at MCW, about their concerns regarding the quality of care provided by the cardiac program headed by Dr. Love. At Dr. Warltier's direction, certain doctors in the anesthesiology department compiled a report on the surgical mortality outcomes for MCW's four cardiothoracic surgeons in the four-month period between January and April 2014. The report indicated that the four surgeons together had totaled 18 patient deaths in that period. The report also indicated that Dr. Love, identified as "Surgeon 2," had been primary surgeon on 27 cases during the time period and that 5 of those patients had died.

Dr. Douglas Evans, the Chief of the Department of Surgery at MCW, and Dr. James Tweddell, MCW's Chief of Cardiothoracic Surgery at the time, decided to remove

Dr. Love from the cardiac surgery program at MCW. On May 8, 2014, Dr. Evans met with Dr. Love and informed him of this decision.

Again, the parties dispute whether the reason for Dr. Love's removal from the surgery program was due to concerns about Dr. Love's ability to safely treat patients and competence as a surgeon and medical leader, or because of his personal conflicts with other doctors in the program. Dr. Evans documented the meeting with Dr. Love in a memorandum dated May 8, 2014 (the same day as the meeting) which states, "[Dr. Love] understand[s] that we will remove [him] from the Cardiac Surgery program and [he] is not allowed to perform cardiac surgery at this institution." ECF No. 290-17 at 2. The memo listed the following reasons for the decision:

1. Mortality and morbidity which are unacceptable for a high performing program.
2. Various aspects of case management as retrospectively reviewed by Dr. Tweddell . . . and myself reflect a level of expertise which is not consistent with the standards of the department of surgery.
3. An inability to build and lead a multidisciplinary cardiac program manifested by poor interpersonal relationships at multiple levels including physicians, advanced care practitioners, operating room personnel and perfusionists.
4. Unexplained lack of availability when called or paged and tardiness on multiple occasions for multidisciplinary rounds and operating room cases.
5. Feedback from all levels of the program (cardiologists, perfusionists, advanced care practitioners, and nurses) which was highly negative of [his] leadership and clinical practices.

*Id.* In addition, defendants point to evidence that Dr. Tweddell conducted a review or the adult cardiothoracic mortalities at Froedtert in March and April of 2014, and stated in a report to the Froedtert Quality Committee dated June 16, 2014 that "[t]he mortalities occurred in patients who were moderate to high risk but there were also issues related

5

to technical performance and surgical decision-making that appear to have been isolated to Drs. Love and Fischer." ECF No. 290-19 at 2. Dr. Tweddell's report also stated,

> There were several cases where the judgment and performance of Dr. Love and Dr. Fischer were concerning. In addition, I was concerned that both Dr. Love and Dr. Fischer were not forthcoming with all the information concerning the operations and complications. I subsequently had discussions with midlevel providers and perfusionists who were universally concerned about patient selection and outcome.

Id. at 11. Defendants argue that the concerns documented in the report were the basis of the decision to remove Dr. Love. Dr. Love disputes the point on grounds that Dr. Tweddell did not conduct his review of cases until after he and Dr. Evans had already made the decision to remove Dr. Love. ECF No. 321, ¶¶ 35-37. Dr. Love also points to deposition testimony by Dr. Evans that the reason for Dr. Love's removal was his "inability to form an effective team." ECF No. 303-9 at 5.

Also on May 8, 2014, Cathy Buck, President of Froedtert, sent an email to a number of physicians at Froedtert to notify them of changes in cardiothoracic surgery. Her email included a statement that Dr. Love was "currently on a leave of absence and [would] no longer perform cardiac surgery here." ECF No. 321, ¶ 43. On May 23, 2014, Buck sent a second email clarifying that, though Dr. Love was on a leave of absence, he was still a member of the Froedtert medical staff and "no hospital action had been taken with respect to his privileges." ECF No. 303-13.

Dr. Love and MCW subsequently negotiated a separation agreement which was entered on August 26, 2014. Pursuant to the agreement, Dr. Love remained on leave but employed by MCW until his resignation, which was to happen by April 1, 2015.

6

During the leave, MCW continued to provide Dr. Love with an office, a MCW email address and computer programming, and an administrative assistant. MCW expected Dr. Love to use these resources to transition to new employment in 2015. Further, as part of the separation agreement, Dr. Love drafted and MCW agreed to sign a letter of recommendation for Dr. Love to use in his search for new employment.

Froedtert did not revoke, limit or suspend any of Dr. Love's surgical privileges during the period that he was on a leave of absence from MCW. ECF No. 303-15.

*B. Dr. Pagel's Communications with St. Mary's Regarding Dr. Love*

In the fall of 2014, Dr. Love applied for a position at St. Mary's Hospital in Madison. Dr. Andrew Schroeder was an anesthesiologist at St. Mary's. Dr. Schroeder had worked at MCW until June of 2014, had worked with Dr. Love on some surgical cases, and had been mentored by Dr. Pagel. Dr. Schroeder had concerns about Dr. Love's clinical judgment and skills, and he did not want Dr. Love to work at St. Mary's. ECF No. 321, ¶¶ 62-63. Dr. Schroeder reached out to Dr. Pagel via text message on October 21, 2014 to elicit information about Dr. Love that he might share with other physicians at St. Mary's for their consideration in deciding whether to hire Dr. Love.

The text messages between Drs. Schroeder and Pagel proceeded as follows:

> **Dr Schroeder:** So I'll give you one guess who is interviewing for a cardiac surgery position at St. Mary's Madison this Thursday…
>
> **Dr. Pagel:** Bob Love.
>
> **Dr. Schroeder:** Ding ding ding! We have a winner, or loser as the case may be. I hate to be the guy trying to torpedo someone's career, but I really don't want him to work here. Unfortunately a bunch of people here worked with him when he was at UW when he was apparently great.

7

> **Dr. Pagel:** U need to [*sic*] loud and in their faces. Tell them that he lost his privileges at MCW cuz of incompetence and that there r multiple malpractice cases pending. They can call anybody here to verify the story. Or have them call Al!!!!
>
> **Dr. Schroeder:** Yeah I have been doing that. Going to bring it to the director of inpatient services today though. Just wanted some take home points to give them. We just fired a locums cv guy for similar issues so I am hoping they will stay away from Bob. Can I give them your VA number to check as a reference?
>
> **Dr. Pagel:** Of course. I'll be happy to tell them that he's a threat to public health.
>
> **Dr. Schroeder:** What was it, 17 perioperative deaths between Jan and April that finally broke the camel's back? Just trying to get my figures straight.
>
> **Dr. Pagel:** 17 dead in 4 months. That's more than John Wayne Gacy and Jeffrey Dahmer combined during any 4 month period of their serial murders.

ECF No 321, ¶ 67. Dr. Schroeder then read at least one of these messages from Dr. Pagel aloud during a discussion of Dr. Love's candidacy at a meeting of St. Mary's cardiac anesthesiologists and surgeons. Several of the St. Mary's physician to whom Dr. Schroeder read Dr. Pagel's statements understood them to mean that Dr. Love alone had lost 17 patients in four months. In fact, only five of Dr. Love's perioperative patients and a total of eight of his patients died during that time.

It is undisputed for purposes of summary judgment that Dr. Schroeder reading these messages aloud at the meeting effectively terminated Dr. Love's candidacy at St. Mary's. *Id.*, ¶¶ 41-43. The parties dispute the extent to which other factors, including Dr. Love's alleged administrative challenges at MCW, his actual clinical abilities, and the fact that he was not allowed to perform surgery at MCW, also contributed to St. Mary's decision not to hire Dr. Love. ECF No. 321, p. 26-28, ¶¶ 76-77.

8

*C. Drs. Pagel and Lindenbaum's Communications with UKCM Regarding Dr. Love*

In December, 2014, Dr. Love interviewed for a cardiothoracic surgery position with the University of Kentucky College of Medicine (UKCM).

Also in December, 2014, Defendant Dr. Lindenbaum, who had worked at MCW as an anesthesiologist while Dr. Love was practicing there, happened to interview for an anesthesiology position at UKCM. On December 22, 2014, as part of this interview process, Lindenbaum met with critical care specialist Dr. Kevin Hatton, who mentioned that Dr. Love was also coming to UKCM. ECF No. 317, ¶ 46. In response, Dr. Lindenbaum made certain comments about Dr. Love to Dr. Hatton and encouraged UKCM to do further due diligence on Dr. Love before making any decision about hiring him.

At his deposition, Dr. Hatton testified that he does not remember the specifics of the conversation, but that his general impression was that Dr. Lindenbaum raised some issues with respect to Dr. Love's operating ability and bad outcomes. Dr. Hatton also recalled that Dr. Lindenbaum had suggested there were issues related to Dr. Love's operating room credentials at MCW. Dr. Hatton testified that, while Dr. Lindenbaum went out of his way not to state specifically that Dr. Love had lost his privileges, Dr. Hatton's impression from Dr. Lindenbaum was that "there was something amiss with [Dr. Love's] privileges. It wasn't clear to me whether [Dr. Love's privileges] had been revoked, whether they were about to be revoked, whether they were limited." ECF 317, ¶ 43. As for Dr. Lindenbaum's recollection of the conversation, he testified that he told Dr. Hatton that Dr. Love had been placed on administrative leave and was no longer

allowed to operate at Froedtert, but that he did not tell Dr. Hatton that Dr. Love had lost his administrative privileges at MCW or Froedtert. *Id.*, ¶¶ 44-45. Dr. Hatton told Dr. Lindenbaum he should repeat his comments to Dr. Edwin Bowe, the Chairman of the Department of Anesthesiology at UKCM.

Dr. Lindenbaum met with Dr. Bowe later that day. Like Dr. Hatton, Dr. Bowe has testified that he has difficulty recalling the details of what Dr. Lindenbaum told him about Dr. Love; he testified that he could only recall that the statements were negative about Dr. Love's surgical abilities. *Id.*, ¶¶ 54-55. However, following the interview with Dr. Lindenbaum, Dr. Bowe did discuss Dr. Love's application with Dr. Joseph Zwischenberger, the Chair of the Department of Surgery at UKCM, and Dr. Sibu Saha, a UKCM Professor of Cardiac Surgery. Dr. Bowe indicated to these doctors that there were some red flags about Dr. Love and that they should try to figure out the basis of those red flags.

Following these conversations, on December 30, 2014, Dr. Bowe emailed Dr. Lindenbaum and requested the names of other anesthesiologists who might be willing to speak with him or Dr. Saha about Dr. Love. Dr. Lindenbaum then emailed defendant Dr. Pagel and asked if he might be willing to speak to Dr. Bowe; Dr. Pagel replied that he knew Dr. Bowe well and told Dr. Lindenbaum to have Dr. Bowe call him. ECF No. 282-4. Dr. Lindenbaum then emailed Dr. Bowe the names of several doctors, including Dr. Pagel, who would be willing to chat with Dr. Bowe "off the record". *Id.*, ¶ 71.

Dr. Bowe and Dr. Pagel spoke about Dr. Love by telephone on January 5, 2015. At his deposition, Dr. Bowe testified that Dr. Pagel "started the conversation by saying we're not supposed to talk about him. I tuned everything out after that." ECF No. 290-30

at 3. For his part, Dr. Pagel testified about the call as follows: "what I told [Dr. Bowe] was I had no way of being able to recommend [Dr. Love], and I—I couldn't comment further." ECF No. 290-22 at 6. Following the call, Dr. Bowe sent an email to Dr. Kersten (another anesthesiologist at MCW) stating that "Dr. Pagel was extremely informative" and "[t]he information I acquired from Dr. Pagel was almost as chilling (actually maybe more chilling) than the possibility of having different heart rates in different parts of the body." ECF No. 303-10 at 2. Dr. Love argues that this email suggests that Dr. Pagel said more during the conversation than that he could not talk about Dr. Love.

Ultimately, UKCM elected not to hire Dr. Love.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

## III.    DISCUSSION

The live claims are defamation against Dr. Pagel for his communications to UKCM and St. Mary's and against Dr. Lindenbaum for his communications to UKCM; and tortious interference against Dr. Pagel regarding Dr. Love's potential employment at UKCM and St. Mary's and against Dr. Lindenbaum regarding Dr. Love's potential employment at UKCM. Drs. Pagel and Lindenbaum move for summary judgment on all these claims. For the sake of efficient handling of overlapping facts and arguments, I will

11

first address the claims related to interactions between the defendants and doctors at UKCM, and second the claims related to Dr. Pagel's interactions with doctors at St. Mary's.

### A. Claims re UKCM

#### 1. Defamation Claims

Under Wisconsin law, a common law defamation claim that does not involve a public figure has three elements:

> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Torgerson v. Journal/Sentinel Inc.*, 210 Wis.2d 524, 534 (1997); *see* Wis JI-Civil 2500. The privilege referred to in the third element may be absolute or conditional. *Vultaggio v. Yasko*, 215 Wis.2d 326, 330 (1998). A conditional privilege is not absolute and may be forfeited if the privilege is abused, which may occur where, *inter alia*, the publisher of the defamatory material acts with knowledge or reckless disregard of its falsity, or where the material is published for a purpose other than that for which the privilege is given. *Id.* at 331. Improper purposes that may give rise to abuse of the privilege include spite and ill will. Restatement (Second) of Torts § 603 (1977)(cited in *Vultaggio*, 215 Wis.2d at 331). Where a defendant has established that a communication was subject to a conditional privilege, the burden shifts to the plaintiff to show that the privilege was abused. *Otten v. Schutt*, 15 Wis.2d 497, 504 (1962).

Dr. Love's defamation claim against Dr. Pagel regarding his conversation with Dr. Bowe fails on the first element: the making of a false statement. Dr. Love has not

presented evidence that Dr. Pagel said something untrue to Dr. Bowe. Both Dr. Bowe and Dr. Pagel testified that Dr. Pagel said only that he was not allowed to comment on Dr. Love. To be sure, Dr. Love has presented ample evidence that calls into question whether Pagel said *more* to Dr. Bowe. Both Dr. Pagel's expressed willingness to talk to Dr. Bowe in his response to Dr. Lindenbaum's email and Dr. Bowe's strong reaction to the conversation with Dr. Pagel (describing it as "very informative" and "chilling") could comfortably form the basis of a jury finding that Dr. Pagel said more about Dr. Love than that he was not supposed to comment on him and that what Dr. Pagel said about Dr. Love was very negative. But without evidence of the *substance* of what Dr. Pagel said, the jury lacks a non-speculative basis to assess whether what was said was untrue. Because Dr. Love has not presented evidence from which a reasonable jury could find that Dr. Pagel made an untrue statement to Dr. Bowe, I will grant summary judgment to Dr. Pagel on this claim.

Dr. Love's assertion that Dr. Lindenbaum made a false statement to Dr. Hatton finds better support in the evidence. Under Wisconsin law, "one may be libeled by implication and innuendo quite as easily as by direct affirmation." *Frinzi v. Hanson*, 30 Wis. 2d 271, 277 (1966) (quoted in *Teague v. Schimel*, 375 Wis.2d 458, 487 (2017)). Thus, one accused of defamation is "responsible for the understanding his language reasonably conveys to its recipients under the circumstances whether that exact meaning was intended or not." *Id.* Dr. Hatton testified that Dr. Lindenbaum's statements gave him the impression that there was "something amiss with Dr. Love's privileges"— that they had been or were going to be revoked or otherwise limited. However, no action had been taken with respect to Dr. Love's privileges. The record thus supports a finding

13

that, through innuendo and implication, Dr. Lindenbaum gave Dr. Hatton a false impression about Dr. Love's professional standing.

Dr. Love's defamation claim against Dr. Lindenbaum fails, however, because Dr. Lindenbaum's communication to Dr. Hatton regarding Dr. Love's surgical privileges was protected by conditional privilege, and Dr. Love has not presented evidence from which a jury might find that the privilege was abused. Wisconsin courts have adopted § 598 of the Restatement (Second) of Torts, which provides a conditional privilege where "the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important public interest, and (b) the public interest requires the communication of a defamatory matter to a public officer or private citizen who is authorized or privileged to take action if the defamatory matter is true." *Otten,* 15 Wis.2d at 500, quoting Restatement (Second) of Torts § 598.

I find that both these elements are met, such that the conditional privilege applies. Regarding the first element: Dr. Lindenbaum's implied statements about Dr. Love's privileges implicate important public interests—namely, the public's interest in competent health care providers and in the reasonable safety of patients who seek surgical treatment. Dr. Love argues that § 598 does not reach these interests and points out that comments e. and f. to the section describe circumstances where the privilege applies which are not analogous to the present case: comment e. addresses communications to public officials, and comment f. addresses communications to private citizens to prevent crime or apprehend a criminal. Restatement (Second) of Torts, § 598 cmts. e. and f.  However, comment d. states that the public interest privilege is applicable "when any recognized interest of the public is in danger," and

14

that, though the category of public interests that give rise to the privilege is not all-inclusive, it includes the "most important" public interests that "may be protected by the publication of defamatory communications concerning others." *Id.,* cmt. d. The public's interest in safe and competent surgeons falls within that "most important" category. See, e.g., *Reeder v. Carroll*, 759 F.Supp.2d 1064, 1087 (N.D. Iowa 2010)(applying § 598 and recognizing "important interest in ensuring the competency and safety of physicians practicing in Iowa"). The second element of § 598 is satisfied because Dr. Lindenbaum communicated his concerns about Dr. Love's professional standing to a "private individual"—Dr. Hatton—who was "authorized to take action if the defamatory matter was true"—i.e., to raise concerns within UKCM about Dr. Love and to encourage UKCM to further investigate Dr. Love's credentials before hiring him.

Since the conditional privilege applies, it is Dr. Love's burden to show that Dr. Lindenbaum abused the privileged and so lost it. The privilege may be abused

> (1) because of the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) because the defamatory matter is published for some purpose other than that for which the particular privilege is given; (3) because the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege; (4) because the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged; or (5) the publication includes unprivileged matter as well as privileged matter.

*Vitaggio*, 215 Wis.2d at 331. Dr. Love's response brief does not argue that any of these conditions have been met. Instead, he argues that Dr. Lindenbaum "led Dr. Hatton to believe that MCW had taken adverse action with respect to Dr. Love's privileges because Dr. Lindenbaum was intent on 'dissuading' UKCM from hiring Dr. Love." ECF

No. 298 at 17. But preventing a hospital from hiring a surgeon perceived as dangerous or incompetent is precisely the public interest that gives rise to the privilege. Dr. Love fails to show that Dr. Lindenbaum abused the privilege as opposed to appropriately using the privilege. Because the public interest privilege applies and Dr. Love has not presented evidence that Dr. Lindenbaum abused it, Dr. Lindenbaum is entitled to summary judgment on this claim.

### 2.  Tortious Interference With Contract Claims

Under Wisconsin law, a tortious interference with contract claim requires proof of five elements:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere.

*Wesbrook v. Ulrich*, 840 F.3d 388, 395 (7th Cir. 2016), *quoting Briesemeister v. Lehner,* 295 Wis. 2d 429, 451 (Wis. App. 2006).  Dr. Love's tortious interference claim against Dr. Lindenbaum is based on Dr. Lindenbaum's efforts in late December, 2014, to recruit MCW anesthesiologists to speak with Dr. Bowe about Dr. Love. The tortious interference claim against Dr. Pagel is based on Dr. Pagel's January 5, 2015, conversation with Dr. Bowe.

Dr. Lindenbaum first argues that he is entitled to summary judgment on the tortious interference claim against him because Dr. Love did not have a prospective contractual relationship with UKCM at the time Dr. Lindenbaum recruited the other anesthesiologists to speak with Dr. Bowe. A claim of tortious interference that is based on an alleged prospective contractual relationship requires proof that there was a

"reasonable probability" that the prospective contract would have been made were it not for the interference. *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 956 (5th Cir. 1975), *cited in Williams v. Enbridge Pipelines (Lakehead LLC)*, 2011 WL 4596153 at *3 (Wis. App. Oct. 6 2011). The record contains ample evidence from which a jury might find that the prospective employment contract between Dr. Love and UKCM would likely have been made were it not for Dr. Lindenbaum's actions. For example, it is undisputed that on December 22, 2014, Drs. Zwischenberger and Saha told Dr. Love that UKCM was extremely interested in hiring him, asked Dr. Love whether he could start as early as February 1, 2015, and offered to expedite his application for a Kentucky medical license. Dr. Lindenbaum argues that this conduct was part of a generic interview process, consistent with what generally happened at UKCM recruitment dinners. A jury must decide whose characterization of the evidence and its implications for the probability that the employment contract would have been made is to be believed.

Next, Dr. Lindenbaum argues that he is entitled to summary judgment on the tortious interference claim because his conduct was privileged under Wis. Stat. § 895.487(2). The statute provides,

> An employer who, on the request of an employee or a prospective employer of the employee, provides a reference to that prospective employer is presumed to be acting in good faith and, unless lack of good faith is shown by clear and convincing evidence, is immune from all civil liability that may result from providing that reference.

Wis. Stat. § 895.487(2). The statute defines "reference" as "a statement about an employee's job performance or qualifications for employment." Wis. Stat. § 895.487(1)(c). Dr. Love's tortious interference claim against Dr. Lindenbaum is not

based on any statement made by Dr. Lindenbaum to any person at UKCM; rather, it is based on the allegation that Dr. Lindenbaum recruited people whom he knew to dislike Dr. Love to speak with Dr. Bowe and dissuade UKCM from hiring him. That alleged conduct is not privileged under the statute, and therefore Dr. Lindenbaum is not entitled to summary judgment on the tortious interference claim on the basis of statutory privilege.

As for Dr. Pagel, he argues that he is entitled to summary judgment on the tortious interference claim related to UKCM because the statements he made to Dr. Bowe were true. ECF No. 284 at 27. Truth is an affirmative defense to a tortious interference claim, and as such it is Dr. Pagel's burden to prove that he conveyed truthful information to Dr. Bowe. Restatement (Second) of Torts, § 772; *Liebe v. City Fin. Corp.,* 98 Wis.2d 10, 13 (Wis, App, 1980); WIS JI-CIVIL 2780, cmt. There is evidence from which a jury could find that Dr. Pagel said damaging things about Dr. Love to Dr. Bowe—far more than that he could not comment on Dr. Love. But because neither Dr. Pagel nor Dr. Bowe can recall what was said during the conversation, Dr. Pagel cannot show that what he said was true, and he is therefore not entitled to summary judgment on the basis of the truth defense.

Dr. Pagel also argues that he is protected by the statutory privilege under Wis. Stat. § 895.487(2). I agree with Dr. Pagel that the statute applies to his conversation with Dr. Bowe. Dr. Bowe was acting on behalf of Dr. Love's prospective employer, and he requested a statement from Dr. Pagel, an employee of Dr. Love's prior employer, regarding Dr. Love's job qualifications. However, the statute indicates that the privilege does not apply if the person providing the reference does not do so in good faith, and

there is evidence in the record of a history of animosity between Drs. Pagel and Love which is sufficient, if believed, to support a finding—even by a clear-and-convincing standard—that Dr. Pagel acted in bad faith when he provided the reference to Dr. Bowe. This evidence includes the history of conflict between Dr. Love and Dr. Nicolosi, with whom Dr. Pagel apparently sided, as well as the vitriol of the language used by Dr. Pagel in his various communications regarding Dr. Love. I will not grant summary judgment to Dr. Pagel on the tortious infererence claim relating to UKCM on grounds of statutory privilege.[3]

*B. Claims re St. Mary's*

1. Defamation Claim

Dr. Love's second defamation claim against Dr. Pagel is based on the text messages Dr. Pagel sent to Dr. Schroeder regarding Dr. Love's application to work at St. Mary's. Dr. Pagel moves for summary judgment on this claim, arguing that his text messages were either substantially true or merely opinion, and that they were privileged.

In Wisconsin, the substantial truth of an allegedly defamatory statement is a complete defense to a defamation claim. *Schaefer v. State Bar of Wisconsin,* 77 Wis.2d 120, 125 (1977). A statement may be substantially true "even if some fine splitting of semantic hair s might leave room to argue about its literal truth." *Wesbrook*, 840 F.3d at 395 (quoting *Terry v. Journal Broadcast Corp.*, 351 Wis.2d 549 (Wis.App. 2013)). It is the defendant's burden to prove the truthfulness of the statement. *Denny v. Mertz*, 106

---

[3] Dr. Pagel's brief also alludes to common law privilege as a basis for summary judgment on the tortious interference claims, but Dr. Pagel does not indicate which privilege he is invoking or show how it applies to this claim.

Case 2:15-cv-00650-LA   Filed 06/26/20   Page 19 of 24   Document 322

Wis.2d 636, 661 n.35 (1982). Further, an expression of opinion is generally not the basis of a defamation action. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974); WIS JI-CIVIL 1500, Introduction, ¶ 4.

The parties identify four potentially defamatory statements in Dr. Pagel's text messages, each of which must be analyzed separately for truthfulness and for whether it states an opinion.

**Statement No. 1**: **"Tell them that he lost his privileges at MCW cuz of incompetence.** Dr. Pagel argues that Dr. Love was barred from operating at MCW, which is substantially the same as a loss of privileges such that the statement is substantially true. Dr. Love argues that a leave of absence is not the same as a loss of privileges and that Froedtert did not revoke his privileges, such that the statement is untrue. There is evidence to support Dr. Love's position, including Cathy Bucks follow-up email specifying that Dr. Love was on a leave of absence but that no action had been taken with respect to his privileges. A jury must resolve whether the leave of absence imposed on Dr. Love is sufficiently akin to a loss of hospital privileges to render Dr. Pagel's statement substantially true.

Another component of Statement No. 1 is the assertion that the action taken against Dr. Love was "because of incompetence." Dr. Pagel argues that this portion of the statement is substantially true because of evidence that administration was concerned about Dr. Love's clinical judgment and morbidity/mortality rates. Dr. Love counters by pointing to evidence, including Dr. Evans' deposition testimony, that he was placed on leave because of interpersonal conflicts and his inability to bring together a functioning team of providers. Again, a jury must weigh the evidence and decide

whether the assertion that action was taken against Dr. Love "because of incompetence" was substantially true.

**Statement No. 2: "17 dead in 4 months"**

The evidence shows that, collectively, the four surgeons in the MCW cardiac surgery program totaled eighteen patient deaths between January and April, 2014; Dr. Love alone totaled five perioperative patient deaths during that time. Dr. Love claims this statement as defamatory because, he argues, it suggests that he alone was responsible for 17 patient deaths.

Dr. Pagel argues that his statement is substantially true because it refers to the collective number.   He points out that he made the statement in response to Dr. Schroeder's query, "what was it, 17 perioperative deaths between Jan and April that finally broke the camel's back?" Since Dr. Schroeder posed this question, it was reasonable for Dr. Pagel to think that Dr. Schroeder knew the context for the number— i.e., that it referred to numbers across the program and not to Dr. Love alone. Further, Dr. Pagel argues that because Dr. Love was the section chief and supervisor of all the cardiac surgeons, he bears an additional responsibility for the overall performance of the cardiac surgery section in addition.

In response, Dr. Love argues that many of those at the meeting where Dr. Schroeder read Dr. Pagel's messages aloud understood it to mean that Dr. Love was personally responsible for 17 patient deaths. However, since it is Dr. Pagel's liability at issue, the focus must be on the context in which Dr. Pagel made the statement to Dr. Schroeder. The fact that others who lacked the knowledge shared between Drs. Pagel and Schroeder subsequently misinterpreted the statement does not affect the

truthfulness of the statement when Dr. Pagel made it to Dr. Schroeder in the context of their shared knowledge.

In short, I agree with Dr. Pagel that, taken in context, the 17 dead in 4 months statement was substantially true and cannot be the basis of a defamation claim.

**Statement No. 3: "I'll b happy to tell them he's a threat to public health"**

This statement is an expression of opinion, not of fact, and is therefore not actionable. Dr. Love argues that the statement implies an underlying factual assertion that Dr. Love is not fit to operate. Dr. Love's argument is not persuasive; there's nothing in the statement to suggest that its basis is Dr. Love's fitness to operate (as opposed to, e.g., his ability to cooperate with other medical providers in the interest of patients); further, even if the statement does imply an underlying assertion about Dr. Love's fitness to operate, that assertion might also be characterized as Dr. Pagel's professional opinion and thus not actionable.

**Statement No. 4: "there r multiple malpractice cases pending"**

The parties agree that no malpractice lawsuits had been filed against Dr. Love at the time that Dr. Pagel wrote this message. Dr. Pagel argues that the statement is nevertheless a substantially true expression of his opinion, because he used the word "cases" not in the legal sense but rather to refer to refer to individual patients, and because he used the word "malpractice" to express his opinion that Dr. Love had mishandled the surgical care of those patients. Dr. Love counters that giving these words their ordinary meaning and usage, the sentence conveys that Dr. Love was the subject of live malpractice lawsuits, which was not true. A jury must decide which characterization of the sentence is more plausible.

In sum, the statements by Dr. Pagel that may form the basis of Dr. Love's defamation claim are No.1 (lost his privileges cuz of incompetence) and No. 4 (multiple malpractice cases pending).

Dr. Pagel next argues that his statements are privileged under Wis. Stat. § 895.487, which protects references provided to prospective employers as described above. Because there is evidence from which a jury might find that Dr. Pagel gave this reference in bad faith, see pg. 18-19, *supra,* Dr. Pagel is not entitled to summary judgment on grounds of statutory immunity. Dr. Pagel also invokes the conditional common interest privilege under Restatement (Second) of Torts, § 596. This privilege, too, may be lost if abused. Restatement (Second) of Torts, § 596, cmt. a. For the reasons already stated, a jury must determine if Dr. Pagel abused the privilege by speaking out of malice or in bad faith; thus the common interest privilege, even if applicable, does not entitle Dr. Pagel to summary judgment.

### 2. Tortious Interference With Contract Claim

Dr. Love claims that Dr. Pagel's texts to Dr. Schroeder amount to tortious interference with prospective contractual relations between Dr. Love and St. Mary's. Dr. Pagel's only argument for summary judgment on the tortious interference claim is that the statements in the texts were substantially true and therefore not actionable. ECF No. 284 at 26-27. As discussed above, a jury must decide whether certain of the statements in Dr. Pagel's texts were in fact substantially true. Therefore, Dr. Pagel is not entitled to summary judgment on this tortious interference claim.

## IV.    CONCLUSION

**IT IS ORDERED** that, for the reasons stated above, Dr. Pagel's motion for summary judgment is **GRANTED** with respect to the defamation claim arising from his conversation with Dr. Bowe, and **DENIED** with respect to all other claims.

**IT IS FURTHER ORDERED** that Dr. Lindenbaum's motion for summary judgment is **GRANTED** with respect to the defamation claim against him, and **DENIED** with respect to the tortious interference claim.

**IT IS FURTHER ORDERED** that, based on the plaintiff's representations, all remaining claims for intentional infliction of emotional distress and for punitive damages are **DISMISSED.**

Dated at Milwaukee, Wisconsin, this 26th day of June, 2020.


s/Lynn Adelman
LYNN ADELMAN
District Judge